**Case No. 20-1429 (LEAD)**

**Consolidated with Case Nos. 22-1049, 22-1064**

**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

═══════════════════════════════════════════════════════════

In the

# United States Court of Appeals
# for the District of Columbia Circuit

_____

XCEL ENERGY SERVICES INC., ON BEHALF OF

SOUTHWESTERN PUBLIC SERVICE COMPANY,

KANSAS ELECTRIC POWER COOPERATIVE, INC.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

_____

On Petitions for Review of Orders of the Federal Energy Regulatory Commission

_____

**OPENING JOINT BRIEF OF PETITIONERS KANSAS ELECTRIC POWER COOPERATIVE, INC. AND XCEL ENERGY SERVICES INC.**

_____

Phyllis G. Kimmel
Phyllis G. Kimmel Law Office PLLC
1717 K Street, NW
Suite 900
Washington, DC  20006
(202) 787-5704
pkimmel@pgklawoffice.com

Counsel for Kansas Electric Power
Cooperative, Inc.

Timothy T. Mastrogiacomo
Joseph W. Lowell
Xcel Energy Services Inc.
701 Pennsylvania Avenue NW
Suite 250
Washington, DC  20004
(202) 661-4481/(571) 242-5634
Tim.T.Mastrogiacomo@xcelenergy.com
Joe.W.Lowell@xcelenergy.com

Counsel for Xcel Energy Services Inc.

October 11, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1), the undersigned, counsel of record for Petitioners Kansas Electric Power Cooperative, Inc., and Xcel Energy Services Inc. on behalf of Southwestern Public Service Company, certify as follows:

### A.    Parties and Amici

The parties, intervenors, and amici before this Court in these consolidated appeals and before the Federal Energy Regulatory Commission ("FERC") in the underlying agency dockets are:

Petitioners:

> Kansas Electric Power Cooperative, Inc.
>
> Xcel Energy Services Inc., on behalf of its affiliate Southwestern Public Service Company

Intervenors on behalf of Petitioner:

> Golden Spread Electric Cooperative, Inc.

Intervenors on behalf of Respondent:

> Midwest Energy, Inc.
>
> NextEra Energy Resources, LLC
>
> Oklahoma Gas and Electric Company
>
> Southwest Power Pool, Inc.
>
> Western Farmers Electric Cooperative

Respondent:

Federal Energy Regulatory Commission

Amici:  None

Other Parties to the proceedings before FERC (Docket Nos. EL17-21-000 and EL18-9-000):

Alabama Power Company

American Electric Power Service Corporation

American Wind Energy Association

Apex Clean Energy Management, LLC

Arkansas Electric Cooperative, Inc.

Basin Electric Power Cooperative

Bethel Wind Energy LLC

BHE Renewables, LLC

Buckeye Wind Energy LLC

Calpine Corporation

Central Valley Electric Cooperative, Inc.

City of Independence, Missouri

City of Prescott, Arkansas

East Texas Electric Cooperative, Inc.

EDF Renewable Energy, Inc.

Enel Green Power North America, Inc.

Farmers' Electric Cooperative, Inc.

Flat Ridge 2 Wind Energy LLC

Grande Prairie Wind, LLC

ITC Great Plains, LLC

Kansas City Power & Light Company

KCP&L Greater Missouri Operations Company

Kansas Corporation Commission

Kansas Power Pool

Lea County Electric Cooperative, Inc.

Lincoln Electric System

Lubbock Power & Light

Macquarie Energy LLC

Marshall Wind Energy LLC

Mid-Kansas Electric Company, LLC

Missouri Joint Municipal Electric Utility Commission

Missouri River Energy Services

Nebraska Public Power District

Northeast Texas Electric Cooperative, Inc.

Oklahoma Municipal Power Authority

Omaha Public Power District

Prairie Wind Energy II LLC

Prairie Breeze Wind Energy III LLC

Roosevelt County Electric Cooperative, Inc.

Southern Company Services, Inc.

Sunflower Electric Power Corporation

TDU Intervenors

Westar Energy, Inc.

Wind Coalition

**B.    Rulings Under Review**

*Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 161 FERC ¶ 61,145 (2017)

*Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,095 (2022)

*Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,203 (2018)

*Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,096 (2022)

**C.    Related Cases**

The final agency orders at issue in this proceeding have not been reviewed previously in this or any other court.  There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).  This Court previously has considered FERC's orders denying SPP's request for waiver of certain provisions of the SPP Tariff, which would have permitted SPP to retroactively bill customers under

Attachment Z2.  *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (2021).  The

question of whether SPP was contravening the terms of Attachment Z2 was not

presented to the Court in that case.  Refunds for the historical period remains

pending before Respondent Federal Energy Regulatory Commission on remand in

Docket No. ER16-1341-003.

CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Petitioners Kansas Electric Power Cooperative, Inc. and Xcel Energy Services Inc. submit the following required Disclosure Statements:

**Kansas Electric Power Cooperative, Inc.** ("KEPCo") is a cooperative, nonprofit, membership corporation organized under the Kansas Electric Cooperative Act, K.S.A. 17-4601, et. seq., with its principal place of business in Topeka, Kansas. KEPCo has 16 rural electric cooperative member systems, which together distribute electric power to more than 200,000 rural Kansans, pursuant to the Federal Energy Regulatory Commission ("FERC")-filed open access transmission tariff of, and the agreements thereunder with, the Southwest Power Pool, Inc. KEPCo has no parent corporation and issues no stock. Accordingly, no publicly held corporation owns 10% or more of KEPCo stock.

**Xcel Energy Services Inc.**, on behalf of its public utility affiliate Southwestern Public Service Company, provides the following disclosure statement:

Southwestern Public Service Company is a New Mexico corporation and an operating utility engaged in the generation, purchase, transmission, distribution and sale of electric power in portions of western Texas and eastern New Mexico. Southwestern Public Service Company also owns and operates electric

transmission in Kansas and Oklahoma. Southwestern Public Service Company is a wholly-owned utility subsidiary of Xcel Energy Inc. ("Xcel Energy"). There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in Southwestern Public Service Company. Southwestern Public Service Company's principal place of business is 790 South Buchanan Street, Amarillo, TX 79101.

Xcel Energy Services Inc. is a Delaware corporation and the centralized service company subsidiary of Xcel Energy, and provides, inter alia, Southwestern Public Service Company with an array of services, including making appearances before FERC and reviewing courts. There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in Xcel Energy Services Inc. Xcel Energy Services Inc.'s principal place of business is 414 Nicollet Mall, Minneapolis, Minnesota, 55401.

Xcel Energy is a Minnesota corporation and a holding company under the Public Utility Holding Company Act of 2005. The securities of Xcel Energy Inc. are publicly traded. No publicly held company owns 10% or more of Xcel Energy Inc. stock.

Respectfully submitted,

/s/ Phyllis G. Kimmel

Phyllis G. Kimmel
Phyllis G. Kimmel Law Office PLLC
1717 K Street, NW
Suite 900
Washington, DC  20006
(202) 787-5704
pkimmel@pgklawoffice.com

Counsel for Kansas Electric Power
Cooperative, Inc.

/s/ Joseph W. Lowell

Timothy T. Mastrogiacomo
Joseph W. Lowell
Xcel Energy Services Inc.
701 Pennsylvania Avenue NW
Suite 250
Washington, DC  20004
(202) 661-4481/(571) 242-5634
Tim.T.Mastrogiacomo@xcelenergy.com
Joe.W.Lowell@xcelenergy.com

Counsel for Xcel Energy Services Inc.

October 11, 2022

## Table of Contents

I.    Jurisdictional Statement ....................................................................1

II.   Statement of Issues ..........................................................................3

III.  Statutes and Regulations ..................................................................4

IV.   Statement of the Case.......................................................................4

  A.  Introduction ....................................................................................4

  B.  SPP Tariff ......................................................................................6

  C.  Relevant Provisions of SPP's Tariff............................................7

    1.  Attachment Z1 Aggregate Transmission Service Study Rules....................7

    2.  Attachment Z2 Revenue Crediting Process .................................9

    3.  Attachment J .............................................................................11

  D.  Events Preceding the Disputes between Transmission Customers and SPP .11

  E.  The Proceedings at FERC .............................................................15

    1.  KEPCo...........................................................................................15

    2.  Xcel.............................................................................................20

V.    Summary of Argument .....................................................................24

VI.   Standing ............................................................................................28

VII.  Argument .........................................................................................29

  A.  Standard of Review .......................................................................29

  B.  FERC's Interpretation of Attachment Z2 Is Not the Result of Reasoned Decision-Making..........................................................................31

    1.  FERC's Orders Impermissibly Use Extrinsic Evidence to Modify the Meaning of Attachment Z2 .....................................................31

    2.  FERC's Consideration of Extrinsic Evidence Is Arbitrary and Capricious.............................................................................35

    3.  FERC's Orders Are Arbitrary and Capricious Because They Disregard Record Evidence Demonstrating That the White Paper Process Does Not Conduct the Causal Analysis Required by the Tariff. ................................38

4.  FERC's Finding That Attachment Z2 Cannot Be Implemented By Its Express Terms without Difficulty Is Not Reasoned Decision-Making and Does Not Justify the Result..........................................................................43

C.  FERC's Rulings That Attachment Z2 Provided Transmission Customers Adequate Notice of Prospective Directly Assigned Upgrade Charges Are Arbitrary and Capricious.................................................................................45

D.  FERC Erred In Finding That SPP Did Not Violate Its Study Process Rules In Attachment Z1 And In Ignoring The Crucial Impact Such Violation Had On Transmission Customers..............................................................................59

VIII. Conclusion ........................................................................................68

### TABLE OF AUTHORITIES

## Cases

*Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) ...........................2

*Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596 (D.C. Cir. 1997)...............29

*Ark. La. Gas Co. v. Hall*, 453 U.S. 571 (1981)........................................46

*Ark. PSC v. FERC*, 891 F.3d 377 (D.C. Cir. 2018) ..................................46

*Baltimore Gas & Elec. Co. v. FERC*, 26 F.3d 1129 (D.C. Cir. 1994)....................29

*City of Kaukauna v. FERC*, 581 F.2d 993 (D.C. Cir. 1978)...................................35

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)...............................................28

*Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135 (D.C. Cir. 1987),
    *order on reh'g*, 844 F.2d 879 (1988) ....................................................54

*Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028 (D.C. Cir. 2022).........64

*Emera Me. v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) ...................................... 30, 44

*Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177 (D.C. Cir. 1994)...................................49

*Exxon Co., U.S.A. v. FERC*, 182 F.3d 30 (D.C. Cir. 1999) ...................................49

*FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441 (D.C. Cir. 2005).............35

*Maislin Indus., U.S. v. Primary Steel*, 497 U.S. 116 (1990)...................................45

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d. Cir. 1998) .............................................45

*Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246 (1951)
    ............................................................................................................ 46, 51

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)30

*National Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177 (D.C. Cir. 2020)
    ..............................................................................................................28

*Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (D.C. Cir. 2021)............ 5, 15, 31, 47

Papago Tribal Utils. Auth. v. FERC, 723 F.2d 950 (D.C. Cir. 1983) ....................35

*PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203 (2011)................... 59, 67

*Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004 (D.C. Cir. 2005)....................30

*Pub. Util. No. 1 of Snohomish Co. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).........28

*Sithe/Indep. Power Partners, L.P. v. FERC*, 165 F.3d 944 (D.C. Cir. 1999) .........64

*Tarpon Transmission Co. v. FERC*, 860 F.2d 439 (D.C. Cir. 1988)............... 29, 30

*Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67 (D.C. Cir. 1992) ....................................................................................................................54

*Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538 (D.C. Cir. 2010) ............39

*Transmission Agency of N. California v. FERC*, 495 F.3d 663 (D.C. Cir. 2007 ....28

*Transwestern Pipeline Co. v. FERC*, 897 F.2d 570 (D.C. Cir. 1990) ............. 49, 54

*W. Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) ................ 54, 58

*W. Res. v. FERC*, 72 F.3d 147 (D.C. Cir. 1995) .......................................................54

**Administrative Decisions**

*Cal. Indep. Sys. Operator Corp*., 132 FERC ¶ 61,154 (2010) .................................38

*Cal. Independent Sys. Operator Corp*., 124 FERC ¶ 61,095 (2008).......................38

*Ind. Mich. Power Co*., 64 FERC ¶ 61,184 (1993) ....................................................39

*Indiana & Michigan Electric Co.*, 53 FPC 1180 (1975) .........................................57

*Interstate Power & Light Co. v. ITC Midwest, LLC*, 146 FERC ¶ 61,113 (2014)..32

*Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 161 FERC ¶ 61,145 (2017) ................................................................................................ 1, 19, 20, 63, 66

*Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,095 (2022) ................................... 1, 8, 9, 20, 46, 47, 48, 51, 52, 56, 57, 59, 61, 62, 63, 65, 66

*Louisville Gas & Elec. Co*., 137 FERC ¶ 61,195 (2011)........................................37

*Mid-Continent Area Power Pool*, 92 FERC ¶ 61,229 (2000) .......................... 34, 35

*Midcontinent Indep. Sys. Operator*, 129 FERC ¶ 61,268 (2009) ...........................38

*Midcontinent Indep. Sys. Operator*, 142 FERC ¶ 61,149 (2013) ...........................37

*Midcontinent Indep. Sys. Operator*, 152 FERC ¶ 61,189 (2015) ...........................38

*Missouri Utils. Co.*, 10 FERC ¶ 61,048 (1980) ......................................................51

*N.Y. Indep. Sys. Operator, Inc*., 128 FERC ¶ 61,049 (2009) .................................39

*N.Y. State Elec. & Gas Corp.*, 47 FERC ¶ 61,185 (1989) .......................................39

*Ne. Utils. Serv. Co*., Opinion No. 364, 56 FERC ¶ 61,269 (1992).........................32

*Ne. Utils. Serv. Co*., Opinion No. 364-A, 58 FERC ¶ 61,070 (1992) ....................32

*Old Dominion Elec. Coop*., 154 FERC ¶ 61,155 (2016) .........................................45

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public*

*Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. and Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (1997), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000) (TAPS v. FERC), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002)...7

*Seminole Elec. Coop., Inc. v. Fla. Power & Light Co*, 153 FERC ¶ 61,037 (2015) ..................................................................................................50

*Seminole Elec. Coop., Inc. v. Fla. Power & Light Co.*, 139 FERC ¶ 61,254 (2012) ..................................................................................................50

*Sw. Power Pool, Inc.*, 145 FERC ¶ 61,198 (2013) ....................................................8

*Sw. Power Pool, Inc.*, 163 FERC ¶ 61,063 (2018) ..................................................49

*Sw. Power Pool, Inc.*, 163 FERC ¶ 61,092 (2018) ..................................................44

*TC Ravenswood, LLC v. N.Y. Indep. Sys. Operator, Inc.,* 133 FERC ¶ 61,205 (2010) ...............................................................................................37

*Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,203 (2018) ... 2, 23, 43

*Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,096 (2022) ... 2, 12, 33, 34, 36, 37, 40, 41, 42, 43, 44, 46, 47, 48, 49, 51, 52, 55, 57, 67

## Statutes

16 U.S.C. § 824d .................................................................. 6, 44, 46, 53

16 U.S.C. § 824e .................................................................. 1, 6, 21, 44

16 U.S.C. § 825e ..................................................................................21

16 U.S.C. § 825*l*(b) ............................................................................1, 30

## Regulations

18 C.F.R. § 35.1(a) (2022)...................................................................53

18 C.F.R. § 35.1(g) (2022)...................................................................17

## Other Authorities

BLACK'S LAW DICTIONARY (10th ed. 2014)..........................................32

Webster's New World College Dictionary ..............................................32

WEBSTER'S THIRD NEW INTERNAL DICTIONARY ......................................34

# GLOSSARY

| | |
|---|---|
| FERC or Commission | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| JA | Joint Appendix |
| KEPCo | Kansas Electric Power Cooperative, Inc. |
| KEPCo Complaint | Complaint Requesting Fast-Track Processing of Kansas Electric Power Cooperative, Inc., Docket No. EL17-21-000 (filed Nov. 21, 2016), JA___ |
| KEPCo Complaint Order | *Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, Docket No. EL17-21-000, 161 FERC ¶ 61,145 (2017), JA___ |
| KEPCo Rehearing Request | Request for Rehearing of Kansas Electric Power Cooperative, Inc., Docket No. EL17-21-001 (filed Dec. 6, 2017), JA___ |
| KEPCo Rehearing Order | *Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, Docket No. EL17-21-001, 178 FERC ¶ 61,095 (2022), JA___ |
| P | Paragraph of FERC Order |
| SPP | Southwest Power Pool, Inc. |
| SPP Tariff | Open Access Transmission Tariff of Southwest Power Pool, Inc. |
| Transmission Customers | Petitioners Kansas Electric Power Cooperative, Inc. and Xcel Energy Services Inc. |
| Upgrade Charges | Creditable Payment Obligations, which are charges associated with a transmission service's use of Creditable Upgrades |
| White Paper | The 2011 white paper developed by the SPP Crediting Process Task Force that discusses implementation of Attachment Z2 revenue crediting |
| Xcel | Xcel Energy Services Inc. |

| Xcel Complaint | Complaint of Xcel Energy Services Inc. on Behalf of Southwestern Public Service Company and Request for Fast Track Processing, Docket No. EL18-9-000 (filed Oct. 10, 2017), JA___ |
|---|---|
| Xcel Complaint Order | *Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, Docket No. EL18-9-000, 162 FERC ¶ 61,203 (2018), JA___ |
| Xcel Rehearing Order | *Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, Docket No. EL18-9-001, 178 FERC ¶ 61,096 (2022), JA___ |
| Xcel Rehearing Request | Request for Rehearing of Xcel Energy in Docket No. EL18-9-001 (filed Apr. 5, 2018), JA___ |

## I.    JURISDICTIONAL STATEMENT

This Court has jurisdiction under section 313(b) of the Federal Power Act ("FPA"), 16 U.S.C. § 825*l*(b).  On November 21, 2016, in FERC Docket No. EL17-21-000, Kansas Electric Power Cooperative, Inc. ("KEPCo"), filed a complaint under FPA section 206, 16 U.S.C. § 824e, requesting that the Federal Energy Regulatory Commission ("FERC" or "the Commission") find that the Southwest Power Pool, Inc.'s ("SPP's") direct cost assignment of approximately $6.2 million to KEPCo in connection with the Attachment Z2 revenue crediting process of SPP's Open Access Transmission Tariff ("Tariff") violates that Tariff, violates the filed rate doctrine, and is otherwise unjust, unreasonable and proscribed by the FPA.  KEPCo Complaint, JA___.  In an order issued on November 6, 2017, FERC denied the complaint with respect to all issues raised by KEPCo except one.  *Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 161 FERC ¶ 61,145 (2017), JA___ ("KEPCo Complaint Order").  KEPCo timely filed a request for rehearing of the FERC's order on December 6, 2017.  JA ___.  FERC issued an order granting rehearing for further consideration on January 3, 2018.  On February 17, 2022, FERC issued an order addressing KEPCo's rehearing request.  *Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,095 (2022), JA___ ("KEPCo Rehearing Order").  FERC modified its analysis but reached the same outcome as in its prior order.  KEPCo timely filed a petition

for review of FERC's orders with the D.C. Circuit on April 20, 2022, which was docketed in Case No. 22-1064.

