## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____
)
**XCEL ENERGY SERVICES INC.,**                                    )
)
**Petitioner,**                                    )
)
**v.**                                    )    **Case No.** 20-1429
)
**FEDERAL ENERGY REGULATORY**                 )
**COMMISSION,**                                    )
)
**Respondent.**                                    )
)
_____)

## PETITION FOR REVIEW

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure, Circuit

Rule 15, and Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b), Xcel

Energy Services Inc. ("Xcel"), on behalf of its public utility affiliate, Southwestern

Public Service Company ("SPS"), hereby respectfully petitions this Court for

review of the following orders issued by the Federal Energy Regulatory

Commission (the "Commission"):

1) *Xcel Energy Services Inc. v. Southwest Power Pool, Inc.*, Docket

   No. EL18-9-000, "Order on Complaint," 162 FERC ¶ 61,203

   (March 6, 2018) ("Complaint Order"); and

2) *Xcel Energy Services Inc. v. Southwest Power Pool, Inc.*, Docket No. EL18-9-001, "Order Granting Rehearing for Further Consideration," (May 7, 2018) ("Tolling Order").

Xcel timely sought rehearing of the Complaint Order on April 5, 2018, pursuant to 16 U.S.C. § 825l(a).  On May 7, 2018, FERC issued the Tolling Order, which indicated that "timely-filed rehearing requests will not be deemed denied by operation of law."  Tolling Order at 1.  On June 30, 2020, in *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc) ("*Allegheny*"), this Court found that FERC's issuance of a tolling order amounts to inaction on a request for rehearing and does not stave off judicial review.  The mandate in *Allegheny* was issued to FERC on October 6, 2020.

Xcel now petitions this Court for review of the Complaint Order and the Tolling Order.  Venue in this Court is proper under 16 U.S.C. § 825l(b).  A copy of each of the underlying orders is attached hereto.  Xcel was an active participant in the underlying proceeding and is aggrieved by the orders from which this petition for review is taken.

Respectfully submitted,

*/s/ Stephen M. Spina*
Stephen M. Spina
Joseph W. Lowell
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 739-5958/5384
Fax:  (202) 739-3001

Attorneys for Petitioner
Xcel Energy Services Inc.

October 23, 2020

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Rules of this Court, Xcel Energy Services Inc. ("Xcel") provides the following disclosure statement:

Southwestern Public Service Company ("SPS") is a New Mexico corporation and an operating utility engaged in the generation, purchase, transmission, distribution and sale of electric power. SPS is a wholly-owned utility subsidiary of Xcel Energy Inc. ("Xcel Energy"). There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in SPS. SPS's principal place of business is 790 South Buchanan Street, Amarillo, Texas 79101.

Xcel is a Delaware corporation and the service company subsidiary of Xcel Energy, and provides, *inter alia*, PSCo with an array of services, including making appearances before the Commission and reviewing courts. There are no other parent corporations or publicly held companies that own a 10% or greater ownership interest in Xcel. Xcel's principal place of business is 414 Nicollet Mall, Minneapolis, Minnesota, 55401.

Xcel Energy is a Minnesota corporation and a holding company under the Public Utility Holding Company Act of 2005.

Respectfully submitted,

*/s/ Stephen M. Spina*
Stephen M. Spina
Joseph W. Lowell
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 739-5958/5384
Fax:  (202) 739-3001

Attorneys for Xcel Energy Services Inc.

October 23, 2020

# CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing Petition for Review of Xcel Energy Services Inc. and accompanying documents by U.S. mail, postage prepaid, in accordance with the Rules of this Court, upon:

> The Honorable Kimberly D. Bose
> Secretary
> Federal Energy Regulatory Commission
> 888 First Street, N.E.
> Washington, D.C. 20426

> Robert H. Solomon
> Solicitor
> Federal Energy Regulatory Commission
> 888 First Street, N.E., Room 9A-01
> Washington, D.C. 20426

and upon all parties to the proceeding below, as shown on the Commission's service list attached to the original hereto.

Dated at Washington, D.C., this 23rd day of October 2020.


*/s/ Stephen M. Spina*
Stephen M. Spina
Joseph W. Lowell
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 739-5958/5384
Fax:  (202) 739-3001

Attorneys for Xcel Energy Services Inc.

**APPENDIX A**
**(FERC SERVICE LIST)**

**FERC** Online - Web Applications of the Federal Energy Regulatory Commission



| FERC Online Home |
| About FERC Online |
| |
| Log Out |
| Edit Registration |
| Company Registration |
| |
| eFiling |
| eSubscription |
| eComment |
| |
| Query Mailing List/Recipients by State |
| Query Service List |
| My Service List |
| My Filing List |
| eLibrary |
| eTariff Viewer |
| |
| Help |

Service List for EL18-9-000 Xcel Energy Services Inc. and Southwestern Public Service Company v. Southwest Power Pool, Inc.

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| American Electric Power Service Corporation | | Jim Jacoby<br>Manager, RTO Regulatory SPP<br>1201 Elm Street<br>Suite 800<br>Dallas, TEXAS 75270<br>jwjacoby@aep.com |
| American Wind Energy Association | eugene grace<br>Regulatory Attorney<br>1501 M St NW, Ste 1000<br>washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>ggrace@awea.org | |
| Arkansas Electric Cooperative Corporation | John Elkins<br>Associate General Counsel<br>Arkansas Electric Cooperative Corporation<br>1 Cooperative Way<br>Little Rock, ARKANSAS 72219<br>UNITED STATES<br>john.elkins@aecc.com | |
| Basin Electric Power Cooperative | Nicole Allen<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>nallen@thompsoncoburn.com | Jesse Halpern<br>Thompson Coburn LLP<br>1909 K St NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA 20006<br>jhalpern@thompsoncoburn.com |
| Basin Electric Power Cooperative | | Tom Christensen<br>Basin Electric Power Cooperative<br>1717 East Interstate Ave<br>Bismarck, NORTH DAKOTA 58503<br>tomc@bepc.com |
| Bethel Wind Farm LLC | Nicole Luckey<br>Invenergy LLC<br>1 South Wacker<br>Suite 1800<br>Chicago, ILLINOIS 60606<br>UNITED STATES<br>nluckey@invenergyllc.com | |
| BHE Renewables, LLC | Christopher Jones<br>Troutman Sanders LLP<br>401 9th Street NW<br>TROUTMAN SANDERS LLP<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>christopher.jones@troutmansanders.com | |
| Buckeye Wind Energy LLC | Nicole Luckey<br>Invenergy LLC<br>1 South Wacker | |

| | | |
|---|---|---|
| | Suite 1800<br>Chicago, ILLINOIS 60606<br>UNITED STATES<br>nluckey@invenergyllc.com | |
| Central Valley Electric Cooperative, Inc. | Eli Eilbott<br>Attorney<br>Duncan, Weinberg, Genzer & Pembroke PC<br>DUNCAN WEINBERG GENZER & PEMBROKE PC<br>1667 K STREET, NW SUITE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ede@dwgp.com | Linda L. Murray-Kimball<br>Legal Assistant<br>Duncan, Weinberg, Genzer & Pembroke PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>lmk@dwgp.com |
| Central Valley Electric Cooperative, Inc. | Kristen Connolly McCullough<br>Attorney<br>Duncan Weinberg Genzer & Pembroke, PC<br>1667 K Street, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>KC@dwgp.com | Charles Pinson<br>General Manager<br>Central Valley Electric Cooperative, Inc.<br>P. O. Box 230<br>Artesia, NEW MEXICO 88211-0230<br>cpinson@cvecoop.org |
| City of Independence, Missouri | | Dayla Bishop Schwartz<br>Assistant City Counselor<br>City of Independence, MO<br>111 East Maple Street<br>Independence, MISSOURI 64050<br>dschwartz@indepmo.org |
| City of Independence, Missouri | | Randy L Hughes<br>rhughes@indepmo.org |
| EDF Renewable Energy, Inc. | Bruce Grabow<br>ICC Energy Corporation<br>701 East Street N.W.<br>Wash, DISTRICT OF COLUMBIA 75206<br>UNITED STATES<br>bgrabow@lockelord.com | |
| Enel Green Power North America, Inc. | Bruce Grabow<br>ICC Energy Corporation<br>701 East Street N.W.<br>Wash, DISTRICT OF COLUMBIA 75206<br>UNITED STATES<br>bgrabow@lockelord.com | |
| Farmers' Electric Cooperative, Inc. | Eli Eilbott<br>Attorney<br>Duncan, Weinberg, Genzer & Pembroke PC<br>DUNCAN WEINBERG GENZER & PEMBROKE PC<br>1667 K STREET, NW SUITE 700<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>ede@dwgp.com | Lance R Adkins<br>General Manager<br>FARMERS ELECTRIC COOPERATIVE<br>3701 North Thornton<br>Clovis, NEW MEXICO 88101<br>lance@fecnm.org |
| Farmers' Electric Cooperative, Inc. | Matthew Bly<br>Partner<br>Duncan & Allen LLP<br>1730 Rhode Island Avenue, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20036-3115<br>UNITED STATES<br>mlb@duncanallen.com | |

| | | |
|---|---|---|
| Flat Ridge 2 Wind Energy LLC | Gretchen Schott<br>Senior Regulatory Counsel<br>BP America Inc.<br>1100 Louisiana Street<br>Suite 5150<br>Houston, TEXAS 77002<br>UNITED STATES<br>gretchen.schott@clearwayenergy.com | Carla Holly<br>Director, Regulatory Complianc<br>BP Wind Energy North America Inc.<br>201 Helios Way<br>Houston, TEXAS 77079<br>carla.holly@bp.com |
| Golden Spread Electric Cooperative, Inc. | Craig Silverstein<br>Attorney<br>March Counsel LLC<br>1201 Connecticut Avenue, NW<br>6th Floor<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>craig.silverstein@marchcounsel.com | |
| Golden Spread Electric Cooperative, Inc. | Maggie Berry<br>Associate General Counsel<br>Golden Spread Electric Cooperative<br>905 S Fillmore<br>Suite 300<br>Amarillo, TEXAS 79101<br>UNITED STATES<br>mberry@gsec.coop | |
| Grande Prairie Wind, LLC | Christopher Jones<br>Troutman Sanders LLP<br>401 9th Street NW<br>TROUTMAN SANDERS LLP<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>christopher.jones@troutmansanders.com | |
| ITC Great Plains, LLC | James Bixby<br>Counsel - Regulatory & Legisla<br>ITC Holdings Corp.<br>601 13th St NW<br>Suite 710S<br>RTS-RETURN TO SENDER<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>jbixby@itctransco.com | |
| Kansas City Power & Light Company and KCP & L Greater Missouri Operations Company | Denise Buffington<br>Director Federal Regulatory Af<br>Kansas City Power & Light Company<br>PO Box 418679<br>Kansas City, MISSOURI 64141-9879<br>UNITED STATES<br>Denise.Buffington@evergy.com | |
| Kansas Electric Power Cooperative, Inc. | | Susan Cunningham<br>Sr. Vice President, Regulatory<br>600 SW Corpoorate View<br>RTS- RETURN TO SENDER<br>Topeka, KANSAS 66615<br>scunningham@kepco.org |
| Kansas Electric Power Cooperative, Inc. | SUSAN CUNNINGHAM<br>SVP, Regulatory and Government<br>Kansas Electric Power Cooperative, Inc.<br>600 SW Corporate View<br>Topeka, KANSAS 66615<br>UNITED STATES<br>scunningham@kepco.org | |
| Kansas Electric Power | Phyllis Kimmel<br>Phyllis G. Kimmel Law Office PLLC | |

| | | |
|---|---|---|
| Cooperative, Inc. | 1717 K Street, NW Suite 900 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES pkimmel@pgklawoffice.com | |
| Kansas Power Pool | | Larry W Holloway Assistant General Manager of O Kansas Power Pool 100 n broadway ste L110 Wichita, KANSAS 67202 lholloway@kpp.agency |
| Lea County Electric Cooperative, Inc. | Eli Eilbott Attorney Duncan, Weinberg, Genzer & Pembroke PC DUNCAN WEINBERG GENZER & PEMBROKE PC 1667 K STREET, NW SUITE 700 WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES ede@dwgp.com | Gary L Hurse CEO/Executive VP INDIVIDUAL 18 W West Washington Lovington, NEW MEXICO 88260 ghurse@lcecnet.com |
| Lea County Electric Cooperative, Inc. | Matthew Bly Partner Duncan & Allen LLP 1730 Rhode Island Avenue, NW Suite 700 Washington, DISTRICT OF COLUMBIA 20036-3115 UNITED STATES mlb@duncanallen.com | |
| Marshall Wind Energy LLC | Christopher Jones Troutman Sanders LLP 401 9th Street NW TROUTMAN SANDERS LLP Washington, DISTRICT OF COLUMBIA 20004 UNITED STATES christopher.jones@troutmansanders.com | |
| Mid-Kansas Electric Company, LLC | Adrienne Clair Thompson Coburn LLP Thompson Coburn LLP 1909 K Street NW Suite 600 Washington, DISTRICT OF COLUMBIA 20006 UNITED STATES aclair@thompsoncoburn.com | Mark D. Calcara General Counsel Sunflower Electric Power Corporation PO Box 1110 Great Bend,DISTRICT OF COLUMBIA 67530-1110 mcalcara@sunflower.net |
| Mid-Kansas Electric Company, LLC | | Ray Bergmeier rbergmeier@sunflower.net |
| Missouri Joint Municipal Electric Utility Commission | | John E Grotzinger INDIVIDUAL 1808 I-70 Drive SW Columbia, MISSOURI 65203 jgrotzinger@mpua.org |
| Missouri Joint Municipal Electric Utility Commission | | Rebecca Atkins ratkins@mpua.org |
| Missouri Joint Municipal Electric Utility Commission | | Douglas L Healy 3010 E. Battlefield Suite A |