On October 10, 2017, in FERC Docket No. EL18-9-000, Xcel Energy Services Inc. ("Xcel"), on behalf of its affiliate Southwestern Public Service Company, filed a complaint under FPA section 206, alleging that SPP was violating the terms of Attachment Z2 of the SPP Tariff and the terms of Southwestern Public Service Company's service agreement with SPP. JA, ___. FERC denied the complaint. *Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,203 (2018), JA___ ("Xcel Complaint Order"). Xcel requested rehearing on April 5, 2018. FERC issued an order granting rehearing for further consideration on May 7, 2019. In light of the Court's decision in *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020), Xcel filed a petition for review of FERC's orders on October 3, 2020, and the petition was docketed in Case No. 20-1429. On February 17, 2022, FERC issued an order addressing the merits of Xcel's rehearing request. *Xcel Energy Serv. Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,096 (2022), JA___("Xcel Rehearing Order"). FERC modified its analysis but reached the same outcome as in its prior order. On March 31, 2022, Xcel filed a petition for review of FERC's rehearing order with the D.C. Circuit, which was docketed in Case No. 22-1049.

## II.   STATEMENT OF ISSUES

1.   Whether the challenged FERC orders are arbitrary and capricious or
contrary to law in finding that Attachment Z2 of SPP's Tariff requires
a "subsequent use" test rather than "but for" causation to determine
which service requests should be directly assigned upgrade charges;

    a.   Whether FERC's orders err in finding that Attachment Z2 is
ambiguous;

    b.   Whether FERC's orders fail to engage in reasoned decision-
making in reaching an interpretation of Attachment Z2 that is
contrary to record evidence and contrary to FERC's own
precedent regarding "but for" causation;

2.   Whether the challenged FERC orders are arbitrary and capricious or
contrary to law in finding that Attachment Z2 provided adequate
notice of upgrade charges;

    a.   Whether FERC's findings are consistent with the filed rate
doctrine and the requirements of the Federal Power Act and
FERC's regulations;

    b.   Whether FERC's findings are supported by substantial evidence
in the record;

3

> c.    Whether FERC engaged in reasoned decision-making and adequately addressed all arguments made by Transmission Customers;
>
> d.    Whether FERC's orders resulted in unjust and unreasonable charges to Transmission Customers; and

**3.**    Whether the challenged FERC orders are arbitrary and capricious or contrary to law in finding that SPP did not violate the unambiguous requirements of the Study Process Rules in Attachment Z1 of SPP's Tariff.

## III.    STATUTES AND REGULATIONS

The relevant statutory and regulatory provisions are provided in the addendum, along with the Tariff provisions at issue in this case.

## IV.    STATEMENT OF THE CASE

### A.    Introduction

In the orders under review, FERC rejected the complaints of KEPCo and Xcel ("Transmission Customers"), both of which had argued, *inter alia*, that SPP unlawfully assigned millions of dollars in upgrade charges to them, in violation of the filed rate doctrine and the rule against retroactive ratemaking, in violation of the Transmission Customers' service agreements, and in violation of the plain language of the SPP Tariff.  FERC denied both complaints, finding that SPP's

4

process for assessing upgrade charges to Transmission Customers was permissible under Attachment Z2.  FERC ruled that, rather than requiring a strict causation test as a predicate for revenue credits, Attachment Z2 only required consideration of the "subsequent usage" of a Creditable Upgrade.  FERC also found that SPP's assessment of upgrade charges on a retroactive basis did not violate the filed rate doctrine or rule against retroactive ratemaking because customers were provided adequate notice through study reports and the White Paper.

Following this Court's opinion in *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821 (2021) ("*Okla. Gas*"), on rehearing, FERC modified its analysis but reached the same conclusions.  On rehearing, FERC for the first time, found aspects of Attachment Z2 ambiguous such that FERC could turn to an unfiled white paper in support of FERC's interpretation that SPP's Tariff allowed the costs of network upgrades not studied at the time of Transmission Customers' service requests to subsequently be assigned to Transmission Customers.  FERC apparently agreed that Attachment Z2 includes a "But For" causation requirement but found that identifying subsequent usage of a Creditable Upgrade satisfies that test.  FERC also retreated from its findings that customers had received adequate notice of the charges through study reports or the White Paper, and instead found that customers had notice of the charges through Attachment Z2.

Transmission Customers seek review because FERC's orders result in unjust and unreasonable charges being imposed on them and because FERC's orders unlawfully erode the legal standard of what is sufficient notice to satisfy the filed rate doctrine.  Ultimately, this case is about FERC's failure to adhere to FPA section 205, 16 U.S.C. § 824d.  SPP failed to comply with the requirements of FPA section 205 with appropriate filings, and FERC failed to enforce this lack of compliance.  FERC's attempts to fix SPP's inability to comply with its Tariff with tariff interpretation violate the filed rate doctrine and the procedural requirements of the Federal Power Act.

### B.    SPP Tariff

Transmission Customers are load-serving entities that take network transmission service under the SPP Tariff.  The rates, terms and conditions of the transmission service for KEPCo and Southwestern Public Service are set forth in their individual network transmission service agreements ("service agreements") with SPP.  Network transmission service allows Transmission Customers to integrate their generation resources with their transmission loads and as network transmission service customers, KEPCo and Southwestern Public Service pay for transmission service based upon their load-ratio share of the total fixed costs of the

transmission system operated by SPP.  In return, the entire transmission network is available for their transmission service.[1]

From time to time, network transmission customers seek to add new network resources to serve their loads (*e.g.*, residential or business customers).  Under the cost allocation rules of the SPP Tariff, if upgrades to the transmission system are needed to accommodate the addition of new network resources, SPP may directly assign the costs of such network upgrades to network transmission customers, if certain conditions are met.  The SPP rules that govern how requests for new service are performed and how costs of new upgrades are allocated among transmission customers are contained in several provisions of the SPP Tariff.

## C.    Relevant Provisions of SPP's Tariff

### 1.    Attachment Z1 Aggregate Transmission Service Study Rules

SPP added the Aggregate Transmission Service Study process to its Tariff in

---

[1] FERC has explained, "Network service allows [. . . .] a transmission customer to use the entire transmission network to provide generation service for specified resources and specified loads without having to pay multiple charges for each resource-load pairing." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. and Regs. ¶ 31,036 at n. 65 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (1997), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

2005 (Attachment Z), and in 2008, separated this process into two parts, Attachment Z2 (discussed immediately below) and Attachment Z1, which sets forth the Aggregate Transmission Service Study procedures (the Attachment Z1 "Study Process Rules.")[2] *See* KEPCo Rehearing Order P 3, JA___. In this process, SPP combines all long-term requests received during a specified period into a single Aggregate Transmission Service Study. Pursuant to Attachment Z1, SPP is required to "determine the upgrades required to reliably provide all of the requested service." Xcel Complaint, Exh. 5 at 2, JA___ (quoting Attachment Z1, section III.a). SPP is also required to "identify the facilities limiting the availability of the requested aggregate transmission service and the upgrades required to provide this service." KEPCo Rehearing Order P 23, JA___ (quoting Attachment Z1, section III.c).

Attachment Z1 of the SPP Tariff also requires SPP to provide transmission customers with "an estimate of the cost of those upgrades" (*id*.) that are needed to be constructed to accommodate each new transmission service request. *Id*. "The assignment of upgrade costs to each reservation will be provided [by SPP] to enable customers to estimate their costs." *Id*. Based on the cost estimates,

---

[2] The then-effective Attachments Z1 and Z2 are included in the Addendum. The Addendum includes both the 2010 and the 2013 version of Attachment Z2, which includes changes SPP made to the Attachment Z2 crediting process not at issue in this case. KEPCo Rehearing Order P 6, JA___ (citing *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,198 (2013)).

transmission customers may take the service, request restudy, or withdraw their request.

For those transmission customers taking service, SPP tenders a new or amended service agreement for the studied transmission service request. The service agreement lists the conditions of transmission service, identifies the transmission upgrades needed to provide service, and the specified costs of those transmission upgrades.

### 2.    Attachment Z2 Revenue Crediting Process

Attachment Z2 sets forth a revenue crediting process that is available under certain circumstances to certain transmission customers, generator interconnection customers, and entities that request a Sponsored Upgrade for network upgrades whose costs have been directly assigned to them ("Creditable Upgrades"). KEPCo Rehearing Order P 5, JA___. An eligible entity that has been directly assigned network upgrade costs may receive revenues from other customers' payment of "Creditable Payment Obligations" (or "upgrade charges") if such other customers' service is deemed to be made possible by the network upgrades. For network transmission service, Attachment Z2 first sets forth a rule establishing which new transmission service will pay revenue credits (upgrade charges) associated with Creditable Upgrades:

> Revenue for credits will be provided from (i) new Long-Term
> Network Integration Transmission Service, and (ii) new

transmission service taken under the non-rate terms and
conditions of this Tariff by Transmission Owners subject to
Section 39.1 of this Tariff, that *could not be provided but for*
one or more Creditable Upgrades to accommodate designation
of new Network Loads or Transmission Owner's(s') loads, new
Designated Resources or increases in the designation of
existing Designated Resources above previously designated
levels.

Addendum at A-28.

Immediately following this sentence, Attachment Z2 sets forth the rule

addressing how these revenue credits will be determined:

Revenue credits shall be determined based upon the subsequent
incremental use of each affected Creditable Upgrade for such
new or increased Network Load or Transmission Owner load or
Network Resource.

*Id*.

For point-to-point transmission service, Attachment Z2 provides different

wording, but conveys the same two rules:

Revenues from new Point-to-Point Transmission Service that
could not be provided but for the Creditable Upgrade(s) will be
used, in whole or in part, for crediting purposes. For each new
point-to-point reservation that could not be provided but for one
or more Creditable Upgrades, made after (i) the commitment
for such Creditable Upgrade by an Upgrade Sponsor or (ii) the
request causing the need for such Creditable Upgrade, with
service commencing after or extending beyond the date the
Creditable Upgrade is completed, the Upgrade Sponsor for each
affected Creditable Upgrade shall receive a portion of the
transmission service charge equal to the positive response factor
of such new reservation on the Creditable Upgrade times the
portion of the new reservation capacity that could not be
provided but for the Creditable Upgrade times the rate

10

applicable to such new reservation.

Addendum at A-27.

### 3.    Attachment J

SPP assigns the costs of "Service Upgrades," which are defined as transmission upgrades "required to provide transmission service requested" by a transmission customer, in accordance with rules prescribed by Attachment J of the SPP Tariff.  Only an upgrade studied in the Transmission Service Study Process pursuant to the Attachment Z1 Study Process Rules can be considered a Service Upgrade.

Service Upgrades' costs are either directly assigned to specific transmission customers or are treated as "Base Plan Upgrades."  Whereas transmission customers are wholly responsible for directly assigned costs, the costs of Base Plan Upgrades are rolled into transmission rates and shared among all users of the transmission system on a load-ratio share basis.  Most Creditable Payment Obligations are base-plan funded pursuant to Attachment J's cost allocation provisions.  Section III of Attachment J instructs that a transmission customer will not be directly assigned the costs of Service Upgrades if those costs can be treated as Base Plan Upgrade costs by meeting certain conditions.

### D.    Events Preceding the Disputes between Transmission Customers and SPP

Although the Attachment Z2 Tariff provisions summarized above were

11

accepted by FERC and became effective in 2008, it was not until eight years later that SPP finally began assigning upgrade charges to Transmission Customers.

SPP still had not begun implementing Attachment Z2 revenue crediting as of 2011, when a working group within SPP, the Crediting Process Task Force, developed a white paper (the "White Paper") that discussed the implementation of revenue crediting under Attachment Z2.  (The White Paper is appended to the Xcel Complaint, JA___.)  As noted above, Attachment Z2 provides that upgrade charges associated with a "Creditable Upgrade" can be assigned to a new transmission service request only if the requested service "could not be provided but for" the Creditable Upgrade.

Under long-standing practice throughout the public utility industry, the identification of whether a new or upgraded transmission facility is necessary to provide a particular transmission service request is achieved through an engineering study that models the transmission service in issue with the facility in and out of service, known as the "but for" test.  *See, e.g.*, Xcel Rehearing Order P 22 & n. 46, JA___.  If, with the Creditable Upgrade removed, the modeling shows that an N-1 contingency[3] would occur due to granting the customer's service

---

[3] N-1 contingency refers to the loss of a transmission element on a transmission system.  FERC explained, "under an N-1 contingency analysis, a transmission provider studies an individual transmission service request to determine if the additional loading on transmission elements violates any reliability criteria."  Xcel Rehearing Order n.24, JA___.

12

request, then one can conclude that the customer's service could not be provided "but for" the upgrade. Xcel Complaint at 19-20, JA__. The White Paper postulated that an analysis under a traditional "but for" causation test would be impractical and difficult to implement, summarizing the issue as follows:

> One way to determine if a specific transmission service request meets the "but for" test, would be to add the proposed service to the existing system model including the Creditable Upgrade and then remove the Creditable Upgrade from the modeled topology. If any overloads occur using standard N-1 system assessment procedures the new service request satisfies the "but for" condition and revenue credits are due. Each Creditable Upgrade would need to be assessed with respect to each newly granted transmission service. This method becomes impractical since the entire list of Creditable Upgrades would have to be analyzed against literally hundreds of such new transmission service requests each hour. Further, the results of this "but for" test can be altered by the order in which multiple Creditable Upgrades are handled and the order each new request is added. Another disadvantage to this approach is that service previously granted likely would not be feasible without the Creditable Upgrade since it had previously been determined to be required.

White Paper at 2-3, JA___.

Instead of a traditional "but for" causation test, the White Paper recommended consideration of the incremental flows of a subsequent transmission service upon a Creditable Upgrade and their direction. Under a series of guidelines recommended by the White Paper, SPP would first determine whether the reservation results in flow over the Creditable Upgrade by as little as three percent, a *de minimis* threshold in SPP. If the reservation flows over the Creditable

Upgrade, SPP would then separate reservations that flow in the direction of the flow that originally necessitated the Creditable Upgrade from those reservations with opposite flow.  For "positive" flows, SPP would simply assign Creditable Payment Obligation responsibility to subsequent transmission requests if the model indicates that the specific transaction will have at least a three-percent flow impact on the Creditable Upgrade.  For reservations with reverse directional flow, SPP would charge new transmission service requests with any flow above a calculated threshold over the Creditable Upgrade.  JA___.

SPP did not file the White Paper with FERC.  Nor did SPP make any Tariff filings to implement the recommendations in the White Paper.

Five years after the White Paper came out, in April 2016, SPP made a filing at FERC requesting that FERC waive several rules and restrictions of the SPP Tariff that stood as an obstacle to implementing the revenue crediting approach of the white paper on a retroactive basis to the original 2008 effective date.  Petition of Southwest Power Pool, Inc. for Tariff, Waiver, Docket No. ER16-1341-000 (filed Apr. 1, 2016).  Among other things, SPP requested waiver of a one-year billing adjustment limitation in section 7.1 of the SPP Tariff to allow SPP to impose credit payment obligations and make revenue distributions that may be beyond the one-year limitation.  The request for waiver ultimately was denied by FERC in a decision that was upheld by this Court.  *Okla. Gas & Elec. Co. v.*

*FERC*, 11 F.4th 821 (2021) ("*Okla. Gas*").

It was not until a few weeks after making its waiver request filing at FERC that SPP issued letters to transmission customers in April 2016 that, for the first time, notified them of Creditable Payment Obligations. Relevant here, SPP directly assigned a total of $6.2 million in upgrade charges to KEPCo (KEPCo Complaint at 1, JA__)[4] and assigned $12.8 million in retroactive upgrade charges and an additional $485,000 per month. Xcel Complaint at 12, 43, JA___.

### E.    The Proceedings at FERC

#### 1.    KEPCo

##### a.    Background

In 2010, KEPCo submitted four requests for long-term network transmission service to SPP during the 2010 open season, the "2010 Aggregate Facility Study." Each of the four transmission service requests was for yearly firm network transmission service, for a forty-year period, for the following amounts: (i) 14 MW; (ii) 7 MW; (iii) 22 MW; and (iv) 25 MW, for a total of 68 MW. KEPCo Complaint at 10, JA___.

SPP reported the final results of the 2010 Aggregate Facility Study on March 20, 2012 (the "2010 Aggregate Study Report"). *Id.*, JA___. For KEPCo's

---

[4] A portion of KEPCo's $6.2 million in directly assigned upgrade charges were billed for the historical period (before 2016).

four service requests, Table 3 of the 2010 Aggregate Study Report listed four

upgrades and noted that "Credits may be required for the following Network

Upgrades in accordance with Attachment Z2."  2010 Aggregate Study Report at

32-35, JA___.  However, Table 2 of the 2010 Aggregate Study Report stated that

KEPCo's four transmission service requests had no upgrade charges allocated to

them.  KEPCo Complaint, Attachment A, J. Chiles Affidavit at 14, JA___; 2010

Aggregate Study Report at 16, JA___.