| | | |
|---|---|---|
| | | Springfield, MISSOURI 65804<br>doug@healylawoffices.com |
| Missouri Joint Municipal Electric Utility Commission | | Heather H Starnes<br>Attorney<br>Healy Law Offices, LLC<br>12 Perdido Circe<br>Little Rock, ARKANSAS 72211<br>heather@healylawoffices.com |
| Nebraska Public Power District | David D'Alessandro<br>ddalessandro@stinson.com | Jonathan Trotta, ESQ<br>Stinson LLP<br>Stinson LLP<br>1775 Pennsylvania Avenue, NW<br>Suite 800<br>Washington, DISTRICT OF COLUMBIA 20006<br>jtrotta@stinson.com |
| Nebraska Public Power District | | Harold Hadland<br>Nebraska Public Power District<br>1414 15th Street<br>Columbus, NEBRASKA 68601<br>hlhadla@nppd.com |
| NextEra Energy Resources, LLC | Gunnar Birgisson<br>Senior Attorney<br>NextEra Energy Resources, LLC<br>801 Pennsylvania Ave., N.W.<br>Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>gunnar.birgisson@nee.com | |
| NextEra Energy Resources, LLC | Gunnar Birgisson<br>Senior Attorney<br>NextEra Energy Resources, LLC<br>801 Pennsylvania Ave., N.W.<br>Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>gunnar.birgisson@nee.com | |
| Oklahoma Gas & Electric Company | William Sultemeier<br>General Counsel, OGE Energy Co<br>Oklahoma Gas & Electric Company<br>321 N Harvey Avenue<br>Oklahoma City, OKLAHOMA 73102<br>UNITED STATES<br>sultemwh@oge.com | Gregory McAuley<br>mcaulegl@oge.com |
| Oklahoma Gas & Electric Company | John Longstreth<br>K&L Gates LLP<br>1601 K Street, NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>john.longstreth@klgates.com | Donald A Kaplan<br>K&L Gates LLP<br>1601 K Street, NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>don.kaplan@klgates.com |
| Omaha Public Power District | Joseph Lang<br>Manager, FERC & SPP Policy<br>Omaha Public Power District<br>4325 Jones Plaza<br>Omaha, NEBRASKA 68501<br>UNITED STATES<br>jelang@oppd.com | |
| Prairie Breeze Wind Energy II LLC | Nicole Luckey<br>Invenergy LLC<br>1 South Wacker<br>Suite 1800<br>Chicago, ILLINOIS 60606 | |

| | | |
|---|---|---|
| | UNITED STATES<br>nluckey@invenergyllc.com | |
| Prairie Breeze<br>Wind Energy<br>III LLC | Nicole Luckey<br>Invenergy LLC<br>1 South Wacker<br>Suite 1800<br>Chicago, ILLINOIS 60606<br>UNITED STATES<br>nluckey@invenergyllc.com | |
| Roosevelt<br>County<br>Electric<br>Cooperative,<br>Inc. | Eli Eilbott<br>Attorney<br>Duncan, Weinberg, Genzer & Pembroke<br>PC<br>DUNCAN WEINBERG GENZER &<br>PEMBROKE PC<br>1667 K STREET, NW SUITE 700<br>WASHINGTON, DISTRICT OF COLUMBIA<br>20006<br>UNITED STATES<br>ede@dwgp.com | Antonio R Sanchez, JR<br>General Manager<br>Roosevelt County Electric<br>Cooperative, Inc.<br>121 N Main Street<br>PO Box 389<br>Portales, NEW MEXICO 88130<br>sancheza@rcec.org |
| Roosevelt<br>County<br>Electric<br>Cooperative,<br>Inc. | Matthew Bly<br>Partner<br>Duncan & Allen LLP<br>1730 Rhode Island Avenue, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA<br>20036-3115<br>UNITED STATES<br>mlb@duncanallen.com | |
| Southwest<br>Power Pool,<br>Inc. | Matthew Binette<br>Attorney<br>Wright & Talisman, PC<br>1200 G Street, N.W.<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA<br>20005-3898<br>UNITED STATES<br>binette@wrightlaw.com | |
| Southwest<br>Power Pool,<br>Inc. | Tessie Kentner<br>Attorney<br>Southwest Power Pool Inc.<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72223<br>UNITED STATES<br>tkentner@spp.org | |
| Sunflower<br>Electric Power<br>Corporation | Adrienne Clair<br>Thompson Coburn LLP<br>Thompson Coburn LLP<br>1909 K Street NW<br>Suite 600<br>Washington, DISTRICT OF COLUMBIA<br>20006<br>UNITED STATES<br>aclair@thompsoncoburn.com | Mark D. Calcara<br>General Counsel<br>Sunflower Electric Power Corporation<br>PO Box 1110<br>Great Bend,DISTRICT OF COLUMBIA<br>67530-1110<br>mcalcara@sunflower.net |
| Sunflower<br>Electric Power<br>Corporation | | Ray Bergmeier<br>rbergmeier@sunflower.net |
| TDU<br>Intervenors | | Stephen C. Pearson<br>Attorney<br>Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA<br>20006<br>steve.pearson@spiegelmcd.com |
| TDU | | E Service |

| | | |
|---|---|---|
| Intervenors | | Spiegel & McDiarmid LLP<br>1875 Eye St, NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20006<br>eService@spiegelmcd.com |
| Westar Energy, Inc. | Patrick Smith<br>Corporate Counsel<br>Westar Energy, Inc.<br>818 South Kansas Ave.<br>Topeka, KANSAS 66601<br>UNITED STATES<br>Patrick.Smith@evergy.com | Mo Awad<br>Director, Operations Analytics<br>Westar Energy, Inc.<br>PO BOX 889<br>Topeka, KANSAS 66601<br>mo.awad@evergy.com |
| Westar Energy, Inc. | | Grant L Wilkerson<br>grant.wilkerson@westarenergy.com |
| Western Farmers Electric Cooperative | Daniel Frank<br>Partner<br>Eversheds Sutherland (US) LLP<br>700 Sixth Street NW<br>Suite 700<br>Washington, DISTRICT OF COLUMBIA 20001-3980<br>UNITED STATES<br>DanielFrank@eversheds-sutherland.com | Matthew A. Caves<br>Senior Manager, Legal & Regula<br>Western Farmers Electric Cooperative<br>707 N.E. 7th St.<br>Anadarko, OKLAHOMA 73005<br>matt.caves@wfec.com |
| Western Farmers Electric Cooperative | Allison Speaker<br>Eversheds Sutherland (US) LLP<br>700 6th Street NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>AllisonSpeaker@eversheds-sutherland.com | |
| Xcel Energy Services Inc. | Joseph Lowell<br>Attorney<br>Morgan Lewis & Bockius LLP<br>1111 Pennsylvania Ave NW<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>jlowell@morganlewis.com | Stephen M Spina<br>Morgan Lewis & Bockius LLP<br>1111 Pennsylvania Ave.<br>Washington, DISTRICT OF COLUMBIA 20004<br>sspina@morganlewis.com |
| Xcel Energy Services Inc. | | Timothy T Mastrogiacomo<br>Lead Assistant General Counsel<br>Xcel Energy Services Inc.<br>701 Pennsylvania Avenue NW<br>Suite 250<br>Washington, DISTRICT OF COLUMBIA 20004<br>tim.t.mastrogiacomo@xcelenergy.com |

Back to Query Service List    Back to FERCOnline

**APPENDIX B**
**(UNDERLYING ORDERS)**

*Xcel Energy Services Inc. v. Southwest Power Pool, Inc.*, Docket No. EL18-9-000, "Order on Complaint," 162 FERC ¶ 61,203 (March 6, 2018)

**162 FERC ¶ 61,203**
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Kevin J. McIntyre, Chairman;
                       Cheryl A. LaFleur, Neil Chatterjee,
                       Robert F. Powelson, and Richard Glick.

Xcel Energy Services Inc.                            Docket No.  EL18-9-000

              v.

Southwest Power Pool, Inc.

ORDER ON COMPLAINT

(Issued March 6, 2018)

1.      On October 10, 2017, pursuant to sections 206 and 306 of the Federal Power Act (FPA)[1] and Rule 206 of the Commission's Rules of Practice and Procedure,[2] Xcel Energy Services Inc. (Xcel) filed a complaint against Southwest Power Pool, Inc. (SPP) alleging that:  (1) SPP's implementation of Attachment Z2 of the SPP Open Access Transmission Tariff (Tariff) violates the Tariff and the filed rate doctrine; (2) SPP's assignment of Attachment Z2 revenue crediting costs of approximately $12.8 million for credit payment obligations for the historical period from 2008 to 2016 and $485,000 for Schedule 11 charges[3] violates Attachment Z1 of the Tariff, service agreements with Xcel's affiliate, Southwestern Public Service Company (Southwestern), and the filed rate doctrine; and (3) SPP's assignment of credit payment obligations to Xcel is unjust and unreasonable. In this order, we deny the complaint, as discussed below.

---

[1] 16 U.S.C. §§ 824e, 825e (2012).

[2] 18 C.F.R. § 385.206 (2017).

[3] *See* SPP Tariff at Schedule 11 (Base Plan Zonal Charge and Region-Wide Charge).

## I.    Background

2.     Under Attachment Z1 (Aggregate Transmission Service Studies) of the Tariff, SPP studies all of the long-term transmission service requests received during a six-month open season to determine whether any new network upgrades are needed to accommodate those requests.  To make this determination, SPP performs a traditional "but for" test (i.e., identifies system constraints and any network upgrades that would not be necessary but for the transmission service requests).  SPP includes any such needed network upgrades in an Aggregate Facilities Study.  SPP also determines the cost allocation and recovery for Service Upgrades[4] pursuant to Attachment Z1, which provides for direct assignment of some or all of the costs of Service Upgrades to the transmission customer(s) whose transmission service request(s) gave rise to the network upgrade.  Similarly, under Attachment V (Generator Interconnection Procedures) of the Tariff, SPP studies generator interconnection requests to determine the new network upgrades required to grant the generator interconnection requests.  SPP directly assigns the costs of these network upgrades to the generator interconnection customer.

3.     Attachment Z2 (Revenue Crediting for Upgrades) of the Tariff provides that transmission customers, network customers, generator interconnection customers, and project sponsors may receive revenue credits for network upgrades (i.e., network upgrades whose costs have been directly assigned to them).  SPP defines such network upgrades as Creditable Upgrades.[5]  The directly-assigned network upgrade costs are recoverable, with interest, from customers taking new transmission service that could not have been provided "but for" the Creditable Upgrade, until the amount owed to the upgrade sponsor (i.e., the transmission customer or generator interconnection customer that was directly assigned the costs of the Creditable Upgrade) is zero.[6]  The

---

[4] Service Upgrades are "Network Upgrades required to provide transmission service requested by an Eligible Customer in accordance with Attachment Z1 of this Tariff."  SPP Tariff, Section I.1 (Definitions).

[5] A Creditable Upgrade is "[a]ny network upgrade which was paid for, in whole or part, through revenues collected from a transmission customer, network customer, or generation interconnection customer through directly assigned upgrade costs . . . ."  SPP Tariff at Attachment Z2, Section I.A.

[6] Attachment Z2 provides that revenue credits will be based on transmission service that could not be provided "but for" the existence of the Creditable Upgrade.  The Commission recently discussed the Attachment Z2 "but for" test in an order in Docket No. EL17-21-000.  *Kan. Elec. Power Coop., Inc. v. Sw. Power Pool, Inc.*, 161 FERC ¶ 61,145 (2017) (*KEPCo*).  In *KEPCo*, the Commission found that the "but for" test in Attachment Z2 is a subsequent use test to determine a new transmission service request's

Attachment Z2 revenue crediting process does not guarantee full recovery of the directly-assigned network upgrade costs, but only an amount equivalent to the subsequent use of the upgrade by transmission customers that request new transmission service.

4.      Under the cost allocation rules in Section III of Attachment J (Recovery of Costs Associated with New Facilities), Base Plan funding is available for the cost of the new network upgrades identified in the Aggregate Facilities Study to accommodate the transmission service request associated with designated network resources.  In addition, Base Plan funding is available for the revenue credit payment obligations for the subsequent use of Creditable Upgrades by transmission service requests associated with designated network resources, whose revenue credit payment obligations are also treated as network upgrade costs.[7]  Once the network upgrade costs meet the eligibility criteria for Base Plan funding, those network upgrade costs are included in the rolled-in allocation of the costs to transmission customers through the region-wide and zonal rates to be recovered under Schedule 11 of the Tariff.[8]

---

effect on an existing Creditable Upgrade.  *Id.* PP 65-70.  On December 6, 2017, *KEPCo* and Xcel filed requests for rehearing of *KEPCo*.