Following completion of the 2010 Aggregate Facility Study, as required by

Attachment Z1,[5] SPP prepared and tendered four service agreements for KEPCo's

execution.  These service agreements referred only to one network upgrade, which

was identified in section 8.10 of the specifications of each service agreement and is

not at issue in this case.  KEPCo Complaint at 12, JA___.  Each of the four service

agreements stated that "[t]hese upgrade costs are not assignable to the Network

Customer."  *Id.*  None of the four upgrades identified in the 2010 Aggregate Study

Report were identified in KEPCo's service agreements.  Based on the information

provided in the service agreements, KEPCo executed them; SPP incorporated them

into its Tariff;[6] and service commenced on June 1, 2012.  *Id.*, JA___.

---

[5] *See also* 2010 Aggregate Study Report at 3, JA___) ("Service Agreements for
each request for service will be tendered identifying the terms and conditions of the
confirmed service").

[6] FERC's regulations provide that any service agreement that conforms to the form
of service agreement that is part of the utility's approved tariff shall not be filed

Nearly four years after service commenced, on April 28, 2016, SPP notified KEPCo that SPP had directly assigned it a total of $6.2 million for Attachment Z2 upgrade charges. KEPCo Complaint at 13, JA___. This notice listed seven network upgrades for each of KEPCo's service requests, four of which were new and had not been previously identified in the 2010 Aggregate Study Report. *Id*. at 23, JA___; *id.*, Attachment A, J. Chiles Affidavit at P 36, JA___. KEPCo submitted evidence showing that when SPP evaluated the ability of the transmission system to accommodate KEPCo's service requests, these four facilities did not exist and were clearly not needed to grant KEPCo's service. *Id*., J. Chiles Affidavit at PP 45-50, JA___.

### b.    KEPCo Complaint

On November 21, 2016, KEPCo filed a complaint under section 206 of the FPA, 16 U.S.C. § 824e, arguing that SPP's direct assignments of $6.2 million in Attachment Z2 upgrade charges were unjust and unreasonable and in violation of the SPP Tariff and the filed rate doctrine. KEPCo contended that SPP's direct

---

with FERC, but rather, shall be retained and made available for public inspection and provided to FERC upon request. Any individually executed service agreement for transmission that deviates in any material respect from the applicable form of service agreement contained in the utility's tariff is subject to the filing requirements. 18 C.F.R. § 35.1(g). Three of KEPCo's service agreements were "*pro forma*" and not filed at the time with FERC. KEPCo Complaint at 12, JA___. An amendment to the fourth service agreement was filed at FERC in December 2013. The other three were filed at FERC in 2014 to accommodate an amendment to a different section. *Id*.

assignments of the Attachment Z2 upgrade charges violated the filed rate doctrine and its four service agreements, which did not specify that KEPCo would be responsible for any network upgrade costs or any Attachment Z2 credit obligations.  KEPCo Complaint at 2-3, 17-20, JA___.

KEPCo also argued that SPP violated the transmission Study Process Rules of Attachment Z1 of the SPP Tariff, which impose time deadlines on SPP to identify all transmission upgrades and estimated costs of upgrades, and provide those to KEPCo so that it could decide whether to take the service.  Attachment Z1 requires SPP to finalize estimates during the Aggregate Facility Study process and provide those to customers, and in KEPCo's case, SPP's estimate of costs for KEPCo's four transmission service requests was $0.  *Id*. at 2, 21-23, JA___.

KEPCo also argued that SPP's assignment of certain Creditable Payment Obligations violate the "but for" test of Attachment Z2.  KEPCo explained that more than half of the Creditable Payment Obligations assigned to it were for facilities that were not even a part of the 2010 Aggregate Facility Study, which was the basis of SPP's granting its requests for transmission service.  Since KEPCo's service requests were granted by SPP without any prior identification of these upgrade facilities, it is impossible that KEPCo's service requests could not be granted "but for" those upgrade facilities.  *Id*. at 3, 23-27, JA___.

### c.    FERC's Orders on KEPCo's Complaint

In an order issued on November 2017, FERC denied most of the relief requested in KEPCo's complaint.  First, FERC found that SPP did not violate the terms of KEPCo's service agreements or the filed rate doctrine by directly assigning to KEPCo the costs of network upgrade costs that were not listed in the service agreements.  FERC reasoned that there was no filed rate doctrine violation because KEPCo was "on notice" that it may be responsible for Attachment Z2 credit payment obligations through both the development of the White Paper and a generic note included with the 2010 Aggregate Study Report for KEPCo's transmission requests that stated "[c]redits may be required . . . in accordance with Attachment Z2."  KEPCo Complaint Order PP 61, 63, JA___.

Second, FERC found that SPP did not violate the Study Process Rules in Attachment Z1, notwithstanding SPP's failure to provide KEPCo with an identification of network upgrades needed to accommodate the requests or the estimated cost of upgrades for KEPCo's four transmission service requests.  FERC found that the inclusion of a generic note in the 2010 Aggregate Study Report satisfied SPP's cost estimate obligations under Attachment Z1.  *Id.*, PP 62, 63, JA___.

Third, FERC found that SPP did not violate the "but for" test in Attachment Z2 by directly assigning costs of transmission upgrades that SPP did not study

19

before it tendered the service Agreements. FERC concluded that only a "subsequent use" test rather than a strict "but for" causation test was required by Attachment Z2, and that the White Paper was a reasonable methodology to determine whether a transmission service request makes subsequent use of Creditable Upgrades. *Id.*, PP 65-70, JA___.

KEPCo requested rehearing of FERC's order. In its Rehearing Order, FERC affirmed most of its prior rulings. However, in light of the Court's opinion in *Okla. Gas*, FERC no longer concluded that Attachment Z2 provided notice to KEPCo as to any credit payment obligations for purposes of the historical period (2008-2016), or that the 2010 Aggregate Facility Study or the White Paper qualify as formal notice to satisfy the filed rate doctrine for the historical period. KEPCo Rehearing Order P 17, JA___.

### 2. Xcel

#### a. Background

In 2008 and 2009, Southwestern Public Service submitted several requests for new transmission service, which were studied through SPP's Aggregate Transmission Service Study process. Xcel Complaint, Exhibit 1 P 36, JA__. Similar to KEPCo, the Southwestern Public Service transmission service requests were studied in the 2010 Aggregate Facilities Study. *Id.* SPP issued a study report to Southwestern Public Service that included a note indicating that Southwestern

Public Service may need to pay upgrade charges under Attachment Z2 for twenty-five (25) Creditable Upgrades.  Xcel Complaint, Exhibit 1 P 39, JA__.  The study report also included the statement "[a]t the conclusion of the [Aggregate Transmission Service Study], Service Agreements for each request for service will be tendered identifying the terms and conditions of the confirmed service."  Xcel Complaint, Exhibit 1 P 36, JA__.

Southwestern Public Service subsequently entered into a revised network transmission service agreement with SPP that specified upgrade charges for Southwestern Public Service's use of five (5) Creditable Upgrades.  Xcel Complaint, Exhibit 1 P 37, JA__.

When Southwestern Public Service received its initial bill for upgrade charges under Attachment Z2 in late 2016, SPP billed Southwestern Public Service for revenue credits for one hundred and one (101) Creditable Upgrades.  Xcel Complaint, Exhibit 1 P 37, JA__.  Seventy-six of the Creditable Upgrades were not even identified in the study report issued to Southwestern Public Service for the 2010 Aggregate Facilities Study.  Xcel Complaint, Exhibit 1 P 39, JA__.

### b.    The Xcel Complaint

On October 10, 2017, Xcel filed a complaint against SPP under sections 206 and 306 of the FPA.  16 U.S.C. §§ 824e, 825e.  Xcel contended that SPP's implementation of Attachment Z2 of the SPP Tariff violates the Tariff and the filed

rate doctrine because SPP was not applying a "but for" causation test in assigning

upgrade charges, but rather a flow-based methodology that considered a flow upon

a Creditable Upgrade as little as three percent as having been caused by the

Creditable Upgrade.  Network transmission customers like Xcel already pay for the

existing facilities of the SPP transmission system through their base rates.  *See* n.1,

*supra*.  To the extent there is available capacity to deliver their service without

using Creditable Upgrades, Xcel is entitled to use such capacity at no extra costs.

*E.g.*, Xcel Rehearing Request at 27-28, JA__.  Unless Attachment Z2 is applied as

written (inclusive of a causation test), Xcel is being charged unjust and

unreasonable rates for its service.  *Id*. at 28, JA__.

Xcel also argued that SPP's assignment of Attachment Z2 revenue crediting

costs of approximately $12.8 million for upgrade charges for the historical period

from 2008 to 2016 and $485,000 for ongoing charges violates Attachment Z1 of

the Tariff and the service agreement with Xcel, and the filed rate doctrine, because

Attachment Z1 required SPP to inform Xcel of its potential cost responsibility at

the time of the study process for the transmission service, and the service

agreement did not list any responsibility for most of the Creditable Upgrades that

SPP was assessing upgrade charges to Xcel.  In addition, Xcel argued that SPP's

assignment of credit payment obligations to Xcel is unjust and unreasonable

because there was no process for Xcel to test the accuracy of the upgrade charges.

### c.    FERC's Order on the Xcel Complaint

In its initial order on Xcel's Complaint, FERC rejected Xcel's claims that SPP was violating Attachment Z2.  FERC found that Attachment Z2 only required SPP to conduct a "subsequent use" test, which, according to FERC, was a method of "determin[ing] whether a transmission service request makes subsequent use of Creditable Upgrades."  Xcel Complaint Order P 74, JA__.  FERC cited to its decision on KEPCo's complaint, in which FERC stated that "the Commission has always understood SPP's Tariff to mean that revenue credit payment obligations resulted from 'subsequent use' of the transmission system."  KEPCo Complaint Order P 66, JA___.  FERC found that the White Paper set forth a set of rules for determining "subsequent use" of a Creditable Upgrade, and that the White Paper was guidance to implement Attachment Z2.  Xcel Complaint Order PP 73-75, JA___.

FERC also rejected Xcel's claim that the upgrade crediting had violated the Xcel service agreements.  FERC found that Xcel "was on notice" of possible cost responsibility under Attachment Z2 through notations in the Aggregate Facilities Study reports and through the White Paper.  *Id*. P 78, JA__  "Inasmuch as Xcel was on notice of possible Attachment Z2 cost responsibility," FERC concluded, the sponsors of Creditable Upgrade are entitled to receive "compensation for upgrades subsequently used for transmission service."  *Id*. P 78, JA___.

23

Xcel timely requested rehearing of the Xcel Complaint Order, arguing that FERC's interpretation disregarded the plain terms of Attachment Z2, that FERC had considered extrinsic evidence to alter the meaning of Attachment Z2, that FERC had disregarded Xcel's evidence, and that FERC did not make any findings that Attachment Z2 was ambiguous. Xcel Rehearing, JA__. Xcel also argued that FERC erred in finding that SPP's assessment of upgrades charges did not violate the Xcel service agreement because, among other things, the notations in the study report did not qualify as adequate notice to overcome the filed rate reflected in the Xcel service agreements. *Id.*, JA__. In the Xcel Rehearing Order, FERC denied Xcel's request for rehearing.

## V.    SUMMARY OF ARGUMENT

FERC's orders rejecting Transmission Customers' complaints are arbitrary and capricious in numerous respects.

First, the plain terms of Attachment Z2 require that new transmission service will only be responsible for upgrade charges if, but for a Creditable Upgrade, the service would not be possible. If the service is made possible by the Creditable Upgrade, then the transmission service is responsible for upgrade charges based upon a calculation of its use of the Creditable Upgrade. Under SPP's implementation of Attachment Z2, SPP deems the "but for" requirement satisfied if the transmission service would flow onto the Creditable Upgrade; under SPP's

24

approach, the entirety of a transmission request can be deemed to have been made possible by a Creditable Upgrade if three percent or more of the service would flow upon the Creditable Upgrade. In the orders under review, FERC arbitrarily and capriciously found that implementing Attachment Z2 according to its terms would create practical difficulties for SPP, and FERC strained to adopt an interpretation of Attachment Z2 that would permit SPP to disregard the plain terms. FERC's attempt to reform the filed rate through an illogical tariff interpretation violates its and this Court's precedent, and violates the requirements of the FPA.

Second, FERC's findings that Attachment Z2 provided adequate notice to Transmission Customers of millions of dollars in upgrade charges that were not specified by SPP in service agreements are contrary to law. FERC's orders cannot be squared with the Federal Power Act, the Commission's regulations and decades of FERC and court precedent confirming that consistent with the filed rate doctrine, utilities can only charges rates that are on file with FERC. FERC's orders are illogical in correctly acknowledging (as FERC must) that unfiled documents such as a developing White Paper or notations in study reports did not satisfy the legal standard for a "notice exception" to the filed rate doctrine for purposes of the historical period yet did provide adequate notice for upgrade charges after SPP began invoicing for the upgrade charges. Given that SPP's

25

invoicing began several years after the service agreements setting forth no charges were executed, there is no basis for FERC's attempt to water down the filed rate doctrine by broadening the notice exception. FERC ignored precedent that individual service agreements are where charges are set forth, and its attempts to point to a lack of a requirement in SPP's Tariff that upgrade charges needed to be specified in Transmission Customers' service agreements are contrary to the underpinnings of the Federal Power Act. FERC's orders are also internally inconsistent in finding that for purposes of reinterpreting the "but for" test, Attachment Z2 is ambiguous, but for purposes of providing notice to Transmission Customers—and in so doing, overriding service agreements that specified no upgrade charges—Attachment Z2 was perfectly clear.

Finally, FERC's filed rate doctrine errors are compounded by its arbitrary and capricious finding that SPP did not violate the Study Process Rules of Attachment Z1. Attachment Z1 plainly placed an obligation on SPP to identify the upgrade facilities that would be needed to accommodate Transmission Customers' service requests and to provide Transmission Customers an estimate of the costs of such upgrades so that Transmission Customers could make informed decisions about whether to move forward with their transmission service requests. FERC's finding that SPP complied with Attachment Z1 is contrary to substantial evidence in the record, including FERC's own statements that SPP claimed not to know the

upgrade costs and therefore did not provide notice to Transmission Customers of these costs. FERC's finding that SPP satisfied Attachment Z1's Study Process Rules by including a notation in the 2010 Aggregate Study Report indicating "credits may be required" does not constitute reasoned decision-making. FERC ignored substantial record evidence that the 2010 Aggregate Study Report failed to identify, in KEPCo's case, four network upgrades, the costs of which SPP subsequently assigned to KEPCo several years after KEPCo executed its service agreements which did not include such upgrades or their costs.

FERC's multiple excuses for SPP's failure to comply with Attachment Z1 seem to create a new legal standard—a utility may avoid compliance with a tariff obligation if it is too difficult to fulfill, notwithstanding the legal right and obligation of the utility to file to change the tariff obligation or to seek waiver of it. FERC also inappropriately appears to create a new, lower bar for what constitutes notice under the filed rate doctrine as relates to Attachment Z1. This cannot withstand scrutiny given the tremendous impact that SPP's failure to abide by the Attachment Z1 requirements had on Transmission Customers, who were not notified of their directly assigned charges before entering into service agreements that would become the filed rate.

At bottom, FERC's orders failed to hold SPP to the correct, lawful standard when it found that unfiled internal SPP documents satisfied the legal standard for

notice requirements for purposes of the filed rate doctrine.  Combined with the failure to find that SPP violated the notice requirements of its own Study Process Rules, these rulings are arbitrary and capricious, and result in significant unlawful charges to Transmission Customers.

## VI.  STANDING

A party to Commission proceedings must be "aggrieved" by the Commission order to bring a petition for review. "'A party is aggrieved within the meaning of [the statute] if it can establish both the constitutional and prudential requirements for standing.'" *Transmission Agency of N. California v. FERC*, 495 F.3d 663, 669-70 (D.C. Cir. 2007)(*quoting Pub. Util. No. 1 of Snohomish Co. v. FERC*, 272 F.3d 607 at 613 (D.C. Cir. 2001)). "To establish that it has been aggrieved, a petitioner must demonstrate an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *National Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1184 (D.C. Cir. 2020)( *quoting Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

KEPCo and Southwestern Public Service have been injured by SPP's application of its Tariff.  Pursuant to its interpretation of Attachment Z2: (i) SPP directly assigned KEPCo $6.2 million in upgrade charges (a portion of which KEPCo has already paid) and (ii) SPP directly assigned Xcel $12.8 million and

approximately $485,000 per month for Attachment Z2 upgrade charges.  These

charges are unlawful because they are not permitted by the SPP Tariff or the

service agreements with SPP.  FERC's orders under review upheld SPP's unlawful

interpretation of its Tariff and rejected KEPCo and Xcel's claims that the charges

violated the service agreements.  Absent modification, the challenged orders result

in direct, imminent injury through the imposition of unjust and unreasonable rates

on Transmission Customers, thus aggrieving them in both the statutory and

constitutional sense.  The Court can redress this injury by setting the orders aside.

## VII.  ARGUMENT

### A.    Standard of Review

The Court accords deference to the Commission's interpretation of terms

within a tariff.  *See, e.g., Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 441-42

(D.C. Cir. 1988).  "Deference, however, does not mean abdication of careful and

thorough judicial review."  *Baltimore Gas & Elec. Co. v. FERC*, 26 F.3d 1129,

1135 (D.C. Cir. 1994).  The Court will not accept FERC's interpretation of a

contract unless it is "amply supported, both factually and legally."  *Amerada Hess

Pipeline Corp. v. FERC*, 117 F.3d 596, 604 (D.C. Cir. 1997) (internal citations

omitted).  The Commission's determination will not be accepted unless it is the

result of reasoned and principled decision-making that can be ascertained from the

record.  *Tarpon Transmission Co. v. FERC*, 860 F.2d 439 at 442 (internal citation

omitted).  "To meet the requirement of reasoned decision-making, the agency must set forth the basis of the decision 'with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.'" *Id.*, 860 F.2d 439 at 442 (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, *reh'g denied,* 332 U.S. 783 (1947)).

The Court also reviews FERC orders under the FPA.  *See* 16 U.S.C. § 825*l*(b). FERC rulings must be "supported by substantial evidence," and "consistent with past practice or adequately justified." *Emera Me. v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (internal quotations and citations omitted).  Ultimately, the Court seeks to "ensur[e] that the Commission has made a principled and reasoned decision supported by the evidentiary record." *Id.* at 22.