[7] Attachment J, Section III of the Tariff outlines the criteria for the regional and zonal cost allocation of Base Plan Upgrades.  Under the Tariff, Base Plan Upgrades include "those Service Upgrades required for new or changed Designated Resources to the extent allowed for in Attachment J to this Tariff . . . ."  SPP Tariff, Section I.1 (Definitions).

[8] The costs of network upgrades that are eligible for Base Plan funding are allocated pursuant to the "highway/byway" cost allocation method, which allocates the costs of transmission facilities as follows:  (1) if a transmission facility's operating voltage will be 100 kV or less, all of its costs are allocated to the transmission zone in which it is located; (2) if a transmission facility's operating voltage will be greater than 100 kV but less than 300 kV, then one-third of its costs will be allocated on a region-wide, load-ratio share basis and two-thirds of its costs will be allocated to the transmission zone in which it is located; and (3) if a transmission facility's operating voltage will be 300 kV or greater, all of its costs will be allocated on a region-wide, load-ratio share basis.

5.      SPP added these provisions for direct assignment of the costs of Service Upgrades and generator interconnection-related network upgrades, and associated revenue crediting, to its Tariff through several filings between 2005 and 2008.[9]  Subsequently, SPP filed further revisions and stated that, although the 2008 revisions provided clarification on some points, the changes did not simplify the process, and, therefore, in July 2013, SPP filed Tariff revisions to refine the revenue crediting process in Docket No. ER13-1914-000,[10] which the Commission accepted.[11]  However, SPP's implementation of revenue crediting was delayed until 2016 when SPP sought, and the Commission granted, waiver of certain provisions of the Tariff to allow SPP to implement the SPP Attachment Z2 revenue crediting process for the historical period from 2008 to 2016.[12]  The Aggregate Facilities Studies conducted during the historical period only included and directly assigned costs of new facilities needed to accommodate transmission service requests; they did not determine the use and responsibility for existing Creditable Upgrades.  SPP explained that, because of delays in implementing the computer software, it was unable to list certain Creditable Upgrades in the Aggregate Facilities Study report before August 2016.  However, in the July 2016 Waiver Order, the Commission found that parties had notice of potential Attachment Z2 credit payment obligations throughout this time.[13]

6.      In 2012, SPP stakeholders unanimously voted to endorse the Credit Process Task Force (CPTF) White Paper,[14] which provides guidance to SPP to implement Attachment Z2.  In particular, the CPTF White Paper sets forth the Reservation Stack Analysis methodology, which creates rules for determining subsequent use of a Creditable Upgrade, and, therefore, the level of revenue credit payment obligations.

---

[9] *Sw. Power Pool, Inc.*, 123 FERC ¶ 61,208 (2008) (May 2008 Order); *Sw. Power Pool, Inc.*, Docket No. ER08-746-001 (Aug. 28, 2008) (delegated letter order).

[10] Revisions to Clarify the Determination of Credits and Distribution of Credit Revenue for Creditable Upgrades of Southwest Power Pool, Inc., Docket No. ER13-1914-000 (filed July 9, 2013) (2013 Tariff revisions).

[11] *Sw. Power Pool, Inc.*, 145 FERC ¶ 61,198 (2013); *Sw. Power Pool, Inc.*, Docket No. ER13-1914-002 (Feb. 12, 2014) (delegated letter order).

[12] *Sw. Power Pool, Inc.*, 156 FERC ¶ 61,020 (2016) (July 2016 Waiver Order), *order on reh'g*, 161 FERC ¶ 61,144 (2017).

[13] *Id.* PP 53, 56.

[14] *See KEPCo*, 161 FERC ¶ 61,145 at PP 19-20, 61, 70.

The Reservation Stack Analysis determines responsibility for revenue credits based on incremental impacts of each reservation on each Creditable Upgrade.  SPP used the Reservation Stack Analysis to identify with more certainty network upgrades whose costs would be directly assigned to transmission customers, and began invoicing transmission customers in 2016.

## II.    Complaint

7.      First, Xcel alleges that SPP's implementation of Attachment Z2 violates the Tariff and filed rate doctrine.  Xcel argues that SPP is not applying the "but for" test set forth in the Tariff.  Xcel states that Attachment Z2 unambiguously provides for the assignment of credit payment obligations to subsequent transmission service requests that "could not be provided but for" the Creditable Upgrade.[15]  However, Xcel argues that the CPTF White Paper appears to assert that more than one interpretation is possible.[16]  Xcel states that, under Commission policy, in applying the "but for" test in the context of generation interconnections, a customer can only be charged the costs of interconnection-related network upgrades that would not be necessary "but for" the customer's request for interconnection service.[17]  Xcel asserts that, in 2008, SPP eliminated the prior standard for determining credit payment obligations, which focused on whether subsequent transmission service requests would increase the loading on a Creditable Upgrade in the direction of the original constraint that caused the Creditable Upgrade to be built.[18]  Xcel states that SPP intended to establish a "but for" causation test comparable to the test under Commission policy, in order to determine which subsequent transmission requests were using the Creditable Upgrade in a manner justifying responsibility for credit payment obligations.

---

[15] Complaint at 17-18 (citing SPP Tariff at Attachment Z2, Sections II.A, II.B).

[16] *Id.* at 18 (citing Complaint, Exhibit 4 (CPTF White Paper) at 2-3).

[17] *Id.* (citing *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, FERC Stats. & Regs. ¶ 31,146, at P 694 (2003), *order on reh'g*, Order No. 2003-A, FERC Stats. & Regs. ¶ 31,160, *order on reh'g*, Order No. 2003-B, FERC Stats. & Regs. ¶ 31,171 (2004), *order on reh'g*, Order No. 2003-C, FERC Stats. & Regs. ¶ 31,190 (2005), *aff'd sub nom. Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1230 (2008); *Midwest Indep. Transmission Sys. Operator, Inc.*, 131 FERC ¶ 61,165 (2010)).

[18] *Id.* (citing Complaint, Exhibit 1 (Liu Affidavit) ¶¶ 6-9).

8.      Xcel argues that, to apply the "but for" test under Attachment Z2, the correct approach is to model the Creditable Upgrade both in and out of service to observe the effects on the subsequently-granted transmission service.[19]  Specifically, in order to examine the effects of a proposed transmission transaction upon a facility, an engineer should remove the facility from the study model and identify the resulting impacts on the transmission system.  Xcel states that, if with the Creditable Upgrade removed, an N-1 contingency occurs due to granting the customer's service request, then one can conclude that the customer's service could not be provided but for the upgrade.  According to Xcel, in that situation, the Creditable Upgrade makes the customer's service possible, and the customer should have a credit payment obligation with respect to the Creditable Upgrade.

9.      Xcel claims that, instead, SPP currently bases its approach for determining credit payment obligations upon recommendations contained in the CPTF White Paper developed by the Crediting Process Task Force.  Xcel explains that the CPTF White Paper recommends that SPP instead use a set of rules that assigns credit payment obligations based upon the directional impact of incremental flows upon the Creditable Upgrade, which is similar to the approach removed from Attachment Z of the Tariff in 2008.[20]  Xcel notes that the CPTF White Paper was never developed into Tariff revisions filed with the Commission.

10.     Xcel states that, using the CPTF White Paper, SPP first determines whether the transmission service reservation results in flow over the Creditable Upgrade.  Xcel states that, if the reservation flows over the Creditable Upgrade, that reservation is included in the Reservation Stack.[21]  Next, Xcel asserts that SPP separates reservations that flow in the direction of flow which caused the Creditable Upgrade from those reservations with opposite flow.  For reservations with a positive or forward flow that have a transmission distribution factor impact of as little as three percent or greater on the Creditable Upgrade, the reservation is deemed to have been infeasible without the Creditable Upgrade.[22]  Xcel posits that SPP appears to have returned to a form of the "directional loading" approach that was removed from the Tariff in 2008.  Xcel claims that SPP's analysis is conducted on an after the fact basis, and does not examine a reservation's impact on a Creditable Upgrade with the forward looking analysis of the Aggregate Transmission Service Study process.

---

[19] *Id.* at 19 (citing Complaint, Exhibit 2 (Miranda Aff.) ¶ 8).

[20] *Id.* at 20 (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 18-20).

[21] *Id.* (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 17-22).

[22] *Id.* at 20-21 (citing Complaint, Exhibit 1 (Liu Aff.) ¶ 21).

11.    Xcel argues that, for reservations with reverse directional flow, using the CPTF White Paper, SPP currently charges reservations with any flow above a threshold over the Creditable Upgrade.[23]  Xcel states that the threshold equals the line rating plus the volume of the base forward flow on a Creditable Upgrade.  Xcel asserts that SPP assumes any additional reservations above that threshold that flow over the Creditable Upgrade in the reverse direction would have caused that specific Creditable Upgrade to be built, and those reservations are assigned credit payment obligations for that Creditable Upgrade.  Xcel also states that, for subsequent reservations having either positive or negative flows, SPP's test for determining credit payment obligation responsibility simply boils down to whether a reservation is modeled to flow on the Creditable Upgrade, by three percent or more.[24]  If such flows are modeled to occur, the service is deemed by SPP to have been deemed infeasible without the Creditable Upgrade.

12.    Xcel argues that the fact that a transmission reservation causes electricity to flow across a transmission facility does not, on its own, make that transmission facility necessary for the reservation.  Xcel states that electricity flows along the path of least resistance, and each facility upgrade to a transmission system can have an impact on the system's topology, changing the facilities over which a particular transaction would flow.[25]  Thus, Xcel concludes that looking after the fact at whether a particular transmission reservation flows over a specific facility assuming the facility is already in-service is far different from determining whether that facility was necessary to grant a particular reservation.  Xcel states that it is entirely possible that a reservation that has a "response factor" on a Creditable Upgrade may not have needed the Creditable Upgrade to be granted in the first place.  Xcel argues that SPP overlooks this fundamental concept in the CPTF White Paper methodology by applying simplifying assumptions and failing to analyze whether a transmission reservation could have been possible using only other facilities that are already in service and recovered through regional transmission rates.[26]

13.    Xcel asserts that an example of a point-to-point transmission service reservation that has a positive response factor on a Creditable Upgrade in the forward flow direction illustrates the inconsistency between the requirements of Attachment Z2 and the CPTF White Paper.  Xcel asserts that Attachment Z2 provides that, for such reservation, the crediting will be equal to "the positive response factor" of the reservation "times the

---

[23] *Id.* at 21 (citing Complaint, Exhibit 1 (Liu Aff.) ¶ 22).

[24] *Id.* (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 21-22).

[25] *Id.* at 22 (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 23-24).

[26] *Id.* at 22-23 (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 23-24).

portion of the new reservation capacity that could not be provided but for the Creditable Upgrade times the rate applicable to such new reservation."[27]  Xcel asserts that Attachment Z2 results in a credit payment obligation calculation for point-to-point transmission, where a customer's credit responsibility is the product of three variables: (1) positive response factor of reservation; (2) portion of reservation capacity that cannot be provided but for the Creditable Upgrade; and (3) rate applicable to such new reservation.  Xcel asserts that SPP skips the "but for" test and the step in the calculation written into Attachment Z2 in which the positive response factor of the reservation is multiplied by the portion of capacity that cannot be provided "but for" the Creditable Upgrade.  Xcel argues that the credit calculation conducted by SPP for the point-to-point reservation can be represented as the product of only two variables: (1) Positive Response Factor of Reservation; and (2) Rate applicable to such new reservation.[28]  Xcel states that it has been unable to replicate SPP's credit payment obligation calculations.  Xcel alleges that a number of the credit payment obligations that SPP assigned to Southwestern are associated with Creditable Upgrades that did not increase Available Transfer Capability on the SPP transmission system, appear to only benefit the interconnection customer, and do not contribute to expanding the capability of the SPP network or benefit all or individual subsequent transmission customers.  Xcel argues that there is no indication in the Aggregate Transmission Service Studies for Southwestern that these "non-capacity"[29] upgrade facilities played any role in the determination of whether Southwestern's transmission service requests were possible.[30]

---

[27] *Id.* at 23 (citing SPP Tariff at Attachment Z2, Section II.A).

[28] *Id.* at 24.

[29] In the complaint, Xcel refers to "non-capacity upgrades."  Xcel asserts that it does not have enough information to determine whether these non-capacity upgrades (i.e., upgrades that do not add any transfer capacity) would satisfy the but for test under Attachment Z2 but Xcel asserts that "it is unclear how SPP could have determined that assignment of these creditable payment obligations to Southwestern is appropriate even under the principles of the CPTF White Paper because, without capacity ratings, these facilities are not amenable to a flow-based evaluation of [transmission service request] impacts."  *Id.* at 25.  The term "non-capacity upgrades" does not appear in the Tariff, and we do not adopt it in this order.

[30] *Id.* at 24-26 (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 26-28; Complaint, Exhibit 2 (Miranda Aff.) ¶¶ 9-10, 11, 12, 13).