An agency order is arbitrary and capricious if the agency failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence" before it.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  Further, "[t]he Commission must . . . respond meaningfully to the arguments raised before it." *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005).

30

### B. FERC's Interpretation of Attachment Z2 Is Not the Result of Reasoned Decision-Making

#### 1. FERC's Orders Impermissibly Use Extrinsic Evidence to Modify the Meaning of Attachment Z2

Attachment Z2, Section II.B, states that revenue credits will be paid by "new transmission service…that could not be provided but for one or more Creditable Upgrade(s)." Addendum at A-28. Attachment Z2 next provides that the "[r]evenue credits shall be determined based upon the subsequent incremental use." *Id*. These provisions read together are unambiguous and require first, that an analysis must be conducted to determine whether a transmission service request could be provided without the Creditable Upgrade in question. Second, if and only if that threshold inquiry is satisfied, then SPP is to determine revenue credits based upon the subsequent incremental use of the Creditable Upgrade by that new transmission service request.

"When reviewing the Commission's interpretation of a tariff, this court first 'consider[s] de novo whether the relevant language unambiguously addresses the matter at issue,' and if so, we apply that unambiguous meaning." *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th at 827 (internal citation omitted). This Court has explained that "[a] tariff provision must be understood according to its plain meaning, which we draw from its text and context." *Id*.

31

The text in Attachment Z2 that imposes a revenue crediting responsibility on new transmission service requests "that could not be provided but for a Creditable Upgrade" is unambiguous. The text requires a determination of whether the Creditable Upgrade makes the new transmission service possible. The words "but for" mean "if not for" in everyday English and in legal terminology. *E.g.*, Webster's New World College Dictionary, 4th Ed. (defining "but for" to mean "if it were not for"); BLACK'S LAW DICTIONARY 265 (10th ed. 2014) (defining "but for cause" as "the cause without which the event would not have occurred."). In the public utility industry, the words "but for" have the same causation meaning in the context of assigning upgrade costs to transmission service. *See, e.g., Ne. Utils. Serv. Co*., Opinion No. 364, 56 FERC ¶ 61,269 at 62,028, 62,030-31 (1992) (discussing "but for" test in which transmission customers must make a pro rata contribution whenever the facilities would not have been needed *but for* their transfers across a constrained interface), *order on reh'g*, Opinion No. 364-A, 58 FERC ¶ 61,070 at 61,204-05 (1992); *Interstate Power & Light Co. v. ITC Midwest, LLC*, 146 FERC ¶ 61,113 at PP 28-29 (2014) ("we disagree that generator interconnection customers interconnecting in the [ITC Midwest] zone derive no or trivial benefits from these network upgrades, which 'but for' the reliable interconnection of these generators in the [ITC Midwest] zone would not be built"). FERC admitted that its precedent interprets "but for" to have this same

32

causation meaning. *E.g.,* Xcel Rehearing Order P 22, JA___ ("The Commission has used the "but for" concept under its traditional transmission pricing policy to determine, through the use of an N-1 contingency analysis, whether an upgrade would be needed in the absence of a new service request.").

On rehearing, FERC appears to find that, on its face, Attachment Z2 is not ambiguous, but its finding is not entirely clear. While FERC did not expressly state that the terms of Attachment Z2 are ambiguous or unambiguous on their face, the Xcel Rehearing Order points to a concept of "latent ambiguity"—a type of ambiguity in contract or tariff language that is not apparent on its face, but that only reveals itself upon application of the terms to the "real world"—and proceeds to analyze the issues through that lens. *E.g.*, Xcel Rehearing Order P 21 n.46, JA___. FERC found that, based on consideration of extrinsic evidence, that "the Tariff does not specify a particular methodology for ascertaining 'but for' causation" and that "Attachment Z2 is susceptible to more than one meaning and could be satisfied by more than one methodology." *Id*. P 22, JA__. In particular, upon examination of the White Paper, FERC found that Attachment Z2 contains latent ambiguities. *Id.*, JA__.

Even under a theory of "latent ambiguity," FERC cannot reform the filed rate through an interpretation that uses extrinsic evidence to alter the meaning of the tariff without using FPA section 206 of the FPA. *Mid-Continent Area Power*

*Pool*, 92 FERC ¶ 61,229, at 61,755 (2000) (extrinsic evidence is not admissible either to contradict or alter express terms).  Here, FERC's tariff interpretation is flawed because it disregards the plain text.  Having found that the traditional causation analysis would be too difficult to implement to comply with Attachment Z2, FERC focuses on interpreting the words "but for" and "subsequent use" within Attachment Z2 and pays little attention to the phrase "could not be provided" that precedes "but for".  *See* Xcel Rehearing Order P 22, JA__ (discussing Tariff's use of "but for"); *id*. at P 25, JA__ (finding that the "Reservation Stack Analysis gives meaning to both the "but for" language and the 'subsequent use' language in the Tariff"); *id*. at P 28, JA__ (discussing SPP's intent in adding the phrase "but for").

FERC's disregard of the "could not be provided" text is evident in FERC's attempt to assign meaning to the "but for" phrase:  FERC concluded that the White Paper's flow-based analysis can be used to identify whether a Creditable Upgrade "can be considered to have *facilitated*" a transmission service request, "thus satisfy[ing] the 'but for' test."  Xcel Rehearing Order at PP 24-25 (emphasis added).  To "facilitate" something is to "make it easier," "less difficult" or "to help bring about."  WEBSTER'S THIRD NEW INTERNAL DICTIONARY 812 (1993).  The meaning of "facilitate" does not encompass the concept of being *necessary* for accomplishing a task, which is the function of placing the phrase "could not be provided" in front of "but for."  FERC's interpretative attempt to dilute the

34

causation meaning of "but for" is therefore flawed because it is incompatible with the "could not be provided" text.  As a result, FERC's interpretation contradicts or, at a minimum, alters the meaning of Attachment Z2 through extrinsic evidence, which is violative of FERC's own policy and fundamental contract interpretation principles.  *Mid-Continent Area Power Pool*, 92 FERC ¶ 61,229, at 61,755 (2000) (extrinsic evidence is not admissible to contradict or alter express terms); *Papago Tribal Utils. Auth. v. FERC*, 723 F.2d 950, 955 (D.C. Cir. 1983) (Extrinsic evidence is only relevant to prove a meaning to which the language of the instrument is reasonably susceptible).  Moreover, FERC's disregard of the "could not be provided" text discredits its construction of the tariff.  *E.g., City of Kaukauna v. FERC*, 581 F.2d 993, 997-98 (D.C. Cir. 1978) (FERC's interpretation is discredited by disregard of important phrase).

While this Court grants FERC "considerable deference in its interpretation of ambiguous tariff language, we can only uphold the Commission's interpretation if we can 'discern a reasoned path' to the decision."  *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 449 (D.C. Cir. 2005) (cleaned up).  There is no such reasoned path here.

### 2.    FERC's Consideration of Extrinsic Evidence Is Arbitrary and Capricious.

FERC made several findings concerning what FERC itself understood or what FERC understood SPP to have meant when SPP revised Attachment Z2 in

2008.  Xcel Rehearing Order PP 26-29, JA__.  FERC concluded that this evidence supports an interpretation that a "subsequent use" approach to determining revenue credits (which FERC appears to associate with the White Paper approach), not the traditional causation analysis discussed above, was intended by Attachment Z2. Among other things, FERC found that although SPP inserted language into Attachment Z2 stating that credits will be provided from new transmission service "that could not be provided but for" a Creditable Upgrade, SPP "made no indication" in its transmittal letter that SPP intended for the traditional causation analysis to implement that standard.  *Id*. P 28, JA__.

FERC's findings regarding the extrinsic evidence are not supported by substantial evidence.  FERC relies upon the 2011 White Paper—which was developed long after Attachment Z2's terms became effective in 2008—to infer SPP's intent three years earlier, when SPP added the "but for" text to Attachment Z2.  *E.g*., Xcel Rehearing Order PP 23, 28, JA__.  In addition, pointing to SPP's filing letter, FERC unreasonably infers that SPP did not intend to "implement an N-1 contingency analysis" because SPP did not say so in the letter.  *Id*. at P 28, JA__.  FERC also refers to its own understanding that upgrade charges would be calculated based on "subsequent use," which misses the point—it is FERC's attempt to read the causation test out of the Tariff that is unsupported.  The

"subsequent use" and "but for" provisions are not incompatible or mutually exclusive terms.

FERC's interpretive approach also ignores its precedent, which holds that "[i]n the absence of a clear definition of a term in the tariff [. . . ] the Commission will generally define the term consistent with its industry usage." Xcel Rehearing Request at 17, JA___ (quoting *TC Ravenswood, LLC v. N.Y. Indep. Sys. Operator, Inc.,* 133 FERC ¶ 61,205 at P 46 (2010) (citing cases). FERC found that Attachment Z2 was ambiguous and, while FERC acknowledged that Transmission Customers' interpretation of the "but for" phrase in Attachment Z2 was consistent with industry usage, FERC declined to apply that meaning to Attachment Z2. Xcel Rehearing Order P 22, JA__.

Furthermore, according to its precedent, FERC's examination of the prior filings cannot be used to contradict the meaning of tariff language. FERC has ruled that "Applicants' [tariff] provisions, rather than Applicants' statements in its transmittal letter, are binding on Applicants." *Louisville Gas & Elec. Co*., 137 FERC ¶ 61,195 at P 55 (2011). FERC has applied this rule in numerous cases, explaining that "filed tariff language governs over any conflicting language found in a transmittal letter." *See Midcontinent Indep. Sys. Operator*, 142 FERC ¶ 61,149 at P 25 (2013) ("Consistent with our historical practice, we find here that to the extent any language in MISO's pleadings conflict with its proposed Tariff

language, the Tariff language controls."); *Midcontinent Indep. Sys. Operator*, 152 FERC ¶ 61,189 at P 12 (2015) ("The Commission has previously found that filed tariff language governs over any conflicting language found in a transmittal letter."); *Cal. Indep. Sys. Operator Corp*., 132 FERC ¶ 61,154 at P 10 (2010) ("the tariff sheets contain the controlling language"); *Midcontinent Indep. Sys. Operator*, 129 FERC ¶ 61,268 at n. 8 (2009) (tariff controls over transmittal letter); *Cal. Independent Sys. Operator Corp*., 124 FERC ¶ 61,095 at P 22 (2008) (same). Under this FERC precedent, if, at the time SPP inserted the qualifier "that could not be provided but for" into Attachment Z2, SPP had stated in its transmittal letter that "we do not mean this literally," that statement in the transmittal letter effectively would be deemed a nullity, without any legal significance, and the tariff language would prevail over such a statement.

FERC's reliance on the extrinsic evidence of SPP's prior filings to vary or contradict the plain meaning of Attachment Z2 is arbitrary and capricious because it violates tariff interpretation principles, conflicts with FERC's precedent, and is not supported by the record.

> **3.    FERC's Orders Are Arbitrary and Capricious Because They Disregard Record Evidence Demonstrating That the White Paper Process Does Not Conduct the Causal Analysis Required by the Tariff.**

In the proceedings below, Transmission Customers demonstrated that SPP's consideration of a transmission reservation's flows on a transmission facility has

38

no correlation to a need of the reservation for that transmission facility.  Xcel

Complaint, Exhibits 1 & 2, JA__.   At its core, Transmission Customers' evidence

reinforces the well-understood phenomenon—observed by FERC and this Court—

that, within an electrical circuit with multiple branches, electrical flows follow a

path of least resistance.  In FERC's words:  it is an "elementary law of physics that

electricity traversing a grid will follow the path of least resistance, regardless of

whose line that happens to be."  *N.Y. State Elec. & Gas Corp.*, 47 FERC ¶ 61,185

at 61,619 (1989); s*ee also N.Y. Indep. Sys. Operator, Inc*., 128 FERC ¶ 61,049 at

61,259 (2009) ("Electricity flows in accordance with Ohm's law, which holds that

electricity takes the path of least resistance in a parallel circuit."); *Ind. Mich.

Power Co*., 64 FERC ¶ 61,184 at 62,545 (1993) ("in reality power flows are rarely

confined to a designated contract path. Rather, power flows over multiple parallel

paths that may be owned by several utilities that are not on the contract path. The

actual power flow is controlled by the laws of physics which cause power being

transmitted from one utility to another to travel along multiple parallel paths and

divide itself along the lines of least resistance. This parallel path flow is sometimes

called "loop flow."); *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 542

(D.C. Cir. 2010), *cert. denied, Turlock Irr. Dist. v. FERC*, 564 U.S. 1013 (2011)

("power does not always flow over the scheduled route if there are other paths; it

flows over the path of least resistance, creating a parallel flow.").  FERC fully

understands this phenomenon, and it is the reason that the industry standard used in FERC transmission pricing is to conduct an "N-1" test to determine the causal relationship between a particular facility and a transmission service. *See* Xcel Rehearing Order n. 24, PP 46, 47, JA___.

SPP's approach to implementing Attachment Z2 through the White Paper process does not reflect these fundamental engineering principles. Xcel's witness explained the problem with SPP's process:

> [S]uppose that after a 230 kV Creditable Upgrade is placed in service, the SPP transmission system configuration changes because installation of the new line decreases flows on an existing 115 kV facility. With the new line in place, it would not be unusual for new requests for service to flow over the Creditable Upgrade solely as a result of the change in SPP system topology from the new line, particularly if the Creditable Upgrade operates at lower impedance. Nevertheless, if SPP were to apply the assumptions of the CPTF Whitepaper retrospectively, as it is now doing, SPP would conclude that such new requests for service could not be served but for the Creditable Upgrade. Yet, that conclusion would be incorrect since the service flows over the Creditable Upgrade simply as a result of the new line becoming operational, not because the service request was infeasible absent the Creditable Upgrade. It is possible that the service could have been provided by the existing 115 kV facility.

Xcel Complaint, B. Liu Affidavit at P 24, JA ___. Furthermore, SPP's analysis deems a transmission service to have a need for a Creditable Upgrade if as little as three percent flows of the service would flow across the Creditable Upgrade. *Id*. at P 21, JA___.

Xcel and KEPCo also went beyond engineering principles and hypotheticals, and provided evidence that they had been assigned revenue crediting for specific Creditable Upgrades that had no causal relationship to their transmission service. Xcel's witnesses discussed specific Creditable Upgrades that did not increase the capacity of transmission system to provide more transmission service, yet Xcel was billed upgrade charges for them.   Xcel Complaint, Exhibit 2, Affidavit of R. Miranda, JA__.   KEPCo submitted testimony that SPP had assigned it upgrade charges for use of certain Creditable Upgrades—*after* SPP had already conclusively found that the transmission system, without such Creditable Upgrades, could deliver KEPCo's requests for transmission service.  KEPCo Complaint, Attachment A, J. Chiles Affidavit at PP 45-50, JA___. The sum of the directly assigned costs for these four facilities is $3.62 million.  *Id*. at P 50, JA___.

FERC erroneously failed to reconcile its findings that there is any causal relationship—whether that be a strict "cannot be provided but for" analysis or a "facilitates" analysis—with this testimony.  On rehearing, FERC considered the scenario where a new transmission service increases flows on a Creditable Upgrade in the direction of the original constraint that caused the upgrade to be needed.  Xcel Rehearing Order P 24, JA__.  FERC concluded that "any use of the upgrade in that direction by a new reservation is considered to be facilitated by the additional capacity created by the upgrade, and thus satisfies the 'but for' test." *Id*.

41

There is no evidence in the record that the Creditable Upgrade can be said to

"facilitate" the new transmission service because the service or some very small

portion) flows over it, when the same service could still have been provided over

multiple other paths even without the existence of the Creditable Upgrade.

Nevertheless, FERC considered the transmission service's "use" of the Creditable

Upgrade to mean the causation test is satisfied, which reads the 'could not be

provided but for' text out of Attachment Z2.

FERC disregarded Xcel's testimony regarding the absence of a legitimate

causation analysis in the White Paper on the grounds that, according to FERC,

Xcel failed to consider the following "description" in the White Paper:

> All new reservations with response factors in the opposite
> direction of flow which caused the Creditable Upgrade to be
> *needed* will satisfy the "but for" test if the loading on the
> Network Upgrade is such that the new reservation could not
> have been provided.  (emphasis in original)

Xcel Rehearing Order P 32, JA __.

In making this finding, FERC is mistaking the White Paper's own

characterization of its process for what the process *actually* does. The point of

Transmission Customers' testimony was to demonstrate that the Reservation Stack

Analysis does *not* perform a causal analysis that identifies whether a new

transmission service could have been provided without a Creditable Upgrade.

FERC's failure to address the contrary evidence before it regarding the White Paper was arbitrary and capricious.

### 4.    FERC's Finding That Attachment Z2 Cannot Be Implemented By Its Express Terms without Difficulty Is Not Reasoned Decision-Making and Does Not Justify the Result.

On rehearing, FERC interpreted Attachment Z2 in a manner intended to avoid the "practical difficulties" that would be placed upon SPP in implementing the Tariff according to its express terms. *E.g.*, Xcel Rehearing Order P 30 & n. 66, JA__ (tariffs "should be interpreted in such a way as to avoid unfair, unusual, absurd or improbable results."). These findings are not the product of reasoned decision-making because FERC ignores relevant aspects of the record. Although Xcel acknowledged implementing Attachment Z2 correctly may be difficult, Xcel disagreed that there had been any showing that it would be "infeasible". Xcel Answer at 10, JA__. In the Xcel Complaint Order, FERC noted that SPP had recently filed to eliminate short-term firm and non-firm point-to-point transmission service requests from the Attachment Z2 revenue crediting process. Xcel Complaint Order, P 76 & n.145, JA__. In that filing, SPP represented that "the elimination of credits paid by short-term [point-to-point] will substantially reduce the number of transmission service reservations that must the [*sic*] analyzed and processed," and that "[o]ver 95 percent of transmission reservations that have creditable impacts are short-term in duration." Xcel Rehearing Request 29, JA__

(internal citation omitted).[7]  However, on rehearing, FERC did not address Xcel's

point.  Instead, FERC continued to find—borrowing the White Paper's assessment

from ten years earlier—that using a causation test would require SPP to analyze

"hundreds" of transmission service requests each hour and involve "practical

difficulties."  Xcel Rehearing Order P 30, JA__.  FERC ignores substantial

evidence that the number of reservations that SPP would have to analyze to comply

with the causation requirement of Attachment Z2 is significantly less.  *Emera Me.*

*v. FERC*, 854 F.3d 9 (D.C. Cir. 2017) (FERC rulings must be "supported by

substantial evidence").