Similarly, Xcel argues that SPP has assigned to Southwestern a credit payment obligation associated with power system stabilizers, which Xcel contends are facilities that are not amenable to a power flow analysis.[31]

14.     Xcel alleges that SPP's implementation of Attachment Z2 violates the filed rate doctrine and the rule against retroactive ratemaking.  Xcel argues that SPP's reliance on the CPTF White Paper instead of the "but for" test increases the scope of upgrades eligible for SPP cost allocation that otherwise would not have been identified in any other SPP transmission planning process, and unjustifiably increases transmission rates and costs for SPP customers.[32]  Moreover, Xcel argues that the costs of Creditable Upgrades were initially directly assigned to the customer or Upgrade Sponsor because the specific upgrade directly benefitted the specific customer for its specific business needs.  Xcel states that the upgrades were not planned through the SPP Integrated Transmission Plan (ITP) regional planning process, but were instead planned to service specific transmission service or generation interconnection requests through the Aggregate Transmission Service Study.  Xcel asserts that the upgrades were, thus, not shown to benefit the regional transmission system at the time they were built and they were not evaluated to be the most economical solution to meet a variety of customer's future needs.

15.     Xcel states that Creditable Upgrades are then, however, automatically included in the base model as part of SPP's ITP process even if they do not meet existing SPP transmission upgrade study criteria.  Xcel states that Attachment J of the Tariff establishes a "safe harbor cost limit" for cost allocation of transmission service-related upgrades, which allows regional cost allocation of amounts below the safe harbor cost limit through Schedule 11 to the Tariff.  Specifically, Section III.B.1.d of Attachment J provides that, for upgrades that cost over $100,000, the aggregate cost of such upgrades assigned to each individual transmission service request that is less than or equal to the Safe Harbor Cost Limit of $180,000/MW times the requested capacity is eligible for highway/byway cost allocation under Schedule 11.  Xcel states that Attachment Z2 credit payment obligations are considered transmission service costs by SPP, making amounts below the $180,000/MW safe harbor limit recoverable through SPP Base Plan funding (i.e., the highway/byway cost allocation for regional facilities), and uplifted through Schedule 11 of the Tariff.  As a result, Xcel argues that SPP's approach under Attachment Z2 allows for the costs of Creditable Upgrades to be recovered from other SPP transmission customers after applying less stringent planning criteria to the development of such upgrades than under the SPP ITP process.

---

[31] *Id.* at 25.

[32] *Id.* at 27 (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 28-31).

16.     Xcel claims that the CPTF White Paper conflicts with the requirements of
Attachment Z2 and is effectively being used as a substitute for the requirements set
forth in Attachment Z2.  Xcel states that the CPTF White Paper only contains
recommendations and did not lead to Tariff revisions or even the development of posted
SPP business practices.  Xcel argues that an unfiled whitepaper cannot trump the filed
rate, and if the CPTF White Paper had been intended to supplant or vary the terms of
Attachment Z2 to the Tariff, Commission policy requires that the White Paper (or the
methodology stated in the White Paper) should have been filed because it "significantly
affects" rates.**33**

17.     Xcel notes that, although the Commission previously granted SPP certain
waivers of the Tariff to allow retroactive re-billing of the Attachment Z2 charges for the
historical period starting in 2008, the Commission believed that SPP was implementing
Attachment Z2 consistent with its Tariff.**34**  Xcel asserts that SPP never requested, and the
Commission did not waive, the "but for" test requirement in Attachment Z2.**35**

18.     Xcel claims that SPP has represented to Southwestern and other stakeholders that
SPP's assessment of Attachment Z2 credit payment obligations pursuant to the CPTF
White Paper does not violate the filed rate doctrine because "the filed rate requirements
do not apply where the parties have agreed to the rates before their formulation," and that
customers that agree to take transmission service subject to the terms of the Tariff bind
themselves to credit obligations imposed under Attachment Z2.**36**  Xcel states that, while
Southwestern agreed to take service subject to the crediting provisions of the Tariff,

---

**33** *Id.* at 29-30 (citing *Sw. Power Pool, Inc.*, 151 FERC ¶ 61,076 (2015);
*Preventing Undue Discrimination and Preference in Transmission Service*, Order
No. 890, FERC Stats. & Regs. ¶ 31,241, at n.939, *order on reh'g*, Order No. 890-A,
FERC Stats. & Regs. ¶ 31,261 (2007), *order on reh'g*, Order No. 890-B, 123 FERC
¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on
clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009); *Sw. Power Pool, Inc.*,
112 FERC ¶ 61,303, at P 25 (2005); *City of Cleveland Ohio v. FERC*, 773 F.2d 1368,
1376 (D.C. Cir. 1985)).

**34** *Id.* at 31 (citing July 2016 Waiver Order, 156 FERC ¶ 61,020; *Sw. Power Pool,
Inc.*, 156 FERC ¶ 61,245 (2016)).

**35** *Id.* at 31-32 (citing *Old Dominion Elec. Coop.*, 151 FERC ¶ 61,207 (2015),
*reh'g denied*, 154 FERC ¶ 61,155, at PP 17-25 (2016)).

**36** *Id.* at 32 (citing SPP Complaint Response, Docket No. EL17-21-000, at 12
(Dec. 12, 2016)).

including Attachment Z2, it has not agreed to be bound by a retroactive application of a whitepaper that conflicts with express terms of Attachment Z2 in the Tariff. Xcel asserts that the determination of whether a Creditable Upgrade is required to provide transmission service must be identified at the time the transmission service is requested and detailed in the service agreement itself. Xcel argues that the purpose of the Aggregate Transmission Service Study process is to identify the specific facilities needed to meet a transmission service or generation interconnection request, so they can be identified in the service agreement.

19.     Xcel states that SPP has also said that "the filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service."[37] Xcel also states that SPP has claimed that, if the Aggregate Transmission Service Study report for a transmission reservation indicated that additional charges under Attachment Z2 may be forthcoming, then the customer was "on notice" that it may later be assessed such additional charges. Xcel claims that there are multiple issues with SPP's position. First, neither of the notice exceptions set forth in *West Deptford Energy, LLC v. FERC*[38] is applicable under these circumstances, in which SPP is attempting to apply a calculation of credit payment obligations that: (1) contradicts the filed rate in Attachment Z2; and (2) is also inconsistent with SPP's service agreements with Southwestern accepted for filing by the Commission.[39] With regard to the caveats in the Aggregate Transmission Service Study report, Xcel asserts that courts have rejected the proposition that customers should be charged with "adequate notice" from one-way assertions by the public utility to a customer in a study report or from non-binding cost estimates in studies.[40]

20.     In support of its second allegation—that SPP's assignment of credit payment obligations violates Attachment Z1, Southwestern's service agreements, and the filed rate doctrine—Xcel argues that Southwestern's service agreements with SPP that resulted from the Aggregate Transmission Service Study process, and which were filed with and accepted by the Commission, and were to reflect the final costs that Southwestern was responsible for, also constitute a part of the "filed rate" governing Southwestern's

---

[37] *Id.* (citing SPP Complaint Response, Docket No. EL17-21-000, at 12).

[38] 766 F.3d 10 (D.C. Cir. 2014) (*West Deptford*).

[39] Complaint at 33 (citing *West Deptford*, 766 F.3d at 22).

[40] *Id.* (citing *West Deptford*, 766 F.3d at 24).

service.[41]  However, Xcel states, SPP's transmission service agreements with
Southwestern that resulted from the Aggregate Transmission Service Study process do
not mention liability for the majority of Creditable Upgrades for which SPP is now
assessing Southwestern with millions of dollars of credit payment obligations.[42]

21.     Xcel states that, as part of the finalization of arrangements arising out of the
Aggregate Transmission Service Study, and in order to minimize the costs of directly
assigned upgrades, Section V.c.1 of Attachment Z1 of the Tariff requires SPP to "identify
each existing Creditable Upgrade that is impacted by any transmission service request
in the Aggregate Transmission Service Study."[43]  Furthermore, Xcel states that
Subsection III.C.8 of Attachment Z1 of the Tariff requires SPP to "determine the
allocation of estimated cost to provide the transmission service for each request studied in
the Aggregate Transmission Service Study."[44]  Xcel adds that Subsection III.C.8 of
Attachment Z1 requires SPP to "finalize the solutions for the Aggregate Facilities Study
and the cost estimates for upgrades necessary to provide the requested transmission
service."[45]  Xcel asserts that the results of the Aggregate Facilities Study, which identify
the upgrades and cost responsibility necessary for service, are then specified in the
service agreement executed between the customer and SPP.

22.     Xcel claims that, when Southwestern executed the resulting service agreements
with SPP, the service agreements should have contained all of the final cost responsibility
for upgrades necessary to provide Southwestern's service; however, in many cases, the
resulting service agreement makes no mention of potential credit liability for Attachment
Z2 credits.  Xcel notes that only five credit payment obligations being assessed to
Southwestern (out of a total of 101 credit payment obligations assessed to Southwestern)
are mentioned in the Southwestern's service agreements accepted for filing in Docket No.
ER17-1694-000.[46]

---

[41] *Id.* at 34 (citing Complaint, Exhibit 6; *Sw. Power Pool, Inc.*, Docket No. ER17-
1694-000 (July 20, 2017) (delegated letter order)).

[42] *Id.* (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 37-40).

[43] *Id.* (citing SPP Tariff at Attachment Z1, Section V.c.1).

[44] *Id.* (citing SPP Tariff at Attachment Z1, Section III.C.8).

[45] *Id.* (citing SPP Tariff at Attachment Z1, Section III.C.8).

[46] *Id.* at 34-35 (citing Complaint, Exhibits 6 & 8).

23.     Xcel states that, although it is true that the Aggregate Transmission Service Study report included a caveat that there was a possibility of potential responsibility for Creditable Upgrades, no credit responsibility was assigned to Southwestern at that time. Xcel notes that there is also no similar, generic caveat included in the subsequently executed service agreement between Southwestern and SPP. Xcel argues that, in fact, the Aggregate Transmission Service Study report states, "[a]t the conclusion of the Aggregate Transmission Service Study, Service Agreements for each request for service will be tendered identifying the terms and conditions of the confirmed service."[47]  Xcel argues that the effect would be equivalent to unilaterally amending Southwestern's service agreements in effect in prior periods.

24.     Xcel asserts that, even if the Aggregate Transmission Service Study reports constituted adequate notice that SPP could unilaterally re-interpret Attachment Z2 or the terms and conditions of the service agreements, SPP is invoicing Southwestern for many Creditable Upgrades that were never identified in the Aggregate Transmission Service Study. Specifically, Xcel claims that 76 of the 101 total credit payment obligations being assessed to Southwestern are associated with Creditable Upgrades not identified in the Aggregate Transmission Service Study as being impacted by Southwestern's service requests.[48]

25.     With regard to its third allegation in the complaint, Xcel argues that SPP's assignment of credit payment obligations is unjust and unreasonable for two reasons. First, Xcel alleges that SPP disregards reservation term in assigning credit payment obligations, which is unjust and unreasonable. Xcel asserts that the language in Attachment Z2, Section II.B is clear that credit payment obligations are not assessed indefinitely but based on subsequent use of the "but for" upgrades. Xcel states that SPP's method for implementing Attachment Z2 focuses solely on the capacity of the subsequent network transmission service reservation, but does not take into account the term of the request.

26.     Xcel also alleges that SPP's implementation of Attachment Z2 is unjust and unreasonable because it does not provide customers with adequate information to evaluate the underlying costs assessed to customers. Xcel notes that SPP has not filed the credit payment obligation assessments to customers under section 205 as a rate, which would require cost support for the credit payment obligation assessments, allow customers to determine whether a protest is necessary, and offer customers suspension and refund protections. Xcel states that SPP has also not filed the credit payment obligation assessments in any form of informational filing to the Commission.

---

[47] *Id.* at 35 (citing Complaint, Exhibit 1 (Liu Aff.) ¶ 36).

[48] *Id.* at 36 (citing Complaint, Exhibit 1 (Liu Aff.) ¶ 39).

27.    Xcel argues that the calculation of credit payment obligation assessments by SPP generally is a black box to customers.  Xcel claims that, to the extent SPP is or will be applying the Tariff, SPP has not provided information sufficient for transmission customers including Southwestern to determine that their transmission service reservations could not be granted "but for" the specific Creditable Upgrades for which credit payment obligations are being invoiced.[49]  Xcel argues that SPP has not provided customers with sufficient information to determine that the rate associated with the cost of the Creditable Upgrade is just and reasonable.[50]  In addition, Xcel argues that, without a process to verify the SPP credit payment obligation calculations, there is a possibility of over- or double-recovery.[51]  Xcel asserts that there is no way to assess if certain entities who invested in Creditable Upgrades and who are now receiving credits under Attachment Z2 may already be collecting all or a portion of the facility costs through another mechanism.[52]  Xcel states that, for example, a generation interconnection customer that originally funded a Creditable Upgrade may be recovering the directly-assigned Creditable Upgrade costs in the bundled rate of a power purchase agreement or directly from its wholesale and retail customers.  Xcel adds that it is possible that in such case the generation interconnection customer may not be crediting the Attachment Z2 related revenues back to the power supply counterparty.[53]

28.    Xcel also notes that SPP has recently announced that its original Attachment Z2 calculations were incorrect, and SPP is in the process of recalculating the historic Attachment Z2 liabilities because of errors.[54]  Xcel reiterates that Southwestern has no way of verifying SPP's calculations to validate that the current set of errors constitutes all issues with the SPP calculations.  Xcel requests that the Commission direct SPP to adopt informational protocols similar to those required by the Commission for other public

---

[49] *Id.* at 41.

[50] *Id.* (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 45-48).

[51] *Id.* (citing Complaint, Exhibit 1 (Liu Aff.) ¶ 46).

[52] *Id.* at 42 (citing Complaint, Exhibit 1 (Liu Aff.) ¶ 47).