Assuming *arguendo* that the record conclusively demonstrated that SPP

could not implement Attachment Z2 as written, such that the tariff could be

deemed to be unjust and unreasonable in some manner, FERC could have directed

Attachment Z2 to be modified prospectively under FPA section 206.  16 U.S.C. §

824e.  Or, SPP could have made a filing under FPA section 205, 16 U.S.C. § 824d,

years earlier to modify Attachment Z2.  However, the filed rate doctrine and rule

against retroactive ratemaking forbid reinterpreting a filed tariff to reform it, even

when reform otherwise may seem appropriate based upon equitable concerns or

hardship.  By adopting an interpretation of Attachment Z2 that is applicable

---

[7] FERC accepted SPP's filing effective February 1, 2018, and, as a result, short-term firm and non-firm transmission requests are not considered in the Attachment Z2 crediting process.  *Sw. Power Pool, Inc*., 163 FERC ¶ 61,092 (2018).

retroactively and that conflicts with the filed rate, FERC's orders contravene

sections 205 and 206 of the FPA and violate the filed rate doctrine.  *Old Dominion*

*Elec. Coop*., 154 FERC ¶ 61,155 at P 17 (2016) ("Whether ODEC's equitable

arguments for waiving the filed rate may have merit is beside the point, as

*Columbia III* makes clear that those equitable considerations do not bestow upon

the Commission the authority to waive the filed rate doctrine."); *Marcus v. AT&T*

*Corp*., 138 F.3d 46, 58 (2d. Cir. 1998)  ("Application of the filed rate doctrine in

any particular case is not determined by the culpability of the defendant's conduct

or the possibility of inequitable results"); *Maislin Indus., U.S. v. Primary Steel*, 497

U.S. 116, 132 (1990) ("strict adherence to the filed rate has never been justified on

the ground that the carrier is equitably entitled to that rate, but rather that such

adherence, despite its harsh consequences in some cases, is necessary to

enforcement of the Act.").

### C.    FERC's Rulings That Attachment Z2 Provided Transmission Customers Adequate Notice of Prospective Directly Assigned Upgrade Charges Are Arbitrary and Capricious.

FERC's orders finding that Attachment Z2 provided notice to Transmission

Customers of directly assigned upgrade charges are contrary to the filed rate

doctrine, not supported by substantial evidence in the record, and fail to adequately

address arguments made by Transmission Customers.

The FPA requires public utilities to file with FERC schedules showing "all rates and charges," and the "classifications, practices and regulations affecting such rates and charges" for any FERC-jurisdictional service.  FPA section 205(c), 16 U.S.C. § 824d(c).  If a utility wishes to change its filed rates, charges, or the rules affecting those rates and charges, it must provide 60-days' notice to FERC by filing new rate schedules "stating plainly" the changes to be made and the time when they shall take effect.  FPA section 205(d), 16 U.S.C. § 824d(d).  The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority."  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981); *see also Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251 (1951).  For the upgrade charges that SPP invoiced to be lawful, they needed to be part of the rates on file at FERC.  Under the filed rate doctrine, "public utilities may only charge rates filed with FERC.  This assures that customers receive adequate notice of their utility costs." *Ark. PSC v. FERC*, 891 F.3d 377, 383 (D.C. Cir. 2018) (citing *Ark. La. Gas*, 453 U.S. at 578, additional citations omitted).

On rehearing, FERC appropriately retreated from its initial orders in which it had found that Attachment Z2 provided notice to Transmission Customers of directly assigned upgrade charges for the historical period.  KEPCo Rehearing Order P 17, JA___; Xcel Rehearing Order P 40, JA___.  FERC proceeded to find,

46

however, that Attachment Z2 "did provide notice of prospective credit payment obligations, which did not require waiver of the Tariff's billing requirements." KEPCo Rehearing Order P 18, JA___; Xcel Rehearing Order P 41, JA___.  In support, FERC stated that "the D.C. Circuit noted that 'Attachment Z2 failed to provide the requisite notice that upgrade charges could occur *outside [the Tariff's] billing requirements*' but nevertheless recognized that Attachment Z2 'set forth the possibility of upgrade charges.'"  KEPCo Rehearing Order P 18, JA___ (quoting *Okla. Gas*, 11 F.4th at 831) (emphasis added by FERC); Xcel Rehearing Order P 41, JA___ (same).  Based on this, FERC concluded that "[a]ll invoicing that did not require waiver of the one-year time billing adjustment limitation [i.e., after November 2016] was therefore appropriate under the Tariff."  KEPCo Rehearing Order P 18, JA___; Xcel Rehearing Order P 41, JA___.

FERC's conclusion misses the mark.  Just because the Court in *Okla. Gas* found the billing in the historical period to be unlawful does not mean upgrade charges rendered in bills after the historical period are lawful.  That is a mistake in logic.  The issue in this case is not whether SPP needed a waiver of the Tariff's billing requirement provisions to invoice Transmission Customers for upgrade charges after the historical period.  The issue is whether the upgrade charges billed to Transmission Customers after the end of the historical period are lawful.  As discussed below, they are not.

FERC said that Transmission Customers were on notice of these upgrade charges through Attachment Z2, under which they executed their respective service agreements.  Xcel Rehearing Order at P 24 ("the description of the methodology in the filed rate (Attachment Z2) provides all the notice that is required by the FPA and the filed rate doctrine."); KEPCo Rehearing Order P 18, JA___(quoting SPP Tariff Attachment Z2 Section II) (upgrade costs are "recoverable, with interest…..from new transmission service using the facility as defined below until the credit due is zero."); Xcel Rehearing Order P 41, JA___.  According to FERC, "Xcel was on notice of these 2016 and ongoing charges through Attachment Z2, under which Southwestern executed its service agreements."  Xcel Rehearing Order P 41; *see also* KEPCo Rehearing Order P 18, JA___ (same as to KEPCo). These conclusions are erroneous.

As an initial matter, FERC's finding that the language of Attachment Z2 placed Transmission Customers "on notice" of the possibility of upgrade charges cannot be reconciled with FERC's separate finding that the language of Attachment Z2 is ambiguous, and "susceptible to more than one meaning and could be satisfied by more than one methodology."  Xcel Rehearing Order P 22, JA__; KEPCo Rehearing Order PP 36-37, JA__.  FERC cannot have it both ways. Customers may be charged with "notice" of a tariff's charge when it is specifically stated, or set forth in a specific formula or a "rate rule" within the tariff.

*Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 578 (D.C. Cir. 1990). FERC

implicitly draws upon the *Transwestern* precedent in concluding that Transmission

Customers had "notice" through Attachment Z2's description of the methodology,

yet FERC also found that the same methodology suffered from latent ambiguities.

Xcel Rehearing Order P 22, JA__; *id*. at P 21 n.45, JA__ (*quoting Sw. Power Pool,*

*Inc*., 163 FERC ¶ 61,063 at P 20 (2018) ("Ambiguity often first arises through

applying language that appears unambiguous on its face to particular facts")).

Transmission Customers cannot reasonably be deemed to have received notice

through the Tariff of a methodology whose true meaning is hidden. Thus, FERC's

reasoning is both internally inconsistent and illogical, and accordingly does not

meet the requirements of the Administrative Procedure Act. *E.g., Engine Mfrs.*

*Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) (an "unexplained

inconsistency, however, is not reasonable"); *Exxon Co., U.S.A. v. FERC*, 182 F.3d

30, 42 (D.C. Cir. 1999).

    Additionally, given the timing of the relevant events, FERC's reasoning

regarding the timing does not hold up. FERC conceded that Attachment Z2 did not

provide notice of retroactive charges for the historical period (2008 through

November 2016). FERC, however, found that Attachment Z2 did provide notice

of charges for the period beginning 2016. However, the service agreements that

KEPCo executed—service agreements which specified no upgrade charges—were

presented to KEPCo in 2012.   KEPCo Complaint at 9, JA___.   Even assuming

arguendo that Attachment Z2 did provide notice of charges beginning in 2016,

FERC fails to explain how that complies with the filed rate doctrine, which

requires Transmission Customers to have notice of charges in service agreements

before they become part of the filed rate.

　　　FERC brushed aside arguments that the service agreements specified that no

upgrade charges would be directly assigned to Transmission Customers.  As both

KEPCo and Xcel demonstrated, the individual service agreements that they

executed expressly stated that there were no direct assignment charges.  KEPCo

Complaint at __, JA___; Xcel Complaint at __, JA__.  Once Transmission

Customers' service agreements were executed and submitted to FERC and

accepted,[8] those service agreements became part of the filed rate, and can only be

changed under sections 205 or 206 of the Federal Power Act.  *Seminole Elec.*

*Coop., Inc. v. Fla. Power & Light Co.*, 139 FERC ¶ 61,254 at P 44 (2012)

("Significantly, the [section] of the [Network Integration Transmission Service]

Agreement is itself the filed rate"), *reh'g denied*, 153 FERC ¶ 61,037 at P 27

(2015) ("[relevant section] of the [Network Integration Transmission Service

Agreement is part of FPL's filed rate.  Seminole, as FPL's customer, is bound by

---

[8] As explained *supra*, n.6, KEPCo's three *pro forma* service agreements were
initially not filed at FERC but nonetheless become a part of the Tariff and the filed
rate.

FPL's filed rate"), *aff'd sub nom. Seminole Elec. Coop., Inc. v. FERC,* 861 F.3d

230 (D.C. Cir. 2017); *Missouri Utils. Co.*, 10 FERC ¶ 61,048 at 61,113 (1980)

("[T]he Commission's acceptance of the service agreement for filing binds [the

parties] to its terms under the filed rate doctrine") (citing *Montana-Dakota Utils.*

*Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246 (1951)).

FERC's view instead is that "Attachment Z2 is the governing Tariff

provision and sets forth an expectation that sponsors will receive reimbursement

from subsequent users that derive beneficial use of those upgrades."  KEPCo

Rehearing Order P 16; Xcel Rehearing Order P 39.  As discussed above, FERC

erred in its interpretation of Attachment Z2 as a "subsequent use" test, rather than

as a "but for" test.  But regardless of whatever expectation Attachment Z2 may

have set forth for Sponsors regarding their anticipated reimbursement, the

existence of Attachment Z2 did not relieve SPP of the obligation to notify

transmission customers of their directly assigned upgrade charges in the service

agreements.  Attachment Z2 merely provides SPP with the authority to include

upgrade charges in customer-specific service agreements; Attachment Z2 does not

entitle SPP to assess Transmission Customers upgrade charges that are not

identified in their respective service agreements.  *See* Xcel Rehearing Request at

33, JA___.

The bases on which FERC rejected Transmission Customers' arguments that they had no notice of the charges cannot be sustained.  FERC contended that "[a]t the time of the Complaint, there was no Tariff requirement specifying that Attachment Z2 upgrades must be listed in transmission service agreements." KEPCo Rehearing Order P 16; Xcel Rehearing Order P 39.  To support its finding, FERC pointed to a subsequent filing in which SPP added such a requirement. KEPCo Rehearing Order P 16, & n.32, JA__ (noting that on May 4, 2018, Attachment Z2 was revised to require that upgrades be listed in service agreements); Xcel Rehearing Order P 39 & n.85, JA___ (same).  FERC also supported its conclusion by arguing that Transmission Customers pointed to no provision in the service agreements requiring specification of all upgrades and charges, stating that "[i]n the absence of such a requirement," SPP has not violated the terms of the Transmission Customers' service agreements.  KEPCo Rehearing Order P 16, JA___; Xcel Rehearing Order P 39, JA___.

There are several glaring flaws in FERC's reasoning, beginning with its statements in the Rehearing Order taking Transmission Customers to task for not identifying "a provision in the service agreement" that requires specification of all upgrades and charges, as well as FERC's musing that there may be no "such [] requirement."  Xcel Rehearing Order P 39, JA__; *see also* KEPCo Rehearing Order P 16, JA___.  FERC overlooks the fact that it is section 205(c) of the

Federal Power Act and FERC's own implementing regulations that create the obligation to specify all charges in the service agreements. 16 U.S.C. § 824d(c); 18 C.F.R. § 35.1(a) ("Every public utility shall file with the Commission and post, in conformity with the requirements of this part, full and complete rate schedules and tariffs and those service agreements not meeting the requirements of § 35.1(g), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, the classifications, practices, rules and regulations affecting such rates, charges, classifications, services, rules, regulations or practices, as required by section 205(c) of the Federal Power Act."); *see also S. Co. Servs., Inc. v. FERC*, 353 F.3d 29, 33-34 (D.C. Cir. 2003) (affirming FERC's application of its FPA section 205 policies to deny recovery of certain costs under service agreements "due to the failure of the agreements to set forth those costs clearly and specifically.").

Whether or not there was a future provision in SPP's Tariff requiring that SPP specify Attachment Z2 upgrade charges in service agreements is irrelevant as to whether there is a violation of the filed rate doctrine for failure to specify upgrade charges assigned to Transmission Customers. The requirement that a customer be notified of a utility's charges stems not from a requirement in that utility's tariff, but rather from FPA section 205, 16 U.S.C. § 824d, confirmed by

decades of judicial precedent interpreting the notice requirement. "As a central purpose of the [filed rate] doctrine is to enable purchasers to 'know in advance the consequences of the purchasing decisions they make,' it requires that customers receive adequate notice of a rate in advance of the service to which it relates." *W. Res. v. FERC*, 72 F.3d 147, 149-50 (D.C. Cir. 1995) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 577 (D.C. Cir. 1990); citing *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 75 (D.C. Cir. 1992); and citing *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135, 1140 (D.C. Cir. 1987), *order on reh'g*, 844 F.2d 879 (1988)).

FERC's position that SPP need not have specified the upgrade charges in the service agreements because SPP's Tariff did not require it to do so flies in the face of the purpose of the filed rate doctrine:

> The Federal Power Act requires regulated utilities to file with the Federal Energy Regulatory Commission, as a matter of open and accessible public record, any rates and charges they intend to impose for sales of electrical energy that are subject to the Commission's jurisdiction. See 16 U.S.C. § 824d(c). As a consequence, utilities are forbidden to charge any rate other than the one on file with the Commission, a prohibition that has become known as the "filed rate doctrine." [cases omitted] That requirement of *transparent, public filing of rates* ensures evenhandedness, fairness, stability, *and predictability* in the prices charged for electrical energy.

*W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014) (cleaned up) (emphasis added). There was nothing transparent or predictable about the upgrade

charges Transmission Customers were subjected to several years after they executed service agreements which specified zero cost responsibility for the upgrades in question.

The lack of transparency that Transmission Customers had about the upgrade charges was one of the reasons that Xcel filed its Complaint. Xcel's service agreement listed cost responsibility for five upgrade charges, and, after the agreement was signed, SPP announced that Xcel was responsible for one hundred and one (101) upgrade charges. Xcel complained that, unlike a typical rate on file with FERC, the calculation of the upgrade charges was a black box to customers, and customers "do not have a mechanism to examine or challenge the underlying costs for which they are being charged millions of dollars" through the upgrade charges. Xcel Complaint 41-42, JA__. FERC rejected Xcel's claim that the charges were not sufficiently transparent. FERC reasoned that Xcel had the opportunity to attend workshops hosted by SPP on the matter, and FERC concluded that Xcel should have discussed its concerns with SPP in a "one-on-one session" if Xcel had concerns about the upgrade charges rather than file a complaint under FPA section 206. Xcel Rehearing Order P 48, 49, JA__. FERC's reasoning is not consistent, however, with the core "statutory provisions mandating the open and transparent filing of rates…." *Okla. Gas,* 11 F.4th at 829 (cleaned up).

FERC's attempts to minimize the significance of the lack of notice of upgrade charges in the service agreements fail.  FERC argued that, "as KEPCo recognizes in its Complaint, section 8.0 of Attachment 1 to each [service agreement] provides that the 'appropriate charges for individual transactions will be determined in accordance with the terms and conditions of the Tariff.'"  KEPCo Rehearing Order P 16, JA___ (citing KEPCo Complaint at 18, JA___).  However, this ignores KEPCo's argument that section 8.0 of Attachment 1 to the service agreement also states that "[s]ervice under this Service Agreement may be subject to some combination of the charges detailed below[,]" (Complaint at 18, JA___; KEPCo Rehearing Request at 8, JA___), i.e., in section 8.10 of Attachment 1 to the service agreement.  *See* KEPCo Rehearing Request at 8, JA___; KEPCo Complaint at 18-19, JA___.  In each of the four service agreements that SPP tendered to KEPCo in 2012, Section 8.10 said that "[t]hese upgrades costs are not assignable to the Network Customer."  KEPCo Complaint at 12, JA__.  Xcel's situation was different, but also egregious:  its service agreement with SPP indicated responsibility for five (5) Creditable Upgrades, but, after the service agreement was executed and filed with FERC, SPP announced that Xcel was responsible for revenue credits for an additional ninety-six (96) Creditable Upgrades.  Xcel Complaint at 12, JA__.  The service agreements could have said that it is unknown at this time whether particular upgrade costs will be assignable to the customer.

But they did not.  In both cases, the deals that Transmission Customers had with SPP were radically changed after they signed on the dotted line of their service agreements.

FERC said (in a footnote) that "section 3.0 of the [service agreements] provides that Network Integrated Transmission Service is governed by the Tariff and that, in the event of a conflict between the service agreement and the Tariff, the Tariff will control." KEPCo Rehearing Order n.34, JA___; Xcel Rehearing Order n.87, JA__.  It stretches the bounds of imagination to conclude that a statement in a service agreement that there are no directly assignable upgrade charges could be negated by a more general Tariff provision that, years later, FERC found to be ambiguous and reinterpreted in a manner to permit directly assignable charges.  It also contradicts FERC's own precedent that an umbrella tariff, like SPP's, sets forth general terms and conditions that are generally applicable, whereas the individual service agreement with a customer is where the specific charges applicable to that customer are set forth.  *See Indiana & Michigan Electric Co.*, 53 FPC 1180, 1183 (1975) (subsequent history omitted) ("[t]he provisions of the Service Agreement should be given precedence if they conflict with provisions in Tariff IP and the terms and conditions since the Service Agreement was the bargain struck by the two parties, while Tariff IP and the terms

and conditions were intended for the general use of all customers served thereunder.").