[53] *Id.*

[54] *Id.* (citing SPP Market and Operations policy Committee July 11-12 Meeting Minutes, https://www.spp.org/documents/52521/mopc%20meeting%20minutes%20and%20attachments%20july%2011-12,%202017.pdf).

utilities in SPP so that future Attachment Z2 rate calculations are transparent and affected SPP customers can obtain information to verify the SPP calculations.[55]

## III.    Notice of Filing and Responsive Pleadings

29.    Notice of Xcel's complaint was published in the *Federal Register*, 82 Fed. Reg. 48,219 (2017), with interventions and protests due on or before October 30, 2017. Timely motions to intervene were filed by:  Kansas City Power & Light Company and KCP&L Greater Missouri Operations Company; American Electric Power Service Corporation; Westar Energy, Inc; NextEra Energy Resources, LLC (NextEra); Arkansas Electric Cooperative Corporation; Central Valley Electric Cooperative, Inc., Farmers Electric Cooperative, Inc., Lea County Electric Cooperative, Inc., and Roosevelt County Electric Cooperative, Inc.; Western Farmers Electric Cooperative; American Wind Energy Association; Oklahoma Gas & Electric Company; Prairie Breeze Wind Energy II LLC, Prairie Breeze Wind Energy III LLC, Buckeye Wind Energy LLC, and Bethel Wind Farm LLC; Enel Green Power North America, Inc.; EDF Renewable Energy, Inc.; Basin Electric Power Cooperative; Sunflower Electric Power Corporation; Mid-Kansas Electric Company, LLC; Flat Ridge 2 Wind Energy LLC; Omaha Public Power District; and City of Independence, Missouri, Kansas Power Pool, Missouri Joint Municipal Electric Utility Commission, and West Texas Municipal Power Agency.  Nebraska Public Power District (NPPD), Kansas Electric Power Cooperative, Inc. (KEPCo), and Golden Spread Electric Cooperative, Inc. (Golden Spread) filed timely motions to intervene and comments.

30.    On September 30, 2017, SPP filed an answer to the complaint (SPP Complaint Response) and NextEra filed an answer.  On November 1, 2017, ITC Great Plains, LLC (ITC Great Plains) filed a motion to intervene out of time.  On November 14, 2017, Xcel filed an answer to the SPP Complaint Response.  On December 8, 2017, SPP filed a motion to reject Xcel's answer and an answer.  On December 22, 2017, Xcel filed an answer to SPP's December 8, 2017 answer.

## IV.    SPP Complaint Response

31.    SPP disputes Xcel's claim that, instead of following the "but for" standard, SPP has reverted to pre-2008 revenue crediting procedures.  SPP states that the 2008 Tariff revisions replaced the unidirectional impact criterion with language providing that

---

[55] *Id.* (citing *Empire Dist. Elec. Co.*, 148 FERC ¶ 61,030 (2014); *Black Hills Power Inc.*, 148 FERC ¶ 61,035 (2014); *UNS Electric, Inc.*, 148 FERC ¶ 61,032 (2014); *Kan. City Power & Light*, 148 FERC ¶ 61,034 (2014); *Louisville Gas and Elec. Co.*, 148 FERC ¶ 61,031 (2014); *Westar Energy, Inc.*, 148 FERC ¶ 61,033 (2014)).

"revenue credits will be based on network and point-to-point service that could not be provided 'but for' the existence of the upgrade."[56]  SPP further states that the Attachment Z2 implementation applied the Reservation Stack Analysis, which models cumulative, bi-directional flows in assessing the impact of a reservation on a particular upgrade.  SPP asserts that Xcel is incorrect in arguing that the Reservation Stack Analysis applies a standard that is different from the "but for" standard in the Tariff.  SPP argues that the Reservation Stack Analysis represents a reasonable and administratively feasible approach for implementing the "but for" standard and provides a systemic and practical basis for evaluating the impact of reservations and determining Creditable Upgrades.[57]

32.     SPP notes that the analysis that Xcel urges was considered by the CPTF and rejected as infeasible because it would impose an impossible administrative burden on SPP.[58]  SPP further states that the CPTF determined that the creditable upgrade-by-creditable upgrade process results that Xcel proposes could be altered by the order in which multiple Creditable Upgrades are included and the order in which each new transmission service request is added.[59]  SPP argues that the Reservation Stack Analysis retains the "but for" concept by analyzing all service reservations, accounting for response factors in both directions, and evaluating the loading on the network upgrade to determine whether the new reservation could not have been provided at the time immediately prior to such upgrade but for the capacity provided by the Creditable Upgrade.[60]

33.     SPP states that Xcel participated in SPP's efforts to implement the "but for" standard in accordance with the CPTF White Paper and Reservation Stack Analysis, and

---

[56] SPP Complaint Response at 9-10 (citing Submission of Proposed Tariff Revisions of Southwest Power Pool, Inc., Docket No. ER08-746-000, at 7 (filed Mar. 28, 2008)).

[57] *Id.* at 11 (citing SPP Complaint Response, Docket No. EL17-21-000, Affidavit of Steven D. Purdy ¶ 7 (filed Dec. 12, 2016)).

[58] *Id.* (citing CPTF White Paper at 2-3; SPP Complaint Response, Purdy Aff. ¶¶ 7-8).

[59] *Id.* (citing CPTF White Paper at 3; SPP Complaint Response, Purdy Aff. ¶ 8, n.3).

[60] *Id.* at 12 (citing CPTF White Paper at 8).

Xcel voted in 2011 in support of advancing the CPTF White Paper.[61]  SPP asserts
that the CPTF White Paper including the Reservation Stack Analysis prescribes the
implementation details for the "but for" standard, and those details are not required to be
part of the Tariff.[62]

34.    SPP asserts that Xcel's claim that SPP is improperly applying the "but for"
standard is based on a misunderstanding of SPP's Attachment Z2 process.  SPP notes that
when SPP reviews the impact of a granted transmission service request on a Creditable
Upgrade, it reviews the full amount requested as that was the amount of service that was
granted that relies on the Creditable Upgrade to be accommodated.  SPP states that for
the purposes of determining credit payment obligations costs, the full reservation amount
is the portion of the new reservation capacity that could not be provided but for the
Creditable Upgrade.[63]  SPP argues that, if SPP implemented the Attachment Z2 analysis
in the way that Xcel suggests, then the resulting credit payment obligation would be a
fraction of the per-MW rate for the entire reservation which would not account for the
impact of the full reservation on the Creditable Upgrade.[64]

35.    SPP states that Xcel's allegation that non-capacity upgrades and upgrades
associated with power system stabilizers cannot be calculated by the CPTF White Paper
process is mistaken.[65]  SPP states that to apply Attachment Z2, it determines the positive
response factor of each new transmission service reservation on each new Creditable
Upgrade.  SPP notes that this same process does not apply to Creditable Upgrades for
most non-capacity upgrades.  SPP states that because the vast majority of non-capacity
upgrades are substations or substation equipment at or just beyond the point of
interconnection, a power-flow evaluation of transmission service sourcing from the
generator at the point of interconnection is assumed to produce a flow of power on such
upgrades equal to the amount of power being produced by the generator at the source of
the transmission service request.  SPP further states that non-capacity upgrades are sized
to accommodate the amount of interconnection service provided to the interconnection
customer, and that transmission service sourcing from the sponsor of upgrades at the
point of interconnection would produce a positive response factor equal to the amount of

---

[61] *Id.* at 13 (citing SPP Complaint Response, Purdy Aff. ¶ 6).

[62] *Id.*

[63] *Id.* at 14.

[64] *Id.*

[65] *Id.* at 15.

transmission service divided by the amount of the source generator's contractual interconnection service. SPP argues that this approach produces a reasonable approximation of the positive response factor for upgrades at the point of interconnection that are not represented in the planning power-flow model.[66]

36.    SPP asserts that Xcel is incorrect if Xcel is suggesting that the impacts on power system stabilizers are incapable of measurement and therefore should be excluded from credit eligibility. SPP notes that, in Xcel's case, the power system stabilizers mitigated a stability limit associated with exports from Southwestern to the rest of the SPP footprint. SPP states that the flowgate interface between Southwestern and the rest of SPP's footprint is used to monitor these exports. SPP further states that transmission service requests that place flows on the flowgate at or above three percent are then determined to have a positive impact on the power system stabilizers, and therefore, the positive response factor is determined from this flow.[67]

37.    In addition, SPP contends that Xcel is incorrect in arguing that SPP's analysis disregards topology changes. SPP states that the Reservation Stack Analysis uses the most up-to-date models that were available at the time that the transmission service request was first evaluated. SPP further states that it replicates the conditions that existed at the time the transmission service request was originally granted in order to determine what the Attachment Z2 revenue credit would have been had the Attachment Z2 crediting process been in place at the time. SPP argues that by using the system conditions in place at the time the request was studied, SPP's Reservation Stack Analysis appropriately considers factors and topology relevant to the time period being studied. SPP avers that while the Reservation Stack Analysis may have been performed after the fact, it appropriately used information and models reflective of conditions at the time the transmission service request was evaluated to determine credit payment obligations.[68]

38.    Regarding Xcel's allegation that SPP's application of the Attachment Z2 crediting procedures violates the filed rate doctrine, SPP asserts that Xcel points to no Tariff provision that mandates an upgrade-by-upgrade analysis. In addition, SPP asserts that the CPTF White Paper process, including the Reservation Stack Analysis, is an appropriate, stakeholder-approved, and practical way to perform the "but for" test and that the CPTF White Paper merely provides implementation details for applying the "but for"

---

[66] SPP Complaint Response, Purdy Aff. ¶¶ 15-16.

[67] *Id.* ¶ 17.

[68] SPP Complaint Response at 15-16.

standard.[69]  SPP argues that a critical predicate to the filed rate violation is lack of
notice; however, Xcel has known for more than six years that SPP intended to use the
Reservation Stack Analysis and CPTF White Paper.  Furthermore, SPP notes that Xcel
voted to approve the 2013 Tariff revisions that were developed with the assumption that
the Reservation Stack Analysis would be implemented, and did not object to the 2013
Tariff revisions not expressly including the Reservation Stack Analysis.[70]

39.     SPP further argues that its reliance on the CPTF White Paper, which includes the
Reservation Stack Analysis methodology, is consistent with the Commission's "rule of
reason", which SPP states allows implementation details and instructions related to Tariff
provisions to be outlined in a non-Tariff guidance document.[71]  SPP asserts that the
CPTF White Paper does not alter the Attachment Z2 revenue crediting requirements from
what is provided in the Tariff, and that use of the CPTF White Paper is no different than
using unfiled business practice manuals to provide the technical administration of Tariff
provisions.[72]

40.     With regard to Xcel's assertion that it may not be assessed credit payment
obligations for upgrades not identified in the Aggregate Transmission Service Study or
Xcel's transmission service agreements, SPP argues that the service agreements and
Tariff must be read together, and together constitute the filed rate.[73]  SPP asserts that
Section 3.0 of Southwestern's service agreements makes clear that terms and conditions
of the Tariff are applicable to service taken under the service agreements, and Attachment
Z2 of the Tariff provides that the service agreements will be assessed credit payment
obligations.  Thus, SPP argues, it was unnecessary for SPP to include these upgrades in
the service agreements.[74]  Furthermore, SPP states that the Commission has previously
acknowledged that SPP's Attachment Z2 crediting procedures were still being developed

---

[69] *Id.* at 17.

[70] *Id.* at 18-19.

[71] *Id.* at 19 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 158 FERC ¶ 61,003,
at P 69 (2017); *Cal. Indep. Sys. Operator, Corp.*, 147 FERC ¶ 61,231, at P 95 (2014);
*Cal. Indep. Sys. Operator, Corp.*, 122 FERC ¶ 61,271, at P 16 (2008)).

[72] *Id.* at 20-21.

[73] *Id.* at 22 (citing *Seminole Elec. Coop., Inc. v. Fla. Power & Light Co.*,
153 FERC ¶ 61,037, at P 27 (2015)).

[74] *Id.* (citing Complaint, Exhibit 6 at 2).

at the time Southwestern's service agreements were entered into and the applicable transmission studies were performed, and SPP's systems were not capable of identifying all potential upgrades and/or directly assignable costs.[75] SPP also states that it included in the Aggregate Facilities Study reports a notation that additional credit payment obligation costs associated with unidentified generator interconnection upgrades could be forthcoming, and that it was SPP's practice at the time not to list the upgrades in the service agreement. SPP states that it regularly provided stakeholder updates regarding the status of its revenue crediting implementation efforts and the prospect of future assessments.[76]

41.     In addition, SPP disputes Xcel's argument that SPP is applying a less stringent planning criteria than SPP's ITP process to the development of Creditable Upgrades.[77] SPP states that, under Attachment O of the Tariff, SPP is required to include all upgrades as a part of its ITP assessments, which requires inclusion of all such upgrades in base models. In addition, SPP argues that Xcel appears to take issue with SPP's treatment of certain upgrades that were developed "outside" of SPP's ITP process (e.g., generator interconnection upgrades) as eligible for regional cost allocation under Attachment J.[78] SPP states that Attachment J expressly provides that network upgrades that qualify as Service Upgrades under the Tariff are eligible for Base Plan funding under Attachment J and Schedule 11 and Xcel has not demonstrated that the existing provisions affording Base Plan funding for Service Upgrades are unjust and unreasonable.[79]

42.     SPP disagrees with Xcel's allegation that SPP's crediting procedures are unjust and unreasonable because they do not recognize variations in the duration of service agreements and do not allocate total credit payment obligation costs as a function of the term of a particular reservation.[80] SPP states that an upgrade is necessitated as a function of the incremental MW impact on the existing system, irrespective of the duration of the reservation causing that impact. SPP adds that the full, life-cycle revenue requirements of service upgrades built to support transmission service are associated with the

---

[75] *Id.* (citing July 2016 Waiver Order, 156 FERC ¶ 61,020 at P 5).