FERC's position that Attachment Z2 provided notice to Transmission Customers, contrary to the language in the service agreements also cannot be squared with legal precedent.  Courts have explained that the "notice exception" to the filed rate doctrine is generally confined to only two scenarios: (1) where tariffs provide a formula for calculating rates instead of a specific number, the formula itself provides sufficient notice to ratepayers to comport with the Federal Power Act (*see W. Deptford Energy*, 766 F.3d at 22); and (2) where judicial invalidation of FERC decisions has resulted in retroactive changes in rates, parties in the cases were aware of the risk of litigation-induced change in those Commission proceedings (*id*.).  Neither of these scenarios is present here.  In addition, this Court has rejected the notion that customers should be charged with "adequate notice" from a one-way assertion from a utility to a customer in a study report or from non-binding cost estimates in studies.  *Id*. at 24.  FERC's orders do not address this precedent and are arbitrary and capricious.

Additionally, FERC failed to address altogether one aspect of KEPCo's rehearing request.  KEPCo argued that the unfiled notation in the 2010 Aggregate Study Report was legally insufficient notice to inform KEPCo that SPP would *directly assign* these upgrade charges to KEPCo.  KEPCo Rehearing Request at 1,

JA___.  There is a significant difference as to whether a customer must pay its load-ratio share of Base Plan charges or is directly assigned the full amount.  By failing to make any distinction in its ruling, FERC failed to address KEPCo's argument that it lacked notice—not just that it would have some responsibility for some unknown amount of costs, but that it would be individually responsible for $6.2 million of direct assignment charges that stemmed from four transmission service requests totaling in total 68 MW.  FERC's "'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious."  *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203 (2011) (citation omitted).

> **D.    FERC Erred In Finding That SPP Did Not Violate Its Study Process Rules In Attachment Z1 And In Ignoring The Crucial Impact Such Violation Had On Transmission Customers.**

Although FERC said that Attachment Z2 provided notice of the upgrade charges, it failed to reconcile this conclusion with substantial evidence in the record showing that SPP failed to comply with the obligations of Attachment Z1— part of the same Tariff—to notify Transmission Customers of their upgrade charges.  Rather, FERC erroneously sustained its earlier decisions that SPP's direct assignment of Creditable Payment Obligations to Transmission Customers did not violate the Attachment Z1 Study Process Rules.  KEPCo Rehearing Order P 23, JA___.

FERC made no finding that Attachment Z1 is ambiguous, and indeed, it is not. The plain language of the then-effective Attachment Z1 to SPP's Tariff contradicts FERC's ruling. Attachment Z1, Section III.c places the following obligations on SPP:

- Within the Aggregate Facility Study, SPP "will identify the facilities limiting the availability of the requested aggregate transmission service and the upgrades required to provide this service." KEPCo Rehearing Order P 23, JA__ (quoting Attachment Z1, Section III.c).

- SPP "will also provide an estimate of the cost of those upgrades. The assignment of upgrade costs to each reservation will be provided to enable customers to estimate their costs." *Id*.

The issue of whether SPP fulfilled its obligations is critical because, pursuant to Attachment Z1, "[u]pon receipt of the [Aggregate Facilities Study], customers will have 15 days to make one of the elections per … Section 32.4 of the Tariff for Network Integration Transmission Service." *Id*. Under Section 32.4 of the SPP Tariff, after SPP distributes the Aggregate Study Report, including a good faith estimate of the customer's cost responsibility for directly assigned upgrade charges, a customer requesting network service is then given the opportunity to remain in the study or withdraw from the study. The customer has 15 days to withdraw its request for transmission service, take the available capacity without

the addition of facilities (and then has 30 days to execute a service agreement), or remain in the study using a deferred service start date.  *See* KEPCo Complaint, J. Chiles Affidavit at P 20, JA___.

FERC's finding that SPP did not violate the requirements of Attachment Z1 KEPCo Rehearing Order P 23, JA___) is contrary to substantial evidence in the record.  KEPCo demonstrated that the 2010 Aggregate Study of KEPCo's four transmission service requests failed to identify the network upgrades required to provide KEPCo's service.  *See* KEPCo Rehearing Request at 14, JA___.  Indeed, as KEPCo showed, the 2016 study SPP subsequently used as the basis to directly assign KEPCo the Attachment Z2 upgrade charges included four new network upgrades that were not even part of the 2010 Aggregate Study evaluating the feasibility of KEPCo's transmission service requests.  These four upgrades account for $3.6 million of KEPCo's $6.2 million directly assigned upgrade charges. KEPCo Complaint at 3, JA___.  SPP treated Xcel similarly, adding in Creditable Upgrades to the study after the service agreement was signed and imposing significantly more revenue credits upon Xcel.  Xcel Complaint at 35, JA__ (SPP adds seventy-six Creditable Upgrades to the study).  Since SPP failed to provide an estimate of upgrade charges at the time of the study, Transmission Customers had every expectation that SPP was complying with the Attachment Z1 Study Process Rules.  Therefore, when they received their service agreements showing no directly

61

assigned upgrade charges, they relied on that information in accepting the terms of the service agreements.  *See* KEPCo Complaint at 21, JA___ .

FERC contended, nonetheless, that SPP did not violate the Attachment Z1 Study Process Rules, because in FERC's view, KEPCo had notice of the upgrades and upgrade charges.  To support its view, FERC pointed to a footnote in the 2010 Aggregate Study Report that mentioned "applicable generation interconnection network upgrades" and noted that "credits may be required in accordance with Attachment Z2."  KEPCo Rehearing Order P 24, JA___ (citing 2010 Aggregate Facility Study Report at 32-35 (Table 3), JA__).  However, a footnote in an unfiled report that says "credits may be required" in accordance with Attachment Z2 does not satisfy the plain requirements of the Attachment Z1 Study Process Rules.

FERC's conclusion that the unfiled notation in the study report that "'credits may be required . . . in accordance with Attachment Z2' "was a reasonable placeholder estimate, with respect to possible costs after the historical period, consistent with the study process rules in Attachment Z1" (KEPCo Rehearing Order P 24, JA___) is not supported by substantial evidence in the record and does not constitute reasoned decision-making.  FERC attempted to shift the burden to KEPCo in finding that "[t]o the extent KEPCo (upon reviewing the report and Attachment Z2 as referenced therein) had concerns or questions about the extent of

its liability for credit payment obligations, it could have declined the offer of

network transmission service by SPP."  KEPCo Rehearing Order P 24, JA___.

Acknowledging that SPP did not provide an actual estimate of the upgrade

charges it intended to directly assign to KEPCo, FERC devised an excuse for SPP:

FERC said that SPP was in the process of developing the White Paper and

therefore could not provide accurate estimates.  KEPCo Rehearing Order P 24,

JA___ (citing to KEPCo Complaint Order P 63, JA___).  There was some dispute

over whether SPP had information it could have provided (*see* KEPCo Rehearing

Request at 15, JA___; KEPCo Rehearing Order P 26, JA___).  But what is

undisputed is that SPP did not provide KEPCo any information until 2016, four

years after KEPCo executed the service agreements:

> Given the complexity of the Attachment Z2 revenue
> crediting process and associated software implementation
> problems, we continue to find that the record
> demonstrates that SPP did not know which upgrades
> would be directly assigned to customers.  Therefore, SPP
> was unable to determine the allocable amount of
> Creditable Upgrades to be assigned to KEPCo and unable
> to include the total costs of those Creditable Upgrades
> because it had not determined which upgrades to include.

KEPCo Rehearing Order P 26, JA___.

FERC ignored this record evidence and thus acted contrary to its obligation

to make "a reasoned decision based upon substantial evidence in the record."

*Sithe/Indep. Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999) (cleaned up).

Knowing that it was unable or unwilling to provide an estimate of the cost of the upgrades it intended to directly assign KEPCo, SPP could have sought a waiver of the requirement of Attachment Z1 that obligated it to provide such an estimate. SPP did not do so. FERC ignored Transmission Customers' rehearing requests on this point. *See* KEPCo Rehearing Request at 15, JA___; Xcel Rehearing Request 31-33, JA__. FERC also ignored KEPCo's argument that since SPP was unable to fulfill the requirements of Z1, it should have requested a waiver of that. *See* KEPCo Rehearing Request at 15, JA___. SPP could have specified in the service agreement that the amount of upgrade charges was unknown. SPP did not do so. But rather than find that SPP failed to comply with Attachment Z1, FERC, relying on a newly manufactured and unsupported legal principle that an inability to comply with a tariff provision excuses failure to comply with that provision, found to the contrary. This fails the test of reasoned decision-making. While this Court gives deference to FERC on ratemaking decisions, "deference does not mean carte blanche, and the Commission must at all times demonstrate the markers of principled and reasoned decision[making] supported by the evidentiary record." *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, __, 2022 U.S. App. LEXIS 23485, at *24 (D.C. Cir. 2022) (cleaned up).

FERC's arbitrary and capricious decision to turn a blind eye to SPP's failure to comply with the requirements of the Study Process Rules in Attachment Z1 is significant. Had SPP complied with those requirements, KEPCo would have had adequate notice of the potential direct assignment of millions of dollars in upgrade charges. On the issue of notice, FERC's reasoning became even more muddled. FERC stated:

> The alleged Attachment Z1 violation is a separate question from the alleged filed rate doctrine violation discussed in the preceding section of this order because, as the D.C. Circuit recognized, SPP's study reports are not filed with Commission and do not constitute the filed rate. While information contained in the 2010 [Aggregate Study] Report and the stakeholder process do not constitute formal notice for filed rate doctrine purposes, the information is relevant insofar as it undermines KEPCo's position that it "understood the directly assigned costs would be zero."

KEPCo Rehearing Order P 25, JA___ (quoting KEPCo Rehearing Request at 14, JA___).

Despite the Court's clear ruling that neither the footnote in the report nor the developing White Paper sufficed as legal notice to satisfy the filed rate doctrine exception, FERC now relies on this same notation in an unfiled study and on the same unfiled White Paper to support its strained explanation of why it continues to believe SPP complied with Attachment Z2. *See* KEPCo Rehearing Order P 25, JA___. The steps SPP needed to take to comply with the Tariff were clearly laid

out in Attachment Z1.  FERC's recasting items as insufficient notice for purposes of the filed rate doctrine but as sufficient notice to KEPCo under Attachment Z1 should be rejected.  Attachment Z1, part of the Tariff, expressly requires SPP to inform Transmission Customers of upgrade charges.  There is no reason compliance with this provision should be held to a lesser legal standard.  FERC has not explained how a footnote in an unfiled study report can constitute sufficient notice for KEPCo to understand that its directly assigned costs would be over six million dollars, particularly when (i) four of the network upgrades SPP subsequently directly assigned to KEPCo were not even included in the 2010 Aggregate Facilities Study Report, and (ii) the service agreements plainly stated that no upgrade charges were being directly assigned to KEPCo.

In another effort to concoct a rationale why SPP did not violate Attachment Z1, FERC found that it was "reasonable to permit SPP to make corrections to the list of network upgrades" to the extent SPP's original analysis did not capture certain Creditable Upgrades.  KEPCo Rehearing Order P 24, JA___ (citing Complaint Order P 63, JA___).  A reasonable understanding of the term "correction" might be a change to a dollar figure or perhaps a change to one of the network upgrades identified.  It stretches the bounds of credulity to deem as a "correction" a replacement of a specification in service agreements that identified one upgrade and zero upgrade charges with seven upgrades (four of which were

not even studied at the time) and over six million dollars in direct assignment upgrade charges.

Xcel made a similar argument to the KEPCos, pointing out that "SPP is obligated to perform the following tasks under its Tariff: (i) identify 'each existing Creditable Upgrade that is impacted by any transmission service request in the [Aggregate Facility Study],' 'determine the allocation of estimated cost to provide the transmission service for each request' and 'finalize the solutions for the Aggregate Facilities Study and the cost estimates for upgrades necessary to provide the requested transmission service.'" Xcel Rehearing Request at 32-33, JA__ (quoting the 2013 effective Attachment Z1, Sections V.c.1, III.C.8 and III.C.7). However, unlike in the KEPCo Rehearing Order, FERC did not address this argument directly. Rather, FERC responded only by stating that "there was no Tariff requirement specifying that Attachment Z2 upgrades must be listed in transmission service agreements." Xcel Rehearing Order P 39, JA__. By sidestepping the issue of SPP's failure to comply with Attachment Z1, FERC's "failure to respond meaningfully to objections raised by a party renders [FERC's] decision arbitrary and capricious." *PSEG Energy Res. & Trade LLC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (cleaned up).

## VIII.  Conclusion

FERC's orders arbitrarily and capriciously denied the complaints of Xcel and KEPCo.  Xcel's and KEPCo's petitions for review should be granted and FERC's orders should be vacated and remanded.

Respectfully submitted,

*/s/ Phyllis G. Kimmel*
Phyllis G. Kimmel
Phyllis G. Kimmel Law Office PLLC
1717 K Street, NW
Suite 900
Washington, DC  20006
(202) 787-5704
pkimmel@pgklawoffice.com

Counsel for Kansas Electric Power
Cooperative, Inc.

*/s/ Joseph W. Lowell*
Timothy T. Mastrogiacomo
Joseph W. Lowell
Xcel Energy Services Inc.
701 Pennsylvania Avenue NW
Suite 250
Washington, DC  20004
(202) 661-4481/(571) 242-5634
Tim.T.Mastrogiacomo@xcelenergy.com
Joe.W.Lowell@xcelenergy.com

Counsel for Xcel Energy Services Inc.

October 11, 2022

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because its textual portions, including headers, quotations, and footnotes, but excluding the (i) cover pages, (ii) certificates of counsel, (iii) tables of contents and authorities, (iv) glossary, and (v) signature block contain 15,708 words, as counted by the word count feature of Microsoft Word 2010, with which this brief was prepared.


*/s/ Joseph W. Lowell*
Joseph W. Lowell


October 11, 2022

# ADDENDUM

# TABLE OF CONTENTS

Federal Power Act

 Section 205, 16 U.S.C. § 824d ...................................................................A-1

 Section 206, 16 U.S.C. § 824e .................................................................A-3

 Section 313, 16 U.S.C. § 824*l* ................................................................. A-6

Regulations

 18 C.F.R. § 35.1……………………………………………….................A-7

SPP Tariff

 Attachment Z1 (effective 2010)…………………………….................A-9

 Attachment Z2 (effective 2010)…………………………………………A-19

 Attachment Z2 (effective 2013)…………………………………………A-26

State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

**§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years there-

after, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anti-competitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

after, the Commission shall make a thorough re-
view of automatic adjustment clauses in public
utility rate schedules to examine—

(A) whether or not each such clause effec-
tively provides incentives for efficient use of
resources (including economical purchase and
use of fuel and electric energy), and

(B) whether any such clause reflects any
costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determina-
tions in rate cases prior to the time such
costs are incurred.

Such review may take place in individual rate
proceedings or in generic or other separate pro-
ceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in
rate proceedings or in generic or other separate
proceedings, the Commission shall review, with
respect to each public utility, practices under
any automatic adjustment clauses of such util-
ity to insure efficient use of resources (including
economical purchase and use of fuel and electric
energy) under such clauses.

(3) The Commission may, on its own motion or
upon complaint, after an opportunity for an evi-
dentiary hearing, order a public utility to—

(A) modify the terms and provisions of any
automatic adjustment clause, or

(B) cease any practice in connection with
the clause,

if such clause or practice does not result in the
economical purchase and use of fuel, electric en-
ergy, or other items, the cost of which is in-
cluded in any rate schedule under an automatic
adjustment clause.

(4) As used in this subsection, the term "auto-
matic adjustment clause" means a provision of
a rate schedule which provides for increases or
decreases (or both), without prior hearing, in
rates reflecting increases or decreases (or both)
in costs incurred by an electric utility. Such
term does not include any rate which takes ef-
fect subject to refund and subject to a later de-
termination of the appropriate amount of such
rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in sub-
section (d), if the Commission permits the 60-
day period established therein to expire with-
out issuing an order accepting or denying the
change because the Commissioners are divided
two against two as to the lawfulness of the
change, as a result of vacancy, incapacity, or
recusal on the Commission, or if the Commis-
sion lacks a quorum—

(A) the failure to issue an order accepting
or denying the change by the Commission
shall be considered to be an order issued by
the Commission accepting the change for
purposes of section 825l(a) of this title; and

(B) each Commissioner shall add to the
record of the Commission a written state-
ment explaining the views of the Commis-
sioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person
seeks a rehearing under section 825l(a) of this

title, and the Commission fails to act on the
merits of the rehearing request by the date
that is 30 days after the date of the rehearing
request because the Commissioners are divided
two against two, as a result of vacancy, inca-
pacity, or recusal on the Commission, or if the
Commission lacks a quorum, such person may
appeal under section 825l(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug.
26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amend-
ed Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9,
1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006,
Oct. 23, 2018, 132 Stat. 3868.)

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted
"sixty" for "thirty" in two places.
Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL
POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of
Federal Energy Regulatory Commission, in consulta-
tion with Secretary, to conduct a study of legal re-
quirements and administrative procedures involved in
consideration and resolution of proposed wholesale
electric rate increases under Federal Power Act, sec-
tion 791a et seq. of this title, for purposes of providing
for expeditious handling of hearings consistent with
due process, preventing imposition of successive rate
increases before they have been determined by Com-
mission to be just and reasonable and otherwise lawful,
and improving procedures designed to prohibit anti-
competitive or unreasonable differences in wholesale
and retail rates, or both, and that chairman report to
Congress within nine months from Nov. 9, 1978, on re-
sults of study, on administrative actions taken as a re-
sult of this study, and on any recommendations for
changes in existing law that will aid purposes of this
section.