[76] *Id.* at 22-23 (citing July 2016 Waiver Order, 156 FERC ¶ 61,020 at P 56).

[77] *Id.* at 23-24 (citing Complaint at 28).

[78] *Id*. at 24 (citing Complaint at 28-29).

[79] *Id.* at 24-25.

[80] *Id.* at 25.

reservations necessitating their construction. SPP asserts that there is no adjustment of the cost responsibility based on duration of the reservation and Xcel does not cite to any Tariff provision that mandates duration-based adjustments in the calculation of credit payment obligation costs. SPP asserts that credit payment obligations should not be recalculated to account for the term length of transmission reservations.[81] SPP further avers that the Commission should reject Xcel's related claim that cost causation principles require SPP to recalculate credit payment obligations.[82]

43.      SPP also objects to Xcel's argument that SPP's Attachment Z2 implementation has not been open and transparent. SPP states that the Commission has acknowledged SPP's informational sessions and other initiatives designed to keep stakeholders fully informed.[83] SPP states that it routinely posts the input data used to calculate credit payment obligations, including the cost of Creditable Upgrades, their in-service dates, the net plant carrying charges, and discount rates. SPP states that it also makes available long-term transmission service request data, such as the transmission service request number, the aggregate transmission service study in which the service request was approved, the impact of each request on each applicable Creditable Upgrade, and the impact factor for network service. SPP also states that it regularly posts and updates data on short-term transmission service requests. In addition, SPP states that it offers one-on-one sessions with individual companies to discuss concerns on SPP's Attachment Z2 implementation, including credit payment obligation calculations.

44.      Finally, SPP challenges Xcel's claim of possible double recovery by upgrade sponsors. SPP argues that entities' payment arrangements under agreements that are executed outside of the Tariff have no bearing on whether SPP's administration of its Attachment Z2 process is just and reasonable and compliant with the Tariff. SPP states that the Tariff requires SPP to compensate upgrade sponsors for their investments in Creditable Upgrades when the qualifications and conditions for such compensation are met. SPP notes that the Tariff does not require SPP to offset Attachment Z2 revenue credits based on arrangements that upgrade sponsors might have under agreements executed outside of the Tariff. SPP asserts that outside arrangements, such as power purchase agreements, are beyond the scope of SPP's Tariff and do not demonstrate that

---

[81] *Id.* at 25-27.

[82] *Id.* at 27.

[83] *Id.* at 28 (citing July 2016 Waiver Order, 156 FERC ¶ 61,020 at P 53).

SPP's implementation of Attachment Z2 crediting is improper or lacking in sufficient transparency.[84]

## V.    **Comments**

45.    KEPCo, NPPD, and Golden Spread support Xcel's complaint.  Specifically, KEPCo, NPPD, and Golden Spread agree with Xcel that SPP has not followed the Tariff in determining the credit payment obligations.  KEPCo, NPPD, and Golden Spread concur that SPP is not applying a "but for" test, and SPP is instead using an alternative analysis based on the directional impact of incremental flows on Creditable Upgrades.[85] KEPCo and NPPD assert that SPP is inappropriately relying on the CPTF White Paper instead of its Tariff.[86]  Golden Spread agrees with Xcel that SPP is using a methodology that is substantially different than the cost allocation methodology that is set out in the Tariff.[87]  Golden Spread states that it agrees with the complaint's fundamental premise that there is little or no basis to determine that SPP's implementation of Attachment Z2 using the methodology expressed in its CPTF White Paper is just and reasonable.[88]

46.    KEPCo, NPPD, and Golden Spread also agree with Xcel that SPP is violating the filed rate doctrine and the rule against retroactive ratemaking by assessing credit payment obligations for upgrades that are not listed in the customer's transmission service agreement, that were not studied in connection with the requested transmission service, and that were not identified as needed for the customer's requested service.[89]  KEPCo states that SPP may only charge the rate on file for transmission service, and that rate is specified in the agreed-upon terms of the network integration transmission service agreements, which neither specify the potential credit liability for the Attachment Z2

---

[84] *Id.* n.97.

[85] KEPCo Comments at 6; NPPD Comments at 2-3; Golden Spread Comments at 3, 8.

[86] KEPCo Comments at 7; NPPD Comments at 2-3.

[87] Golden Spread Comments at 3, 8.

[88] *Id.* at 7.

[89] KEPCo Comments at 5; NPPD Comments at 3; Golden Spread Comments at 3, 8.

credits obligations, nor identify the associated Creditable Upgrades for which SPP now claims transmission customers have Attachment Z2 credit payment obligations.[90]

47.    Additionally, KEPCo asserts that SPP has not heeded the Commission's admonition in the July 2016 Waiver Order regarding transparency and timeliness. KEPCo also asserts that stakeholders' concerns and diligent efforts to resolve serious concerns with SPP's implementation have not resulted in a solution.[91]  KEPCo agrees that Xcel's complaint correctly points out that there is no merit to SPP's claims that it provided transmission customers with notice sufficient to overcome the filed rate doctrine.[92]  Golden Spread asserts that direct assignments of specific costs associated with some facilities were never specifically identified by SPP's allocation of estimated costs as Golden Spread moved through the transmission service request and corresponding Aggregate Transmission Service Study process.[93]  Golden Spread states that it was unaware that a large direct assignment upgrade cost would be presented in 2016 and would be payable over the remaining life of its network integration transmission service agreement.[94]  Additionally, Golden Spread contends that in the 2016 waiver proceeding it requested that the Commission investigate SPP's 2016 implementation of the Attachment Z2 crediting and raised concerns that SPP would forego important transparency steps in justifying a customer's cost responsibility and proving that Attachment Z2 implementation was consistent with the filed rate.[95]

48.    KEPCo and NPPD note that their complaints in Docket No. EL17-21-000 and Docket No. EL17-86-000 address the same issues, which stem from the alleged  SPP violations of the Tariff and SPP's interpretation and implementation of its Attachment Z2 revenue crediting process.[96]  NPPD clarifies that, while the specific focus of the Xcel complaint is on SPP's failure to implement the "but for" test in its Tariff, and the arguments and requests for relief advanced by Xcel differ from the issues raised in NPPD's complaint, the legal basis for these two complaint proceedings is the same:

---

[90] KEPCo Comments at 7.

[91] *Id.* at 5.

[92] *Id.* at 7.

[93] Golden Spread Comments at 5.

[94] *Id.* at 6.

[95] *Id.* at 7.

[96] KEPCo Comments at 2; NPPD Comments at 4.

SPP's interpretation and application of its Attachment Z2 revenue crediting process under the Tariff is unjust and unreasonable, and has led to improper and unlawful billing of certain credit payment obligation charges to NPPD, Xcel, and other SPP customers. Moreover, NPPD asserts that some of the issues raised by Xcel are identical to those raised by NPPD.[97]

## VI.    NextEra Answer

49.    NextEra asserts that Xcel misinterprets the "but for" test used to establish revenue crediting in Attachment Z2.  Specifically, NextEra disputes Xcel's claim that the "but for" test requires that SPP not provide revenue credits unless the applicable transmission service would not have been possible but for the network upgrades in question. NextEra notes that, according to Xcel, this would necessarily lead to a far smaller amount of revenue crediting to upgrade sponsors.[98]  NextEra contends that Xcel's interpretation of the Tariff is incorrect and inconsistent with the intent of SPP's 2008 filing and May 2008 Order.  NextEra asserts that the 2008 tariff change was intended to provide for more, rather than less, revenue crediting.[99]

50.    According to NextEra, prior to 2008, the revenue crediting provisions stated that upgrade sponsors could obtain revenue credits to the extent subsequent transmission service entailed "increased loading" on the network upgrade.  In adding the "but for" test, NextEra asserts that SPP characterized its 2008 Tariff revisions as allowing crediting for transmission service in either direction of a given network upgrade, rather than one direction.[100]  NextEra argues that the basic principle of the 2008 Tariff revisions is that if transmission service uses the upgrade, revenue credits would follow.  Moreover, NextEra states that the Commission noted that the context of the 2008 proposal was to expand the eligibility for revenue credits for project sponsors, and that the Commission accepted the Tariff revisions to recognize that a network upgrade may also provide benefits by increasing the ability to provide transmission service in the opposite direction.[101]

---

[97] NPPD Comments at 5.

[98] NextEra Answer at 2-3.

[99] *Id.* at 3.

[100] *Id.* at 4.

[101] *Id.* (citing May 2008 Order, 123 FERC ¶ 61,208 at PP 32, 35).

NextEra further reiterates that in accepting the Tariff revisions, the Commission found that the new procedures expand eligibility to customers that fund network upgrades.[102]

51.    NextEra also asserts that Xcel ignores the fundamental distinction between analysis needed under generator interconnection procedures and later reimbursement for upgrades resulting from those procedures.  According to NextEra, the purpose of cost allocation rules in generator interconnection procedures is to allow the interconnection customer to know its cost responsibility for planned network upgrades that are not needed but for the interconnection of its project to the grid so that the interconnection customer can then choose whether to proceed.  However, NextEra asserts, no such choice is involved in revenue crediting under Attachment Z2, which is not part of SPP's generator interconnection procedures for prospectively determining whether new facilities should be built.  NextEra states that instead, revenue crediting under Attachment Z2 is a retroactive test to determine whether later users should help reimburse the party that initially funded the network upgrades.  NextEra states that the upgrades have already been constructed, and the review under Z2 addresses subsequent use.  NextEra asserts that the Attachment Z2 test recognizes that the upgrades already exist, and measures whether a given transmission customer's service used those upgrades.[103]

52.    Finally, NextEra disputes Xcel's suggestion that generators are recovering upgrade costs through other means.  NextEra argues that Xcel does not substantiate its claims of over-recovery.[104]  NextEra asserts that parties to power purchase agreements are free to negotiate their own terms and conditions, including whatever financial compensation they choose, and that whatever parties agree on in those agreements is outside the scope of this proceeding.[105]

## VII.    Xcel November 14, 2017 Answer

53.    Xcel asserts that SPP's Complaint Response does not explain how the CPTF White Paper is consistent with the "but for" test of Attachment Z2.[106]  Xcel states that an analysis of subsequent flow impacts on the Creditable Upgrade is not a suitable substitute for this modeling approach because of the basic properties of electricity:  electricity flows

---

[102] Id.

[103] Id. at 6.

[104] Id. at 8.

[105] Id.

[106] Xcel November 14, 2017 Answer at 3.

over the path of least resistance.  Xcel observes that SPP's Complaint Response is silent on these issues and lacks any explanation of how a measurement of subsequent flows above a *de minimis* threshold on a Creditable Upgrade can be used to show that a subsequent reservation could not have been provided without (i.e., "but for") the Creditable Upgrade being in service.[107]  Xcel alleges that SPP's implementation of the CPTF White Paper has resulted in Creditable Upgrade costs estimated to be $969.8 million.[108]

54.    Xcel states that the observation that a transmission reservation would have flow impacts on a Creditable Upgrade reflects the fact that the Creditable Upgrade is attached to network transmission facilities.  Xcel asserts that it is inappropriate from a technical perspective to conclude that because there are such flows on the Creditable Upgrade that the Creditable Upgrade made such flows possible.[109]  Xcel argues that, under the CPTF White Paper, SPP deems the entire reservation to have been made possible by a Creditable Upgrade if three percent or more of a subsequent reservation flows across the Creditable Upgrade.

55.    Xcel also states that, under the Tariff, Creditable Upgrades are not eligible for a roll-in to average transmission system rates, even though the facilities themselves may be attached to parts of the integrated transmission network.  Xcel asserts that the costs of Creditable Upgrade facilities were assigned to particular entities submitting transmission service requests or generation interconnection requests on a cost causation basis—i.e., the service requests caused the need for the facility, as determined by the Aggregate Transmission Service Study.  Xcel states that the status of Creditable Upgrades as connected to the "looped" or networked transmission system had no bearing on their cost allocation because, despite that connection, they were not necessary for other service or did not provide benefits to other customers.  Furthermore, Xcel contends that a flow-based test with respect to Creditable Upgrades that identifies subsequent reservation flows on the Creditable Upgrade corroborates that they are connected to the network, but that is not, and should not, be a basis for subsequent cost allocations.  Xcel argues that there should be a demonstration of additional benefit, which is what the "but for" test provides by requiring a demonstration that the subsequent service could not be provided

---

[107] *Id.* at 4.

[108] *Id.* (citing *KEPCo*, 161 FERC ¶ 61,145 at P 23).