**§ 824e. Power of Commission to fix rates and
charges; determination of cost of production
or transmission**

**(a) Unjust or preferential rates, etc.; statement of
reasons for changes; hearing; specification of
issues**

Whenever the Commission, after a hearing
held upon its own motion or upon complaint,
shall find that any rate, charge, or classifica-
tion, demanded, observed, charged, or collected
by any public utility for any transmission or
sale subject to the jurisdiction of the Commis-
sion, or that any rule, regulation, practice, or
contract affecting such rate, charge, or classi-
fication is unjust, unreasonable, unduly dis-
criminatory or preferential, the Commission
shall determine the just and reasonable rate,
charge, classification, rule, regulation, practice,
or contract to be thereafter observed and in
force, and shall fix the same by order. Any com-
plaint or motion of the Commission to initiate
a proceeding under this section shall state the
change or changes to be made in the rate,
charge, classification, rule, regulation, practice,
or contract then in force, and the reasons for
any proposed change or changes therein. If, after
review of any motion or complaint and answer,
the Commission shall decide to hold a hearing,
it shall fix by order the time and place of such
hearing and shall specify the issues to be adju-
dicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for

---

[1] See References in Text note below.

a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, §206, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 852; amended Pub. L. 100–473, §2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

### References in Text

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act June 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, §1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

### Amendments

2005—Subsec. (a). Pub. L. 109–58, §1295(b)(1), substituted "hearing held" for "hearing had" in first sentence.

Subsec. (b). Pub. L. 109–58, §1295(b)(2), struck out "the public utility to make" before "refunds of any amounts paid" in seventh sentence.

Pub. L. 109–58, §1285, in second sentence, substituted "the date of the filing of such complaint nor later than 5 months after the filing of such complaint" for "the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period", in third sentence, substituted "the date of the publication" for "the date 60 days after the publication" and "5 months after the publication date" for "5 months after the expiration of such 60-day period", and in fifth sentence, substituted "If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision" for "If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision".

Subsec. (e). Pub. L. 109–58, §1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, §2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, §2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

### Effective Date of 1988 Amendment

Pub. L. 100–473, §4, Oct. 6, 1988, 102 Stat. 2300, provided that: "The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however,* That such complaints may be withdrawn and refiled without prejudice."

### Limitation on Authority Provided

Pub. L. 100–473, §3, Oct. 6, 1988, 102 Stat. 2300, provided that: "Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall

be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.]."

### Study

Pub. L. 100–473, §5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

## § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, §207, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

## § 824g. Ascertainment of cost of property and depreciation

### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, §208, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 853.)

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

### (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".
1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.
Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United

18 CFR 35.1 (up to date as of 10/06/2022)
Application; obligation to file rate schedules, tariffs and c...
A-7
18 CFR 35.1
Filed: 10/11/2022    Page 94 of 120

This content is from the eCFR and is authoritative but unofficial.

# Title 18 - Conservation of Power and Water Resources
## Chapter I - Federal Energy Regulatory Commission, Department of Energy
### Subchapter B - Regulations Under the Federal Power Act
### Part 35 - Filing of Rate Schedules and Tariffs
### Subpart A - Application

**Authority:** 16 U.S.C. 791a-825r, 2601-2645; 31 U.S.C. 9701; 42 U.S.C. 7101-7352.

**Source:** Order 271, 28 FR 10573, Oct. 2, 1963, unless otherwise noted.

## § 35.1 Application; obligation to file rate schedules, tariffs and certain service agreements.

(a) Every public utility shall file with the Commission and post, in conformity with the requirements of this part, full and complete rate schedules and tariffs and those service agreements not meeting the requirements of § 35.1(g), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, the classifications, practices, rules and regulations affecting such rates, charges, classifications, services, rules, regulations or practices, as required by section 205(c) of the Federal Power Act (49 Stat. 851; 16 U.S.C. 824d(c)). Where two or more public utilities are parties to the same rate schedule or tariff, each public utility transmitting or selling electric energy subject to the jurisdiction of this Commission shall post and file such rate schedule, or the rate schedule may be filed by one such public utility and all other parties having an obligation to file may post and file a certificate of concurrence on the form indicated in § 131.52 of this chapter: *Provided, however,* In cases where two or more public utilities are required to file rate schedules or certificates of concurrence such public utilities may authorize a designated representative to file upon behalf of all parties if upon written request such parties have been granted Commission authorization therefor.

(b) A rate schedule, tariff, or service agreement applicable to a transmission or sale of electric energy, other than that which proposes to supersede, cancel or otherwise change the provisions of a rate schedule, tariff, or service agreement required to be on file with this Commission, shall be filed as an initial rate in accordance with § 35.12.

(c) A rate schedule, tariff, or service agreement applicable to a transmission or sale of electric energy which proposes to supersede, cancel or otherwise change any of the provisions of a rate schedule, tariff, or service agreement required to be on file with this Commission (such as providing for other or additional rates, charges, classifications or services, or rules, regulations, practices or contracts for a particular customer or customers) shall be filed as a change in rate in accordance with § 35.13, except cancellation or termination which shall be filed as a change in accordance with § 35.15.

(d)

(1) The provisions of this paragraph (d) shall apply to rate schedules, tariffs or service agreements tendered for filing on or after August 1, 1976, which are applicable to the transmission or sale of firm power for resale to an all-requirements customer, whether tendered pursuant to § 35.12 as an initial rate schedule or tendered pursuant to § 35.13 as a change in an existing rate schedule whose term has expired or whose term is to be extended.

USCA Case #21-1428    Document #1968444    Filed: 10/11/2022    Page 95 of 120

A-8

(2)  Rate schedules, tariffs or service agreements covered by the terms of paragraph (d)(1) of this section shall contain the following provision when it is the intent of the contracting parties to give the party furnishing service the unrestricted right to file unilateral rate changes under section 205 of the Federal Power Act:

Nothing contained herein shall be construed as affecting in any way the right of the party furnishing service under this rate schedule to unilaterally make application to the Federal Energy Regulatory Commission for a change in rates under section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations promulgated thereunder.

(3)  Rate schedules, tariffs or service agreements covered by the terms of paragraph (d)(1) of this section shall contain the following provision when it is the intent of the contracting parties to withhold from the party furnishing service the right to file any unilateral rate changes under section 205 of the Federal Power Act:

The rates for service specified herein shall remain in effect for the term of _____ or until _____, and shall not be subject to change through application to the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 of the Federal Power Act absent the agreement of all parties thereto.

(4)  Rate schedules covered by the terms of paragraph (d)(1) of this section, but which are not covered by paragraphs (d)(2) or (d)(3) of this section, are not required to contain either of the boilerplate provisions set forth in paragraph (d)(2) or (d)(3) of this section.

(e)  No public utility shall, directly or indirectly, demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service subject to the jurisdiction of the Commission, or impose any classification, practice, rule, regulation or contract with respect thereto, which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown.

(f)  A rate schedule applicable to the sale of electric power by a public utility to the Bonneville Power Administration under section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act (Pub. L. No. 96-501 (1980)) shall be filed in accordance with subpart D of this part.

(g)  For the purposes of paragraph (a) of this section, any service agreement that conforms to the form of service agreement that is part of the public utility's approved tariff pursuant to § 35.10a of this chapter and any market-based rate service agreement pursuant to a tariff shall not be filed with the Commission. All agreements must, however, be retained and be made available for public inspection and copying at the public utility's business office during regular business hours and provided to the Commission or members of the public upon request. Any individually executed service agreement for transmission, cost-based power sales, or other generally applicable services that deviates in any material respect from the applicable form of service agreement contained in the public utility's tariff and all unexecuted agreements under which service will commence at the request of the customer, are subject to the filing requirements of this part.

*[Order 271, 28 FR 10573, Oct. 2, 1963, as amended by Order 541, 40 FR 56425, Dec. 3, 1975; Order 541-A, 41 FR 27831, July 7, 1976; 46 FR 50520, Oct. 14, 1981; Order 337, 48 FR 46976, Oct. 17, 1983; Order 541, 57 FR 21734, May 22, 1992; Order 2001, 67 FR 31069, May 8, 2002; Order 714, 73 FR 57530, 57533, Oct. 3, 2008; 74 FR 55770, Oct. 29, 2009]*

**ATTACHMENT Z1**
**AGGREGATE TRANSMISSION SERVICE STUDY PROCEDURES AND COST**
**ALLOCATION AND RECOVERY FOR SERVICE UPGRADES**

## I.    Introduction

This attachment describes the process used to evaluate long-term transmission service requests using an Aggregate Transmission Service Study process.  The Transmission Provider will combine all long-term point-to-point and long-term designated network resource requests received during a specified period of time into a single Aggregate Transmission Service Study. Using this Aggregate Transmission Service Study process, the Transmission Provider will combine all requests received during an open season to develop a more efficient expansion of the transmission system that provides the necessary ATC to accommodate all such requests at the minimum total cost.  For the purposes of this Attachment Z1, all Transmission Owners that are not taking Network Integration Transmission Service under this Tariff will be treated the same as Transmission Customers taking Network Integration Transmission Service under this Tariff. This attachment also details cost allocation and cost recovery for Service Upgrades, for directly assigned costs that are in excess of the Safe Harbor Cost Limit for Service Upgrades associated with new or changed Designated Resources and cost recovery for Network Upgrades associated with generator interconnections.

II.    **Open Season**

The Aggregate Transmission Service Study process commences with the initiation of an open season.  The open season will be 4 months in duration.  During that period, customers may make requests for long-term transmission service that start no earlier than 6 months after the close of the second (in the pair) of open seasons.  Customers may submit and withdraw requests during the open season without any obligation.  In order for an Eligible Customer's request for Long-Term Firm Point-To-Point Transmission Service or Network Integration Transmission Service of one year or longer to be included in the Aggregate Facilities Study (AFS), the Eligible Customer must satisfy the following requirements:

a.    For Eligible Customers requesting Long-Term Firm Point-To-Point Transmission Service, a Completed Application that includes all of the information specified under Sections 17.2 and 17.3 of the Tariff, or Section 17.8 of the Tariff if applicable, and an executed Aggregate Facilities Study Agreement (AFSA) must be submitted on the Transmission Provider's OASIS prior to the end of the open season.  Timing requirements for distribution of the AFSA by the Transmission Provider to the Eligible Customer shall be in accordance with Section 19.4 of the Tariff; or

b.    For Eligible Customers requesting Network Integration Transmission Service of one year or longer, a Completed Application that includes all of the information specified under Section 29.2 of the Tariff and an executed AFSA must be submitted on the Transmission Provider's OASIS prior to the end of the open season.  Timing requirements for distribution of the AFSA by the Transmission Provider to the Eligible Customer shall be in accordance Section 32.4 of the Tariff.

Existing long-term firm service customers who desire to exercise a reservation priority under Section 2.2 of the Tariff shall do so pursuant to the terms of Section 2.2.

A-12

III.    **Aggregate Facilities Study**

a.    Except for the time period provided below, at the close of an open season, all transmission service requests subject to an AFSA will be included in the related AFS.  After January 1, 2008, at the close of the first two consecutive open seasons, all transmission service requests subject to an AFSA for this pair of consecutive open seasons will be included in one AFS.  On an ongoing basis and ending January 31, 2011, the Transmission Provider shall combine each subsequent pair of consecutive open seasons for analysis in one AFS.  These studies shall be done in accordance with Section 19.4 of the Tariff for Firm Point-To-Point Transmission Service and Section 32.4 of the Tariff for Network Integration Transmission Service.  For the open seasons closing during the period January 1, 2008 through January 31, 2011, for the purpose of determining the sixty (60) day period for completing the ASIS in accordance with Sections 19.4 and 32.4, the sixty (60) day period will begin upon the close of the second (in the pair) open season's fifteen (15) day window for a customer to execute an AFSA. The power flow models shall be developed for each season for the period from the earliest start of service to the latest end of service for the applicable requests.  The models will include all other applicable existing reservations having equal or greater queue priority including prospective renewals of existing service having a reservation priority pursuant to Section 2.2 of the Tariff.  System constraints will be identified and appropriate upgrades determined during the AFS.  The Transmission Provider shall determine the upgrades required to reliably provide all of the requested service.  The Transmission Provider shall also perform a regional review of the required upgrades to determine if alternative solutions would reduce overall cost to customers.  The Transmission Provider shall estimate the total cost of these upgrades.

b.    The Transmission Provider shall recognize constraints due to contractually limited facilities and allocate available capacity on a first come first served basis on the contractual constraint only.

A-13

c.      Within the AFS the Transmission Provider will identify the facilities limiting the availability of the requested aggregate transmission service and the upgrades required to provide this service.  It will also provide an estimate of the cost of those upgrades.  The assignment of upgrade costs to each reservation will be provided to enable customers to estimate their costs.  Upon receipt of the AFS, customers will have 15 days to make one of the elections per Section 19.4 of the Tariff for Firm Point-To-Point Transmission Service and Section 32.4 of the Tariff for Network Integration Transmission Service.

d.      The Transmission Provider, in conjunction with the applicable Transmission Owners, shall determine the necessary cost and lead-time for construction of each upgrade and the estimated cost of service for each request.  The Transmission Provider, in conjunction with the applicable Transmission Owners, shall determine the optimal set of solutions to reduce the overall costs for the study group and reliably provide the requested service in a timely manner.

e.      Upon completion of the subsequent Aggregate Facilities Study reflecting the withdrawal of requests, the Transmission Provider shall provide the customer a Service Agreement and the customer shall execute the Service Agreement or request the filing of an unexecuted Service Agreement in accordance with Section 19.4 of the Tariff for Firm Point-To-Point Transmission Service and Section 32.4 of the Tariff for Network Integration Transmission Service.

## IV.    Cost Allocation for Service Upgrades

The cost of Service Upgrades shall be allocated in accordance with this Section.

    a.    For the purpose of determining the cost responsibility for each transmission service request, all upgrades required to provide transmission service for all transmission service reservations included in an Aggregate Facilities Study shall be included in an Aggregate Cost Allocation Assessment. The cost of each transmission upgrade component will be allocated to each customer in the aggregation group on a pro-rata impact basis as provided in paragraph b. With regard to the cost allocation, the Transmission Provider shall review all upgrades and determine the earliest date that each upgrade is required to be in-service in order to provide the requested transmission service. This date is the Date Upgrade Needed. The cost of a facility upgrade shall be allocated to all customers in the aggregate group whose reservation period begins after the Date Upgrade Needed or extends past the Date Upgrade Needed, whether or not an interim redispatch option is available. If the Date Upgrade Needed for the upgrade is after completion of service, no cost will be allocated to the customer for the upgrade under consideration.

        All requests that have a positive impact on the upgrade and for which the service has not been completed prior to the Date Upgrade Needed for such upgrade, shall be allocated costs for the upgrade; and the Transmission Provider shall review these requests in order to determine the amortization period for the facility. For this determination, the start date of the amortization period shall be the expected in-service date of the facility. The end date for the amortization period shall be the end of the term of the request that ends at the latest point in time as adjusted for deferral of any requests.

        In the event the expected in-service date of the upgrade is after the Date Upgrade Needed, the customers whose requests span a portion of the time between the Date Upgrade Needed and the expected in-service date may:

1.      Defer the start of the request until the expected in-service date of the upgrade; or

2.      Request interim redispatch, if available.

If the customer selects the interim redispatch option, the Transmission Provider will evaluate curtailment of existing confirmed service or interim redispatch of units to provide service prior to completion of any allocated network upgrades. The Transmission Provider will provide the top 100 redispatch pairs, if available, to relieve the incremental MW impact on the limiting facilities. This redispatch option will be used to allow the customer to begin transmission service based on an earlier start date than the deferred date. Redispatch services shall be provided in accordance with Attachment K of the Tariff.

b.      An allocation of the cost of each facility upgrade to each request shall be determined on a pro-rata basis for the positive incremental power flow impacts of the requested service on such upgraded facility in proportion to the total of all incremental impacts on such upgraded facility. For each upgraded facility identified, the average incremental power flow impact of each request in the aggregate study shall be determined using each summer model available for the aggregate study period, after the Date Upgrade Needed of such upgraded facility. Each impact amount shall be determined by first establishing a set of initial seasonal base cases that excludes flows associated with all requests included in the Aggregate Facilities Study. Then each request will be added to the models and the change in flow across such upgraded facility shall be determined for each request included in the Aggregate Facilities Study. The cost of an upgrade allocated to each request shall be proportional to the average positive incremental impact of each request on such facility divided by the total average positive incremental impact of all requests included in the Aggregate Facilities Study on such upgraded facility. The cost of each upgrade shall be allocated to requests independently. Incremental flows having a negative impact on an upgraded facility shall be ignored.

**A-16**

    c.     After concluding the above cost allocations to each reservation in the aggregate group, the Transmission Provider shall determine the charges for each request by using the levelized monthly revenue requirement associated with the transmission service requested by each customer in the aggregate group.  This levelized monthly revenue requirement is determined by calculating the present worth of the revenue requirements associated with the upgrades as allocated to each customer in the aggregate group and then calculating an appropriate monthly amount for each customer in the aggregate group for each respective reservation.

## V.    Cost Recovery for Service Upgrades

The cost of Service Upgrades shall be recovered in accordance with this Section.  For Point-to-Point Service, the levelized monthly revenue requirement derived from the cost allocation process shall be compared to the charge applicable for each request under the transmission access charges of Schedule 7, Sections 1 and 7; and each customer shall be required to pay the higher of the total monthly transmission access charges or the monthly revenue requirement associated with the directly assigned portion of the Service Upgrade, if any.  For Network Integration Transmission Service, the charge shall be a direct assignment charge pursuant to Schedule 9, Section 4; and each customer will be required to pay the monthly revenue requirement associated with the directly assigned portion of the Service Upgrade, if any, in addition to the total monthly transmission access charges applicable under Schedule 9, Sections 1 and 6.  Cost recovery from a customer of the revenue requirement for the directly assigned portion of a Service Upgrade allocated to such customer will be accomplished over the duration of the customer's transmission service request.

For Service Upgrades associated with Designated Resources, to the extent a waiver is not granted pursuant to Section III of Attachment J, the cost in excess of the Safe Harbor Cost Limit of Service Upgrades associated with Designated Resources shall be recovered in accordance with this Section VI.  Transmission Customers paying the above charges may receive credits in accordance with Attachment Z2.