[109] *Id.* at 4-5.

without the Creditable Upgrade.  Xcel asserts that SPP's application of the "but for" test does not determine whether the Creditable Upgrade makes subsequent service possible.[110]

56.     Xcel disputes the theory that there are multiple possible interpretations of the Attachment Z2 "but for" test.  Specifically, Xcel disagrees with SPP's view that the traditional "but for" test is one approach that complies with Attachment Z2 but is infeasible and that the CPTF White Paper is an acceptable approach.  Xcel also disagrees with NextEra's argument that Attachment Z2 is only intended to require credits from subsequent users of Creditable Upgrade and is not intended to apply a strict test in doing so.[111]  In addition, Xcel argues that the Commission's finding in *KEPCo* that there are multiple possible interpretations of the "but for" test, and that Attachment Z2 does not have a traditional "but for" test is erroneous.[112]  Xcel reiterates that the "but for" test should be applied to the plain and unambiguous terms of Attachment Z2 and Commission cost causation precedent, and the Commission should find that SPP should assign Attachment Z2 credit payment obligations only to those subsequent transmission service requests that could not be granted without the Creditable Upgrade.[113]

57.     Xcel further disputes SPP's claim that it is infeasible to implement the "but for" test of Attachment Z2 in the manner advocated by Xcel.[114]  Xcel asserts that the degree of difficulty in implementing the "but for" test as Xcel advocates is not an adequate response or a sufficient justification for an approach that is unjust and unreasonable and is not permitted by the contractual arrangement among SPP and its customers in the form of the Tariff and applicable service agreements.[115]  Xcel notes that part of the complexity appears to be a result of SPP's assumption that it must model the flows of subsequent short-term firm reservations upon Creditable Upgrades.  Xcel argues that short-term firm transmission customers would not be expected to be willing to fund permanent network upgrades in order to take transmission service of short duration, so it is not clear why SPP is seeking to treat such customers as funders of Creditable Upgrades through assessment of Attachment Z2 credit payment obligations.  Xcel acknowledges that there would be

---

[110] *Id.* at 5 (citing Complaint, Exhibit 1 (Liu Aff.) ¶¶ 16-18; Complaint Exhibit 2 (Miranda Aff.) ¶ 8).

[111] *Id.* at 6 (citing SPP Complaint Response, Purdy Aff. ¶ 6; NextEra Answer at 5).

[112] *Id.* (citing *KEPCo*, 116 FERC ¶ 61,145 at PP 64-70).

[113] *Id.* at 7-8.

[114] *Id.* at 9.

[115] *Id.* at 10 (citing SPP Complaint Response, Purdy Aff. ¶ 7).

difficulties in implementing the "but for" test retroactively; however Xcel argues that Southwestern is already paying its fair share of the costs of the rolled-in SPP transmission network through network transmission service rates based upon a load ratio basis and should not be required to pay additional charges for facilities that have never been shown to provide a benefit to Southwestern and that are not necessary for Southwestern's network transmission service.[116]

58.    Xcel also responds to SPP's argument that Xcel should have objected earlier to SPP's interpretation of Attachment Z2, stating that there is no statute of limitations or doctrine of laches available to complaints brought under section 206 of the FPA seeking enforcement of the filed rate doctrine.[117]  Xcel asserts that Southwestern has not waived its right to filed rate doctrine refunds, and mere "notice" would not be sufficient to override Southwestern's contractual rights.[118]  Xcel notes that it is unclear when SPP believes Xcel should have brought its complaint, since, prior to the commencement of billing of credit payment obligations, Southwestern had not yet been harmed nor did it understand in detail what charges would be assessed or how they would be calculated.[119] Xcel asserts that it has filed a dispute to every credit payment obligation invoiced, but has been unable to resolve the disputes with SPP.[120]

59.    Xcel disagrees with SPP's assertion that Xcel consented to the CPTF White Paper as a substitution for the "but for" test in Attachment Z2 without further stakeholder discussion and processes, including a Tariff change filing to the Commission.[121]  Xcel states that SPP's presentations at the time the CPTF White Paper was being considered

---

[116] *Id.*  Xcel notes that Southwestern acknowledges that it is also a recipient of Attachment Z2 credit revenues under SPP's misapplication of Attachment Z2.  It is Southwestern's position that only those customers whose service would not have been granted but for the Creditable Upgrades funded by Southwestern should pay credits.  *Id.* n.24.

[117] *Id.* at 10-11 (citing SPP Complaint Response at 12, 21; *Williams Field Servs. Group, Inc. v. El Paso Natural Gas Co.*, 89 FERC ¶ 61,161 (1999)).

[118] *Id.* at 11-12.

[119] *Id.* 13-14.

[120] *Id.* at 14.

[121] *Id.* at 15.

by stakeholders estimated that Attachment Z2 charges to transmission customers would be relatively minor, on the order of only $5.6 million total.[122]

60.     With regard to SPP's argument that the Commission's rule of reason permits "guidance" material not to be filed in the Tariff, Xcel states that the Commission has explained that if a particular unfiled "guidance" conflicts with a Tariff provision, the Tariff shall govern in all circumstances.[123]

61.     Regarding its assertion in the complaint that SPP applies only two variables when assigning credit responsibility for Creditable Upgrades, Xcel takes issue with SPP's response that SPP looks at the full amount requested when looking at the impact of a granted transmission service request on a Creditable Upgrade.[124]  According to Xcel, the Tariff clearly requires SPP to identify the "portion" of the reservation that could not have been granted without the Creditable Upgrade and to apply the positive response factor to that portion.  Xcel asserts that SPP effectively admits that SPP is applying the response factor to the whole reservation, skipping the "but for" test; therefore, Xcel argues that the Commission should conclude that SPP is not following the "but for" test of Attachment Z2.[125]

62.     Xcel also disagrees with NextEra's interpretation that SPP's 2008 Tariff filing to implement the "but for" test was only intended to establish a more flexible "use" test.[126] Xcel argues that SPP's statements in the transmittal letter in Docket No. ER08-746-000 that its "proposed revision recognizes that, although a particular upgrade may have been built to enable transfer capability in a particular direction, it may also provide benefits by increasing the ability to provide transmission service in the opposite direction" and that the new Attachment Z2 test will address "new or increased uses" of the Creditable Upgrade are not inconsistent with the "but for" test advocated by Xcel, which is a "but

---

[122] *Id.* at 14-15 (citing Arkansas Electric Cooperative Commission Comments, Docket No. EL17-21-000, at 5 (filed Nov. 23, 2016)).

[123] *Id.* at 16 (citing *City of Cleveland v. FERC*, 773 F.2d 1368 at 1376; Order No. 890, FERC Stats. & Regs. ¶ 31,241 n.939).

[124] *Id.* at 17-18 (citing SPP Complaint Response at 14).

[125] *Id.* at 18.

[126] *Id.* at 18-19 (citing NextEra Answer at 3-4).

for" test that considers whether new or increased uses require the Creditable Upgrade.[127] Xcel argues that if subsequent service can be provided without—or but for—the Creditable Upgrade, then the Creditable Upgrade is not "increasing the ability to provide transmission service."[128]

63.    Xcel reiterates that SPP's efforts to provide transparency in the Attachment Z2 process have not been sufficient.[129]  Xcel notes that SPP's Complaint Response did not answer the statements in Xcel's complaint regarding the inability of customers to replicate the credit payment obligation assignments.  Xcel asserts that while SPP may be willing to meet with customers to discuss some of these issues, that is not a sufficient substitute for appropriate filings at and review by the Commission, which is necessary given the large amount of credit payment obligations that SPP seeks to assess through the Attachment Z2 process, the extended period between the adoption of the Attachment Z2 provisions and the commencement of billings, and the lack of other formal means to acquire information.[130]

64.    In addition, Xcel argues that SPP fails to provide sufficient details or information in the CPTF White Paper regarding how response factors are developed for power system stabilizers and non-capacity upgrades, which underscores how non-transparent SPP's implementation of Attachment Z2 has been.[131]

## VIII.  **SPP December 8, 2017 Answer**

65.    SPP argues that *KEPCo* strips Xcel's answer of any viability because the order rejects Xcel's "but for" interpretation.[132]  In addition, SPP argues that Xcel mischaracterizes SPP's position with regard to notice.  SPP asserts that it has argued that Xcel was a part of the stakeholder process, was aware of the Reservation Stack Analysis approach being adopted, and had multiple opportunities to object to the related Tariff

---

[127] *Id.* at 19 (citing Submission of Proposed Tariff Revisions, Docket No. ER08-746-000, Transmittal Letter, at 7-8 (filed Mar. 28, 2008)).

[128] *Id.* (citing Submission of Proposed Tariff Revisions, Docket No. ER08-746-000, Transmittal Letter, at 7-8).

[129] *Id.* at 20.

[130] *Id.* at 21.

[131] *Id.* at 21-22.

[132] SPP December 8, 2017 Answer at 7-8.

filings addressing Attachment Z2 implementation, and never offered any recorded objection.[133]  SPP contends that Xcel's continued insistence that it lacked notice is unsupported by the record, and the Commission has repeatedly held that stakeholders had sufficient notice of SPP's implementation of Attachment Z2.[134]  SPP states that Xcel's attempts to minimize its participation in the development of the CPTF White Paper and Xcel's statement that representatives of Southwestern did not understand that the CPTF White Paper would become a basis to allocate costs for Creditable Upgrades overlook the entire reason for developing the CPTF White Paper, which was to determine what upgrades were creditable and what costs to allocate.[135]

66.    SPP also refutes Xcel's claim that SPP's Complaint Response demonstrated that SPP's method for assigning responsibility for point-to-point transmission service deviates from Attachment Z2.  SPP states that it does not grant partial service for point-to-point transmission service requests, and, instead, determines whether there is sufficient capacity to grant the request and then either grants or denies the request in its entirety.[136]  Therefore, SPP concludes that it is not skipping the "but for" test as Xcel alleges.[137]

67.    Finally, SPP argues that there is no merit to Xcel's challenge to crediting of non-capacity upgrades and power system stabilizers.[138]  SPP states that extending credit eligibility in these circumstances is the necessary and proper consequence of the Reservation Stack Analysis's subsequent use methodology.  SPP asserts that the new transmission service requests indisputably make use of the creditable facility, whether a power system stabilizer or other type of upgrade, through their impact on the flowgate interface, and this is consistent with the process for all capacity-type upgrades.

---

[133] *Id.* at 8-9 (citing SPP Complaint Response at 12-13).

[134] *Id.* at 9 (citing July 2016 Waiver Order, 156 FERC ¶ 61,020 at P 56; *KEPCo*, 161 FERC ¶ 61,145 at P 61 & n.112).

[135] *Id.* at 10 (citing Xcel November 14, 2017 Answer at 14).

[136] *Id.* at 12.

[137] *Id.* at 13 (citing Xcel November 14, 2017 Answer at 18).

[138] *Id.* at 14 (citing Xcel November 14, 2017 Answer at 22).

## IX.    Xcel December 22, 2017 Answer

68.    Xcel asserts that *KEPCo*'s conclusions rest upon a misinterpretation of the facts, and that Xcel presented additional facts that were not present in *KEPCo*.[139]  Xcel further argues that *KEPCo* disregards numerous facts, including the content of the CPTF White Paper, affidavits presented with the Complaint, and SPP's statements, which are in the record of the instant proceeding and directly contradict the assumptions in *KEPCo* regarding the "but for" test.  Xcel states that it interprets the Tariff to require SPP to apply a "but for" test to determine which subsequent use must pay credits under Attachment Z2.  Xcel contends that SPP's interpretation is that it may infer from subsequent uses that the service could not have been granted "but for" the Creditable Upgrade.  Xcel argues that *KEPCo* erroneously proposes a third interpretation, that the "but for" language of Attachment Z2 is superfluous.[140]

## X.    Discussion

### A.    Procedural Matters

69.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2017), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

70.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2017), we will grant ITC Great Plains' late-filed motion to intervene given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

71.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2017), prohibits an answer to an answer unless otherwise ordered by the decisional authority.  We will accept NextEra's, Xcel's, and SPP's answers because they have provided information that assisted us in our decision-making process.

### B.    Substantive Matters

72.    We deny Xcel's complaint, as discussed further below.

---

[139] Xcel December 22, 2017 Answer at 3.

[140] *Id.* at 3-4.

1.    **Assignment of Costs in Violation of Attachment Z2 and the Filed Rate Doctrine Allegation**

73.    We deny Xcel's complaint with respect to Xcel's allegation that SPP's assignment of costs to Xcel violates Attachment Z2 and the filed rate doctrine.  We find that Xcel misinterprets SPP's application of the "but for" test in Attachment Z2 and how SPP has implemented the "but for" test in accordance with the Reservation Stack Analysis process in the CPTF White Paper.  Xcel argues that the determination of revenue credits should be based on a traditional "but for" test.  Under a traditional "but for" analysis (i.e., N-1 contingency analysis) a transmission provider studies an individual transmission service request to determine if the additional loading on transmission elements violates any reliability criteria.  If so, the transmission provider would require the addition of incremental upgrades to the transmission system to address the violation.