**A-18**

## VI.    Cost Recovery for Network Upgrades Associated with Generation Interconnection

Each Generation Interconnection Customer shall be required to pay for the Network Upgrades associated with a generation interconnection in accordance with the terms of its interconnection agreement.

Generation Interconnection Customers shall receive credits in accordance with Attachment Z2 for the Network Upgrades associated with generation interconnection service funded by the Generation Interconnection Customer.

Southwest Power Pool, Inc.

Open Access Transmission Tariff, Sixth Revised Volume No. 1
Effective Date:            07/26/2010
FERC Docket:            ER10-01960-000
FERC Order:            Delegated Letter Order
            10/28/2010
Attachment Z2, Attachment Z2 Revenue Crediting for Upgrades (0.0.0)

## ATTACHMENT Z2
## REVENUE CREDITING FOR UPGRADES

Southwest Power Pool, Inc.

Open Access Transmission Tariff, Sixth Revised Volume No. 1
Effective Date:          07/26/2010
FERC Docket:          ER10-01960-000
FERC Order:          Delegated Letter Order
          10/28/2010
Attachment Z2 Section I, Attachment Z2 Section I (0.0.0)

## I.    Revenue Crediting

Transmission Customers paying Directly Assigned Upgrade Costs for Service Upgrades or that are in excess of the Safe Harbor Cost Limit for Network Upgrades associated with new or changed Designated Resources and Project Sponsors paying Directly Assigned Upgrade Costs for Sponsored Upgrades shall receive revenue credits in accordance with this Attachment Z2. Generation Interconnection Customers paying for Network Upgrades shall receive credits for new transmission service using the facility as specified in Attachment Z1. The credit amount shall be recovered, with interest calculated in accordance with 18 CFR §35.19a(a)(2)(ii), from new transmission service using the facility as defined below until the credit due is zero.  The provisions of this Attachment Z2 are applicable to Transmission Owners subject to the provisions of Section 39.1 of this Tariff.

1.    New Point-To-Point Transmission Service:   Revenues from new Point-to-Point Transmission Service that could not be provided but for the new Network Upgrade will be included for crediting purposes.   For each new point-to-point reservation that could not be provided but for the new Network Upgrade, made after (i) the commitment for such new Network Upgrade by a Project Sponsor or (ii) the request causing the need for such new Network Upgrade, with service commencing after or extending beyond the date the facility upgrade is completed, the Transmission Customer or Project Sponsor shall receive a portion of the transmission service charge equal to the positive response factor of such new reservation on the new Network Upgrade   times the portion of the new reservation capacity that could not be provided but for the new Network Upgrade times the rate applicable to such new reservation.

For crediting purposes, the Transmission Provider shall perform a one-time

A-21

calculation of the response factor of such new reservation on the new Network Upgrade.   This allocation from new service shall continue until the Transmission Customer or Project Sponsor has been fully compensated for all charges paid in excess of the normally applicable transmission access charges pursuant to Schedules 7, 8 or 9 and 11.

2.     **New Network Integration Transmission Service and Service to Transmission Owners Taking Service Under Non-Rate Terms and Conditions:**   Credits will be provided for   (i) new Long-Term Network Integration Transmission Service, and (ii) new transmission service taken under the non-rate terms and conditions of this Tariff by Transmission Owners subject to Section 39.1 of this Tariff, that could not be provided but for the new Network Upgrade to accommodate designation of new Network Loads or Transmission Owner's(s') loads, new Designated Resources or increases in the designation of existing Designated Resources above previously designated levels.   Credits shall be determined based upon the subsequent incremental use of the Network Upgrade for such new or increased Network Load or Transmission Owner load or Network Resource.

The annual credit amount to be billed and paid monthly by a Network Customer, or included in rates, for each such new or increased use shall be the product of the annual revenue requirement associated with the Network Upgrade and the ratio of the incremental impact placed on the Network Upgrade by each such new or increased use to the total of the incremental impacts placed on the Network Upgrade by all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the Network Upgrade.   For the calculation of such credits to be given to a Project Sponsor paying Directly Assigned Upgrade Costs associated with the Network Upgrade, the incremental use assigned to such Project Sponsor shall be the capacity of the Network Upgrade minus all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses.   The cost of

A-22

such credit amount shall be paid by the Network Customer making such new or increased use of the Network Upgrade, or included in rates pursuant to the Base Plan and Balanced Portfolio funding formulas in Attachment J, in addition to all other applicable charges under this Tariff.

a.      For use of Service Upgrades, such credits shall be given to the original Transmission Customer paying Directly Assigned Upgrade Costs for the Service Upgrade and to all previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses, including prior incremental Network Integration Transmission Service uses that resulted in the obligation to pay credits. The grant of such credits shall be in proportion to the fraction of the annual revenue requirement associated with the Network Upgrade for which they are responsible, net of any credits previously applied.

b.      For use of Sponsored Upgrades, such credits to a Project Sponsor paying Directly Assigned Upgrade Costs for a Sponsored Upgrade shall be given first to the Project Sponsor from new transmission service using the Sponsored Upgrade until the credit due to the Project Sponsor for that Sponsored Upgrade is zero. Then such credits shall be given to all previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses, including prior incremental Network Integration Transmission Service uses that resulted in the obligation to pay credits. The grant of such credits shall be in proportion to the fraction of the annual revenue requirement associated with the Network Upgrade for which they are responsible, net of any credits previously applied.

3.     **Power Controlling Devices:**

a.     **New Network Integration Transmission Service:** Credits will be provided for new Long-Term Network Integration Transmission Service using the

**A-23**

device in either direction to accommodate designation of new Network Loads, new Designated Resources or increases in the designation of existing Designated Resources above previously designated levels. Credits shall be determined based upon the subsequent additional incremental use of the device by any such new or increased use.

The annual credit amount to be billed and paid monthly by a Network Customer, or included in rates, for each such new or increased use shall be the product of the annual revenue requirement associated with the device and the ratio of the incremental impact placed on the device by each such new or increased use to the total of the incremental impacts placed on the device by all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the device in both directions. For the calculation of such credits to be given to a Project Sponsor paying Directly Assigned Upgrade Costs associated with the device, the incremental use assigned to such Project Sponsor shall be the capacity of the device in both directions minus all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the device in both directions. The cost of such credit amount shall be paid by the Network Customer making such new or increased use of the device, or included in rates pursuant to the Base Plan and Balanced Portfolio funding formulas in Attachment J, in addition to all other applicable charges under this Tariff.

i.      For use of Service Upgrades, such credits shall be given to the original Transmission Customer paying Directly Assigned Upgrade Costs for the Service Upgrade and to all previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses, including prior incremental Network Integration Transmission Service uses that resulted in the obligation to pay credits. The grant of such credits shall be in proportion to the fraction of

A-24

the annual revenue requirement associated with the Network Upgrade for which they are responsible, net of any credits previously applied.

ii.     For use of Sponsored Upgrades, such credits to a Project Sponsor paying Directly Assigned Upgrade Costs for a Sponsored Upgrade shall be given first to the Project Sponsor from new transmission service using the Sponsored Upgrade until the credit due the Project Sponsor for that Sponsored Upgrade is zero. Then such credits shall be given to all previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses, including prior incremental Network Integration Transmission Service uses that resulted in the obligation to pay credits. The grant of such credits shall be in proportion to the fraction of the annual revenue requirement associated with the Network Upgrade for which they are responsible, net of any credits previously applied.

b.     **New Point-To-Point Transmission Service:** Crediting for Long-Term Firm Point-To-Point Transmission Service using the power controlling device in either direction shall be a portion of the transmission service charge equal to the positive response factor of such new reservation on the device times the new reservation capacity times the rate applicable to such new reservation less any revenue credits applicable to other Network Upgrades on the transmission path. Crediting for Short-Term Firm Point-To-Point Transmission Service and Non-Firm Point-To-Point Transmission Service using the device in either direction shall be the percent usage of the total revenue received by the Transmission Provider that is not required for other transmission funding obligations.

Southwest Power Pool, Inc.

Open Access Transmission Tariff, Sixth Revised Volume No. 1
Effective Date:            07/26/2010
FERC Docket:            ER10-01960-000
FERC Order:              Delegated Letter Order
                10/28/2010
Attachment Z2 Section II, Attachment Z2 Section II (0.0.0)

## II.    Future Roll-In

When a facility upgrade being paid for pursuant to the provisions of Attachment Z1 to this Tariff is rolled into the revenue requirements used for the development of generally applicable transmission service rates, the Transmission Owner that constructed the facility upgrade shall pay the remaining balance of each customer's unrecovered payments described in Sections VI.A and VI.B of Attachment Z1 that are applicable to that facility upgrade. All customers who have upgraded facilities and have remaining balances subject to cost recovery pursuant to Section VI of Attachment Z1, shall be paid in full.  The customer shall continue to pay the charges specified in the customer's transmission service agreement for the transmission service initially reserved.

Southwest Power Pool, Inc.
Electric TCS and MBR
Open Access Transmission Tariff, Sixth Revised Volume No. 1
Effective Date:            09/08/2013
FERC Docket:              ER13-01914-000
FERC Order:               145 FERC ¶ 61,198
        12/06/2013
Attachment Z2 Section I, Attachment Z2 Section I (1.0.0)

## I.    Creditable Upgrades

A.    Any Network Upgrade which was paid for, in whole or part, through revenues collected from a Transmission Customer, Network Customer, or Generation Interconnection Customer through Directly Assigned Upgrade Costs shall be considered a Creditable Upgrade.

B.    A Sponsored Upgrade is not automatically a Creditable Upgrade nor is it automatically eligible to receive revenue credits since Sponsored Upgrades are not built to satisfy a need identified by the Transmission Provider.  For a Sponsored Upgrade to become a Creditable Upgrade, the Transmission Provider must determine that the Sponsored Upgrade is needed as part of the Transmission System.  At the time the Sponsored Upgrade becomes a Creditable Upgrade, the Transmission Provider shall determine the direction of flow which caused the Creditable Upgrade to be needed and the capability in the opposite direction.

C.    A Creditable Upgrade shall cease being a Creditable Upgrade when: (1) the facility is permanently removed from service, (2) all the Upgrade Sponsors have been fully compensated, or (3) the costs have been fully included in rates in accordance with Section III of this Attachment Z2.

Southwest Power Pool, Inc.
Electric TCS and MBR
Open Access Transmission Tariff, Sixth Revised Volume No. 1
Effective Date:            09/08/2013
FERC Docket:              ER13-01914-000
FERC Order:               145 FERC ¶ 61,198
       12/06/2013
Attachment Z2 Section II, Attachment Z2 Section II (1.0.0)

## II.    Revenue Crediting

An Upgrade Sponsor shall be eligible to receive revenue credits in accordance with this Attachment Z2. The Directly Assigned Upgrade Costs are recoverable, with interest calculated in accordance with 18 CFR §35.19a(a)(2), from new transmission service using the facility as defined below until the amount owed the Upgrade Sponsor is zero.   The provisions of this Attachment Z2 are applicable to Transmission Owners subject to the provisions of Section 39.1 of this Tariff.

### A.    New Point-To-Point Transmission Service:

Revenues from new Point-to-Point Transmission Service that could not be provided but for the Creditable Upgrade(s) will be used, in whole or in part, for crediting purposes.   For each new point-to-point reservation that could not be provided but for one or more Creditable Upgrades, made after (i) the commitment for such Creditable Upgrade by an Upgrade Sponsor or (ii) the request causing the need for such Creditable Upgrade, with service commencing after or extending beyond the date the Creditable Upgrade is completed, the Upgrade Sponsor for each affected Creditable Upgrade shall receive a portion of the transmission service charge equal to the positive response factor of such new reservation on the Creditable Upgrade times the portion of the new reservation capacity that could not be provided but for the Creditable Upgrade times the rate applicable to such new reservation. For crediting purposes, the Transmission Provider shall perform a one-time calculation of the response factor of such new reservation on the Creditable Upgrade.   This allocation from new service shall continue until the Upgrade Sponsor has been fully compensated.   Revenue credits will be paid to Upgrade Sponsors in accordance with Section II.D of this Attachment Z2.

B.    **New Network Integration Transmission Service and Service to Transmission Owners Taking Service Under Non-Rate Terms and Conditions:**

Revenue for credits will be provided from (i) new Long-Term Network Integration Transmission Service, and (ii) new transmission service taken under the non-rate terms and conditions of this Tariff by Transmission Owners subject to Section 39.1 of this Tariff, that could not be provided but for one or more Creditable Upgrades to accommodate designation of new Network Loads or Transmission Owner's(s') loads, new Designated Resources or increases in the designation of existing Designated Resources above previously designated levels.   Revenue credits shall be determined based upon the subsequent incremental use of each affected Creditable Upgrade for such new or increased Network Load or Transmission Owner load or Network Resource.

The annual revenue credit amount to be paid monthly by a Network Customer, or included in rates, for each such new or increased use of a Creditable Upgrade shall be the product of the total annual revenue requirement associated with the Creditable Upgrade and the ratio of the incremental impact placed on the Creditable Upgrade by each such new or increased use to the total of the incremental impacts placed on the Creditable Upgrade by all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the Creditable Upgrade.

For the calculation of such revenue credits to be given to an Upgrade Sponsor for subsequent use of a Creditable Upgrade, the incremental use assigned to such Upgrade Sponsor shall be the capacity of the Creditable Upgrade minus all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses.   The cost of such revenue credit amount shall be paid by the Network Customer making such new or increased use of the Creditable Upgrade, or included in rates pursuant to the Base Plan and Balanced Portfolio funding formulas in Attachment J, in addition to

A-29

all other applicable charges under this Tariff.  Revenue credits will be paid to Upgrade Sponsors in accordance with Section II.D of this Attachment Z2.

**C.    Power Controlling Devices:**

**1.    New Network Integration Transmission Service:**

Revenue credits will be provided for new Long-Term Network Integration Transmission Service using the device in either direction to accommodate designation of new Network Loads, new Designated Resources or increases in the designation of existing Designated Resources above previously designated levels. Revenue credits shall be determined based upon the subsequent additional incremental use of the device by any such new or increased use.

The annual revenue credit amount to be paid monthly by a Network Customer, or included in rates, for each such new or increased use   of a Creditable Upgrade shall be the product of the annual revenue requirement associated with the device and the ratio of the incremental impact placed on the device by each such new or increased use to the total of the incremental impacts placed on the device by all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the device in both directions.

For the calculation of such revenue credits to be given to an Upgrade Sponsor for subsequent use of the device, the incremental use assigned to such Upgrade Sponsor shall be the capacity of the device in both directions minus all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the device in both directions.   The cost of such revenue credit amount shall be paid by the Network Customer making such new or increased use of the device, or included in rates pursuant to the Base Plan and Balanced Portfolio funding formulas in Attachment J, in addition to all other applicable charges under this Tariff.   Revenue credits

will be paid to Upgrade Sponsors in accordance with Section II.D of this Attachment Z2.

2.     **New Point-To-Point Transmission Service:**

Crediting for Long-Term Firm Point-To-Point Transmission Service using the power controlling device in either direction shall be a portion of the transmission service charge equal to the positive response factor of such new reservation on the device times the new reservation capacity times the rate applicable to such new reservation less any revenue credits applicable to other Network Upgrades on the transmission path.     Crediting for Short-Term Firm Point-To-Point Transmission Service and Non-Firm Point-To-Point Transmission Service using the device in either direction shall be the percent usage of the total revenue received by the Transmission Provider that is not required for other transmission funding obligations. Revenue credits will be paid to Upgrade Sponsors in accordance with Section II.D of this Attachment Z2.

D.     **Distribution of   Revenue Credits**

1.   For use of Creditable Upgrades which are also Service Upgrades, such revenue credits shall be given to the original Upgrade Sponsor and to all previously identified Upgrade Sponsors from incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses, including prior incremental Network Integration Transmission Service uses that resulted in the obligation to pay revenue credits.   The grant of such revenue credits shall be in proportion to the fraction of the annual revenue requirement associated with the Creditable Upgrade for which each Upgrade Sponsor is responsible, net of any revenue credits previously applied.

2.   For use of Sponsored Upgrades that qualify as Creditable Upgrades, such revenue credits shall be given first to the Project Sponsor from new transmission service using the Creditable Upgrade until the revenue credit

due to the Project Sponsor for that Creditable Upgrade is zero.    Then such revenue credits shall be given to all    Upgrade Sponsor(s) of the Creditable Upgrade.    The grant of such revenue credits shall be in proportion to the fraction of the annual revenue requirement associated with the Creditable Upgrade for which each Upgrade Sponsor is responsible, net of any revenue credits previously applied.

3.    For use of Creditable Upgrades associated with a Generator Interconnection Agreement, revenue credits from new transmission service using the Creditable Upgrade shall be given first to the Generation Interconnection Customer(s) associated with the Creditable Upgrade until the revenue credit due is zero.    Then such revenue credits shall be given to all other Upgrade Sponsors of the Creditable Upgrade.    The grant of such revenue credits shall be in proportion to the fraction of the annual revenue requirement associated with the Creditable Upgrade for which each Upgrade Sponsor is responsible, net of any revenue credits previously applied.

A-32

Southwest Power Pool, Inc.
Electric TCS and MBR
Open Access Transmission Tariff, Sixth Revised Volume No. 1
Effective Date:                    09/08/2013
FERC Docket:                    ER13-01914-001
FERC Order:                    145 FERC ¶ 61,198
        12/06/2013
Attachment Z2 Section III, Attachment Z2 Section III (1.0.0)

## III.    Future Roll-In

When a facility upgrade being paid for pursuant to the provisions of Attachment Z1 to this Tariff is rolled into the revenue requirements used for the development of generally applicable transmission service rates, the Transmission Owner that constructed the facility upgrade shall pay the remaining balance of each customer's unrecovered payments described in Sections VI.A and VI.B of Attachment Z1 that are applicable to that facility upgrade. All customers who have upgraded facilities and have remaining balances subject to cost recovery pursuant to Section VI of Attachment Z1, shall be paid in full.   The customer shall continue to pay the charges specified in the customer's transmission service agreement for the transmission service initially reserved.

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 11th day of October, 2022, the foregoing was filed electronically with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and the system will serve them.

*/s/ Joseph W. Lowell*
Joseph W. Lowell

October 11, 2022