74.    While the existing Tariff language uses the term "but for" in provisions that describe how to determine revenue credit payment obligations, SPP originally proposed and the Commission understands SPP's Tariff to mean that revenue credit payment obligations resulted from "subsequent use" of the transmission system.  As the Commission recently found in *KEPCo*,[141] the Reservation Stack Analysis set forth in the CPTF White Paper is a reasonable methodology to determine whether a transmission service request makes subsequent use of Creditable Upgrades, and a reasonable and practical application of the "but for" test for the purpose of determining credits under Attachment Z2.[142]  In *KEPCo*, the Commission discussed SPP's filings as relevant to the Attachment Z2 process, and found that, while SPP inserted the term "but for" in Attachment Z2, Section I.1, SPP's proposal made no indication that SPP intended to implement a traditional "but for" test.[143]

75.    Consistent with the Commission's finding in *KEPCo*, we disagree with Xcel's position that the determination of revenue credit payment obligations must be based on a traditional "but for" test.  In addition, we disagree with Xcel's assertion that in the 2008 Tariff revisions SPP eliminated a subsequent use analysis in determining credit payment

---

[141] 161 FERC ¶ 61,145 at PP 65-70.

[142] We note that this application of the "but for" test is limited to determining credit obligations under Attachment Z2 and does not replace the traditional "but for" test to determine required network upgrades to grant transmission service requests under Attachment V and Attachment Z1.

[143] *KEPCo*, 161 FERC ¶ 61,145 at P 69 (citing SPP Transmittal, Docket No. ER08-746-000, at Exhibit III (Proposed SPP Tariff at Attachment Z2, Section I.1) (filed March 28, 2008)).

obligations. As SPP has explained, it developed the Reservation Stack Analysis, outlined in the CPTF White Paper, to create rules for determining subsequent use of the Creditable Upgrade, and, therefore, the level of revenue credit payment obligations. The Reservation Stack Analysis determines responsibility for revenue credits based on the cumulative incremental impacts of each reservation on each Creditable Upgrade. The CPTF White Paper notes that application of the traditional "but for" test to determine subsequent use is impractical because each Creditable Upgrade would need to be analyzed to see whether it is required for each individual transmission service request with respect to hundreds of individual transmission service requests each hour. Further, we agree with SPP that the results of the "but for" analysis on each upgrade could be altered by the order in which Creditable Upgrades are added to or removed from the model, and the order in which each transmission service request is added to the model.

76.    We also find that Xcel is incorrect that SPP is improperly elevating the CPTF White Paper over the language in the Tariff. As discussed in *KEPCo*, SPP's Tariff filings regarding the Attachment Z2 mechanism and the Commission orders accepting the revisions demonstrate that the "but for" test in Attachment Z2 was intended and understood to be a subsequent use test.[144] Furthermore, as SPP states, the stakeholders unanimously approved the CPTF White Paper and the Reservation Stack Analysis with the understanding that it set forth the mechanism to implement the Attachment Z2 revenue crediting mechanism. Therefore, contrary to Xcel's argument, the CPTF White Paper does not conflict with the Tariff language, but, instead, provides guidance as to the implementation of the Attachment Z2 "but for" test, as set forth in the Reservation Stack Analysis. We also find that SPP's process for determining the positive response factor and credit payment obligations for non-capacity upgrades and power system stabilizers, as described in the Purdy Affidavit, is consistent with the Tariff and the CPTF White Paper. The non-capacity upgrades and power system stabilizers are eligible for credits as network upgrades that were directly assigned to an upgrade sponsor under Attachment Z2 that future transmission service requests made subsequent use of, and SPP has determined a reasonable process to calculate the credit payment obligations due to upgrade sponsors for these facilities. Further, we find that SPP has properly calculated the credits payment obligations for short-term transmission service reservations, consistent with the current Tariff.[145]

---

[144] *Id.* PP 66-69.

[145] We note that, on December 1, 2017, SPP submitted proposed revisions to Attachment Z2 of the Tariff to eliminate credit payment obligations for short-term firm point-to-point transmission service and non-firm point-to-point transmission service reservations granted on or after February 1, 2018. *See* Submission of Proposed Tariff

## 2.    Assignment of Costs in Violation of Attachment Z1, Service Agreements, and the Filed Rate Doctrine Allegation

77.    We deny Xcel's complaint with respect to Xcel's allegation that SPP's assignment of costs to Xcel violates Attachment Z1, Southwestern's service agreements, and the filed rate doctrine.  We find that the record shows that the Aggregate Facilities Study reports alerted Xcel of potential direct assignment of costs for upgrades that were later determined to be necessary to support the transmission service in Southwestern's service agreements pursuant to Attachment Z2.  Specifically, Xcel acknowledges that the Aggregate Facilities reports provided that "[c]redits may be required for the following Network Upgrades in accordance with Attachment Z2 of the SPP [Tariff]" and that there was a possibility of potential responsibility for Creditable Upgrades.[146]  In addition, as SPP states, it was its practice not to include generator interconnection network upgrades in an Aggregate Transmission Service Study until uncertainty concerning construction had been resolved, and a notation in the Aggregate Facilities Study reports gave notice that Attachment Z2 obligations might be later assessed.[147]  SPP explains that, at the time it provided Xcel with the Aggregate Facilities Study reports, it was in the process of developing the Attachment Z2 revenue crediting mechanism, and, therefore, could not provide accurate estimates and included the note that credits may be assigned in the future.[148]  SPP explains that the purpose of the CPTF White Paper was to implement the Attachment Z2 revenue crediting mechanism and included a methodology that would identify with more certainty upgrades whose costs would be directly assigned to transmission customers.  To the extent that SPP's original analysis did not capture certain Creditable Upgrades, we find it is reasonable to permit SPP to make corrections to the list of network upgrades so that upgrade sponsors are compensated for transmission service that their sponsored upgrades have facilitated, and which Xcel has received.

78.    We agree with SPP that Xcel executed the service agreements, subject to the terms of the Tariff, which bound Xcel to the obligations imposed under Attachment Z2.  As

---

Revisions of Southwest Power Pool, Inc., Docket No. ER18-374-000 (filed Dec. 1, 2017).

[146] Complaint at 11; *id.* at Exhibit 7 (Aggregate Facility Study Report (SPP-2010-AGP1-AFS-8) at Appendix A, Table 3; *id.* at 34-35.

[147] We note that, in the July 2016 Waiver Order and *KEPCo*, the Commission found that market participants had sufficient notice of the possibility of future Attachment Z2 revenue crediting obligations.  July 2016 Waiver Order, 156 FERC ¶ 61,020 at PP 53, 56; *KEPCo*, 161 FERC ¶ 61,145 at PP 61, 63.

[148] SPP Complaint Response at 21-23.

noted above, the Aggregate Facilities Study reports alerted Xcel of potential direct assignment of costs for upgrades that were later determined to be necessary to support the transmission service in Southwestern's service agreements pursuant to Attachment Z2, and, as SPP argues, Xcel has not claimed that it was unaware of this notation. In fact, Xcel acknowledges the existence of this caveat in its complaint. Therefore, we find that, even though the service agreements did not list any network upgrades for which Xcel would be directly assigned cost responsibility, Xcel was aware that the Aggregate Facilities Study reports indicated that there may be possible Attachment Z2 revenue credit payment obligations and also that SPP was in the process of developing the CPTF White Paper, with a methodology that would identify the network upgrades with more certainty. We note that, inasmuch as Xcel was on notice of possible Attachment Z2 cost responsibility, sponsors of Creditable Upgrades anticipated, and are entitled to receive, compensation for upgrades subsequently used for transmission service. In particular, we agree with NextEra that Attachment Z2 is a retroactive test to determine whether later users should help reimburse the party that initially funded the network upgrades, the upgrades have already been constructed, and granting the complaint would clash with parties' expectations of Attachment Z2 revenue crediting.[149]

79.    We also deny Xcel's allegations as to SPP's assessment of Schedule 11 charges. We are not persuaded by Xcel's argument that the upgrades were not planned through the SPP ITP process and are being recovered from SPP transmission customers "after applying less stringent planning criteria to the development" of the upgrades. Under the Tariff, once SPP identifies Creditable Upgrades and associated credit payment obligations for use of such upgrades, such revenue credit payment obligations associated with the subsequent use of a network upgrade by a transmission service request then became eligible for Base Plan funding under the cost allocation rules of Attachment J, Section III of the Tariff. Once the costs meet the eligibility criteria for Base Plan funding, they can be included in the allocation of the costs to transmission customers through the region-wide and zonal rates to be recovered under Schedule 11 of the Tariff.

### 3.    Assignment of Credit Payment Obligations is Unjust and Unreasonable Allegation

80.    We deny Xcel's complaint with respect to the allegation that SPP's assignment of credit payment obligations to Xcel is unjust and unreasonable, as discussed further below.

### a.    Failure to Consider Duration of Reservation Term

81.    We deny the complaint with respect to Xcel's claim that SPP erroneously disregards reservation term in assigning credit payment obligations and incorrectly

---

[149] NextEra Answer at 2, 6.

focuses solely on the capacity of the subsequent transmission service reservation. SPP argues that it does not include a duration-based variable in its revenue crediting process because an upgrade is necessitated, or not, as a function of the incremental MW impact on the existing system, irrespective of the duration of the reservation caused by that impact. In addition, SPP states that it is a long-standing principle under the Tariff that the full, life-cycle revenue requirements of Service Upgrades built to support transmission service are associated with the reservations necessitating their construction, and there is no adjustment of fundamental cost responsibility based on the duration of a reservation. Based on our review of the language of the Tariff, we find that Attachment Z2 provides as follows:

> The annual revenue credit amount to be paid monthly by a Network Customer, or included in rates, for each such new or increased use of a Creditable Upgrade shall be the product of the total annual revenue requirement associated with the Creditable Upgrade and the ratio of the incremental impact placed on the Creditable Upgrade by each such new or increased use to the total of the incremental impacts placed on the Creditable Upgrade by all currently and previously identified incremental Network Integration Transmission Service and Long-Term Firm Point-To-Point Transmission Service uses of the Creditable Upgrade.[150]

82. We find that the language of Attachment Z2 does not provide that the reservation term is a factor in the calculation. Further, we note that the CPTF White Paper does not include any discussion of the reservation term factoring into the revenue crediting calculation. Therefore, we find that SPP is not required to consider reservation term in assigning credit payment obligations.

### b.    Lack of Transparency

83. We deny Xcel's complaint with respect to Xcel's allegation that SPP's assessment of credit payment obligations is unjust and unreasonable due to the lack of transparency in the process. We disagree with Xcel's assertion that SPP should file the assessments as a rate under section 205 of the FPA, or submit an informational filing to the Commission on the assessments. SPP asserts that it has afforded customers numerous opportunities through various channels to collect data and understand the basis for credit payment obligation assessments. As noted above, Xcel and other market participants have had ample notice of SPP's intention to use the CPTF White Paper and Reservation Stack

---

[150] SPP Tariff at Attachment Z2, Section II.A.

Analysis to calculate credit payment obligations, and also, that Attachment Z2 credit payment obligations for upgrades not yet identified in the Aggregate Facilities Study reports may be forthcoming.[151]  Insofar as Xcel raises concerns regarding SPP's recalculating of historical Attachment Z2 liabilities because of errors, it should take advantage of these channels, including one-on-one sessions, to discuss the basis for credit payment obligation assessments.  We also deny Xcel's requests that the Commission direct SPP to adopt informational protocols.

84.    With respect to Xcel's assertion that, without a process to verify the calculations, there is the possibility that entities who invested in Creditable Upgrades and who are now receiving credits under Attachment Z2 may over-or double-recover through another mechanism, we find that the issue of an entity's recovery of costs through some other mechanism is outside the scope of the Attachment Z2 process. The Tariff provisions of the Attachment Z2 process require SPP to assess credit payment obligations to transmission service customers that take service over a Creditable Upgrade that could not be provided "but for" that upgrade.  Attachment Z2 only limits the recovery of Creditable Upgrade costs if the term of the transmission service ends or when the amount owed to the upgrade sponsor is zero.  In addition, even if we were to consider the issue of an entity's recovery of costs through some other mechanism, we agree with SPP and NextEra that Xcel's allegation is not supported by sufficient evidence to support the theory of potential over-recovery by upgrade sponsors.

The Commission orders:

       Xcel's complaint is hereby denied, as discussed in the body of this order.

By the Commission.

( S E A L )

                                      Nathaniel J. Davis, Sr.,
                                      Deputy Secretary.

---

[151] July 2016 Waiver Order, 156 FERC ¶ 61,020 at PP 53, 56; *KEPCo*, 161 FERC ¶ 61,145 at PP 61, 63.

***Xcel Energy Services Inc. v. Southwest Power Pool, Inc.*, Docket No. EL18-9-001, "Order Granting Rehearing for Further Consideration," (May 7, 2018)**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Xcel Energy Services Inc.                                Docket No. EL18-9-001

      v.

Southwest Power Pool, Inc.

ORDER GRANTING REHEARING FOR
FURTHER CONSIDERATION

(May 7, 2018)

Rehearing has been timely requested of the Commission's order issued on March 6, 2018, in this proceeding. *Xcel Energy Services Inc. v. Southwest Power Pool, Inc.,* 162 FERC ¶ 61,203 (2018). In the absence of Commission action within 30 days from the date the rehearing request was filed, the request for rehearing (and any timely requests for rehearing filed subsequently)[1] would be deemed denied. 18 C.F.R. § 385.713 (2017).

In order to afford additional time for consideration of the matters raised or to be raised, rehearing of the Commission's order is hereby granted for the limited purpose of further consideration, and timely-filed rehearing requests will not be deemed denied by operation of law. Rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order. As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing requests will be entertained.

Kimberly D. Bose,
Secretary.

---

[1]*See San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange*, 95 FERC ¶ 61,173 (2001) (clarifying that a single tolling order applies to all rehearing requests that were timely filed).