**ORAL ARGUMENT SCHEDULED FOR MAY 5, 2023**

# In the United States Court of Appeals for the District of Columbia Circuit

**Nos. 20-1429, 22-1049, and 22-1064 (consolidated)**

————————

XCEL ENERGY SERVICES, INC., ON BEHALF OF ITS PUBLIC UTILITY AFFILIATE, SOUTHWESTERN PUBLIC SERVICE CO., *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

Matthew R. Christiansen
 General Counsel

Robert H. Solomon
 Solicitor

Beth G. Pacella
 Deputy Solicitor
For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

March 17, 2023

## CIRCUIT RULE 28(a)(1) CERTIFICATE

**A.    Parties:**

The parties before this Court are identified in the Petitioners'

Rule 28(a)(1) certificate.

**B.    Rulings Under Review:**

1.    *Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*, 161 FERC ¶ 61,145 (2017) ("Kansas Electric Order"), JA 93;

2.    *Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*, 178 FERC ¶ 61,095 (2022) ("Kansas Electric Rehearing Order"), JA 167;

3.    *Xcel Energy Servs. Inc. v. Southwest Power Pool, Inc.*, 162 FERC ¶ 61,203 (2018) ("Xcel Order"), JA 358; and

4.    *Xcel Energy Servs. Inc. v. Southwest Power Pool, Inc.*, 178 FERC ¶ 61,096 (2022) ("Xcel Rehearing Order"), JA 442.

**C.    Related Cases:**

This case has not previously been before this Court or any other

court, and counsel is not aware of any other related cases pending

before this or any other court.

*/s/ Beth G. Pacella*
Beth G. Pacella
Deputy Solicitor

March 17, 2023

## <u>TABLE OF CONTENTS</u>

**<u>PAGE</u>**

STATEMENT OF THE ISSUES.................................................................... 1

STATUTORY AND REGULATORY PROVISIONS ................................. 3

STATEMENT OF FACTS ........................................................................... 3

I.     The Federal Power Act And The Filed Rate Doctrine .................... 3

II.    The Commission's 2003 Rulemaking Requiring
       Reimbursement To Entities That Initially Fund
       Transmission Network Upgrades ...................................................... 5

III.   The Regional Operator's Tariff .......................................................... 5

       A.     Tariff Attachment Z, SPP's Original Aggregate
              Transmission Study And Revenue Crediting Provision......... 6

       B.     SPP Replaces Attachment Z With Attachments Z1
              and Z2 ........................................................................................ 8

IV.    The Regional Operator's Delayed Implementation Of
       Attachment Z2, SPP's 2011 White Paper, And The Billing
       Procedure Waiver Request Proceeding .......................................... 10

       A.     The White Paper ..................................................................... 11

       B.     Billing Procedure Waiver Request Proceeding.................... 15

V.     The Complaints Here ....................................................................... 16

       A.     Kansas Electric's Complaint.................................................. 16

       B.     Xcel's Complaint.................................................................... 17

### TABLE OF CONTENTS

**PAGE**

VI.  The Challenged Orders ................................................................ 18

    A.  The Kansas Electric Complaint Orders ............................... 19

    B.  The Xcel Complaint Orders ................................................ 20

SUMMARY OF ARGUMENT ..................................................... 22

ARGUMENT .................................................................................. 25

I.  Standard Of Review ................................................................. 25

II.  The Commission Reasonably Interpreted Tariff Attachment Z2 As Permitting SPP To Apply The Subsequent Use Reservation Stack Analysis In Determining Whether To Assess Credit Payment Obligations ................................................................ 28

    A.  Attachment Z2 Is Ambiguous Regarding The Specific "But For" Analysis To Be Used In Determining Whether SPP Should Assess A Network Upgrade Credit Payment Obligation ................................................. 29

    B.  The Commission Reasonably Found That Determining Whether To Assess Credit Payment Obligations Based On The Subsequent Use Reservation Stack Analysis Complied With SPP's Tariff ................................................. 33

        1.  The Commission Appropriately Considered Extrinsic Evidence In Interpreting Attachment Z2 ............................................................ 33

            a.  SPP's Tariff Filings And Commission Orders Regarding Those Filings ...................................... 33

            b.  The White Paper .................................................... 39

# TABLE OF CONTENTS

**PAGE**

2.    The Commission's Interpretation Of Attachment
Z2 Appropriately Ensures That "But For"
Causation Is Satisfied...................................................46

III.    The Commission Reasonably Determined That Kansas
Electric and Xcel Had Adequate Formal Notice That SPP
Would Apply A Subsequent Use Analysis In Determining
Whether To Assess Credit Payment Obligations...........................49

IV.    The Commission Reasonably Determined That The
Regional Operator Appropriately Complied With
Attachment Z1's Study Process Rules...........................................59

CONCLUSION.........................................................................................66

iv

# TABLE OF AUTHORITIES

## COURT CASES:                                          PAGE

*ANR Pipeline Co. v. FERC,*
    863 F.2d 959 (D.C. Cir. 1988) .......................................... 27

*Coal. of MISO Transmission Customers v. FERC,*
    45 F.4th 1004 (D.C. Cir. 2022) ....................................... 26

*ESI Energy, LLC v. FERC,*
    892 F.3d 321 (D.C. Cir. 2018) ........................................ 27

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ........................................................ 26

*Fla. Gas Transmission Co. v. FERC,*
    604 F.3d 636 (D.C. Cir. 2014) ........................................ 27

*Ky. Mun. Energy Agency v. FERC,*
    45 F.4th 162 (D.C. Cir. 2022) ......................................... 27

*La. Pub. Serv. Comm'n v. FERC,*
    522 F.3d 378 (D.C. Cir. 2008) ........................................ 26

*Miss. Pub. Serv. Comm'n v. FERC,*
    783 F.3d 310 (D.C. Cir. 2015) ........................................ 27

*Old Dominion Elec. Coop. v. FERC,*
    892 F.3d 1223 (D.C. Cir. 2018) ............................... 4, 27, 50

*Okla. Gas and Elec. Co. v. FERC,*
    11 F4th 821 (2021) ..................... 4, 6-7, 10, 15-16, 27, 49-53, 56, 63

*South Carolina Pub. Serv. Auth. v. FERC,*
    762 F.3d 41 (D.C. Cir. 2014) ......................................... 26

_____

\*  Cases chiefly relied upon are marked with an asterisk.

v

# TABLE OF AUTHORITIES

## COURT CASES (cont'd):                                   PAGE

*Southern Company Services, Inc. v. FERC,*
        353 F.3d 29 (D.C. Cir. 2003) ...........................................................58

*United Power, Inc. v. FERC,*
        49 F.4th 554 (D.C. Cir. 2022)..........................................................49

## ADMINISTRATIVE CASES:

*Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*,
        161 FERC ¶ 61,145 (2017), *on reh'g,*
        178 FERC ¶ 61,095 (2022) .......................................11, 16-20, 28-37,
                                                                      39-44,47-48, 50-64

*Sw. Power Pool, Inc.*,
        110 FERC ¶ 61,028 (2005) ...........................................................6, 7

*\*Sw. Power Pool, Inc.*,
        111 FERC ¶ 61,118, *on reh'g,*
        112 FERC ¶ 61,319 (2005) ...............................................6, 7, 34, 38

*\*Sw. Power Pool, Inc.*,
        122 FERC ¶ 61,060 (2008), *on reh'g,*
        124 FERC ¶ 61,014 (2008) ...........................................5, 7, 36, 387

*\*Sw. Power Pool, Inc.*,
        123 FERC ¶ 61,208 (2008) ...............................................8, 9, 10, 39

*Sw. Power Pool, Inc.*,
        156 FERC ¶ 61,020 (2016), *on reh'g,*
        161 FERC ¶ 61,144 (2017) ............................................................15

*Sw. Power Pool,*
        163 FERC ¶ 61,092 (2018) ...........................................45, 49, 56, 65

## TABLE OF AUTHORITIES

### ADMINISTRATIVE CASES (cont'd):                    PAGE

*Standardization of Generator Interconnection Agreements
and Procedures* (Order No. 2003),
    104 FERC ¶ 61,103 (2003), *on reh'g*, 106 FERC ¶ 61,220,
    *on reh'g*, 109 FERC ¶ 61,287 (2004), *on reh'g*, 111 FERC
    ¶ 61,401 (2005), *aff'd, Nat'l Ass'n of Regulatory Comm'rs
    v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) ........................................ 5

*Xcel Energy Servs. Inc. v. Sw. Power Pool, Inc.*,
    162 FERC ¶ 61,203 (2018), *on reh'g*,
    178 FERC ¶ 61,096 (2002) .............................8, 16, 18, 20-21, 28-35,
                                                        37-45, 47-49, 51-59, 65

*Xcel Energy Servs. Inc. v. Sw. Power Pool, Inc.*,
    178 FERC ¶ 61,096 (2002) ................................................................. 8

### STATUTES:

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ........................................................................ 25

Federal Power Act

    Section 205, 16 U.S.C. § 824d ........................................................ 32

    Section 205(c), 16 U.S.C. § 824d(c) ............................................ 3, 57

    Section 205(d), 16 U.S.C. § 824d(d) .................................................. 4

    Section 206, 16 U.S.C. § 824e .................................................... 16, 32

    Section 206(a), 16 U.S.C. § 824e(a).................................................... 4

    Section 313(b), 16 U.S.C. § 825*l*(b) ................................................ 26

## TABLE OF AUTHORITIES

**REGULATION:**                                                      **PAGE**

18 C.F.R. § 35.1(a) ............................................................................ 57

**OTHER:**

FERC Energy Primer, A Handbook for Energy Market Basics (Apr. 2020), https://www.ferc.gov/sites/default/files/2020-06/energy-primer-2020_Final.pdf    .......................................................................... 6

# GLOSSARY

| | |
|---|---|
| Commission or FERC | Respondent Federal Energy Regulatory Commission |
| Credit payment obligations | Charges assessed to reimburse entities that paid to upgrade transmission facilities |
| Crediting Procedures | Procedures used to reimburse entities for the costs they paid to upgrade transmission facilities |
| Historical period | 2008-2016 |
| Kansas Electric | Petitioner Kansas Electric Power Cooperative, Inc. |
| Kansas Electric Order | *Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*, 161 FERC ¶ 61,145 (2017), JA 93 |
| Kansas Electric Rehearing Order | *Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*, 178 FERC ¶ 61,095 (2022), JA 167 |
| KE-R. | Certified index to record items in Kansas Electric's petition for review |
| Regional Operator or SPP | Southwest Power Pool, Inc. |
| SPP 2008 filing | SPP March 28, 2008, filing in FERC Docket No. ER08-746-000 |
| Upgrade sponsor | SPP transmission customer that initially incurred the costs of an upgrade |

| | |
|---|---|
| X-R. | certified index to record items in Xcel's petition for review |
| Xcel | Petitioner Xcel Energy Services, Inc. |
| Xcel Order | *Xcel Energy Servs. Inc. v. Southwest Power Pool, Inc.*, 162 FERC ¶ 61,203 (2018), JA 358 |
| Xcel Rehearing Order | *Xcel Energy Servs. Inc. v. Southwest Power Pool, Inc.*, 178 FERC ¶ 61,096 (2022), JA 442 |

# In the United States Court of Appeals
# for the District of Columbia Circuit

Nos. 20-1429, 22-1049, 22-1064 (consolidated)

————————

XCEL ENERGY SERVICES, INC., ON BEHALF OF ITS PUBLIC UTILITY AFFILIATE,
SOUTHWESTERN PUBLIC SERVICE CO., *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

————————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

————————

## STATEMENT OF THE ISSUES

This case concerns charges to reimburse entities that funded the

costs of upgrades on an interstate electric energy transmission grid.  In

the challenged orders, the Federal Energy Regulatory Commission

("Commission" or "FERC") addressed complaints filed by Kansas

Electric Power Cooperative, Inc. ("Kansas Electric") and Xcel Energy

Services, Inc. ("Xcel") against Southwest Power Pool, Inc. ("Regional

Operator" or "SPP").  The complaints alleged that the Regional

Operator improperly assigned to Kansas Electric and Xcel excess charges ("credit payment obligations") related to upgrades on the SPP transmission grid used to provide them transmission service. The Commission rejected this allegation, finding that the Regional Operator's assignment of the credit payment obligations to Kansas Electric and Xcel complied with SPP's FERC-jurisdictional Tariff and therefore the filed rate doctrine.

Kansas Electric raised an additional allegation in its complaint— that the Regional Operator violated its Tariff's transmission study requirements by failing to provide estimates of Kansas Electric's credit payment obligations in a 2010 study report. The Commission rejected this allegation as well, finding that SPP satisfied this requirement, in the circumstances here, by stating in the study report that credits may be required.

The issues on appeal are:

(1) whether the Commission appropriately found that the Regional Operator's assignment to Kansas Electric and Xcel of credit payment obligations related to transmission network upgrades used to provide

them transmission service complied with SPP's Tariff and therefore the

filed rate doctrine; and

(2) whether the Commission reasonably determined in the

circumstances here that the Regional Operator complied with its Tariff

obligation to provide in the transmission study report estimates of

Kansas Electric's credit payment obligations, by stating in the study

report that credits may be required.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the

Addendum to this brief.

## STATEMENT OF FACTS

### I.    The Federal Power Act And The Filed Rate Doctrine

The Federal Power Act requires regulated entities to file with the

Commission schedules showing "all rates and charges" and the

"classifications, practices and regulations affecting such rates and

charges" for any FERC-jurisdictional service.  Federal Power Act

section 205(c), 16 U.S.C. § 824d(c).  If a utility wishes to change its filed

rates, charges, or the rules affecting those rates and charges, it must

provide 60-days' advance notice to the Commission by filing new rate

schedules setting out the changes to be made and the time when they

shall take effect.  Federal Power Act section 205(d), 16 U.S.C. § 824d(d); *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1226 (D.C. Cir. 2018).  The Federal Power Act also permits the Commission to prospectively change regulated utilities' rates, charges, and rules if it finds their existing rates, charges and rules are unjust, unreasonable, unduly discriminatory, or preferential.  Federal Power Act section 206(a), 16 U.S.C. § 824e(a).  "[T]he Commission has no authority under the Act to allow retroactive change[s] in the rates charged to consumers." *Old Dominion*, 892 F.3d at 1226.

These principles are collectively known as the "filed rate doctrine." *Okla. Gas and Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021); *Old Dominion*, 892 F.3d at 1226-27.  That doctrine prohibits a regulated entity from collecting a rate, or implementing rules affecting a rate, other than those on file with the Commission, and prohibits the Commission from retroactively changing a rate or the rules affecting a rate. *Okla. Gas*, 11 F.4th at 829; *Old Dominion*, 892 F.3d at 1227.

## II.    The Commission's 2003 Rulemaking Requiring Reimbursement To Entities That Initially Fund Transmission Network Upgrades

The Commission's Order No. 2003 rulemaking[1] generally requires transmission interconnection customers to initially fund the full costs of interconnection facilities and transmission grid network upgrades that would not be needed but for the interconnection.  But once transmission service on the network upgrades begins, the customer that initially incurred the costs (the "upgrade sponsor") must receive transmission service credits as reimbursement for the network upgrades costs it incurred.  Order No. 2003, 104 FERC ¶ 61,103 P 694; *see also Sw. Power Pool, Inc.*, 122 FERC ¶ 61,060 P 13 (citing Order No. 2003, 104 FERC ¶ 61,103 P 694), *on reh'g*, 124 FERC ¶ 61,014 (2008).

## III.    The Regional Operator's Tariff

Southwest Power Pool, the Regional Operator here, is a regional transmission organization that provides FERC-jurisdictional transmission service over approximately 60,000 miles of transmission

---

[1] *Standardization of Generator Interconnection Agreements and Procedures*, 104 FERC ¶ 61,103 (2003) ("Order No. 2003"), *on reh'g*, 106 FERC ¶ 61,220, *on reh'g*, 109 FERC ¶ 61,287 (2004), *on reh'g*, 111 FERC ¶ 61,401 (2005), *aff'd Nat'l Ass'n of Regulatory Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007).

lines stretching from Arkansas to Wyoming and from Texas to North

Dakota. *Okla. Gas*, 11 F.4th at 825. SPP operates under a tariff

approved by the Commission. *Id.*; *see also* FERC Energy Primer, A

Handbook for Energy Market Basics (Apr. 2020), at 96-99,

https://www.ferc.gov/sites/default/files/2020-06/energy-primer-

2020_Final.pdf (providing map and explaining market operations

within Southwest Power Pool).

### A.    Tariff Attachment Z, SPP's Original Aggregate Transmission Study And Revenue Crediting Provision

In 2005, the Commission accepted the Regional Operator's

proposal to add to its Tariff Attachment Z. *Sw. Power Pool, Inc.*,

111 FERC ¶ 61,118, *on reh'g*, 112 FERC ¶ 61,319 (2005); *Sw. Power

Pool, Inc.*, 110 FERC ¶ 61,028 (2005). Attachment Z set out the

Regional Operator's Aggregate Transmission Service Study process,

which aggregated for study transmission service requests received over

a certain period. It also set out a revenue crediting mechanism to

reimburse transmission service customers that are directly assigned

grid upgrade costs. As this Court has explained, "Attachment Z

provided that a utility would initially fund upgrades needed to

accommodate its expansion of service—that utility is the 'upgrade

sponsor.' Other utilities that subsequently use the upgraded transmission facilities—the 'upgrade users'—would pay a share of the upgrade costs. This reimbursement would continue until the upgrade sponsor was fully reimbursed." *Okla. Gas*, 11 F.4th at 825; *see also Sw. Power Pool,* 111 FERC ¶ 61,118; *Sw. Power Pool*, 110 FERC ¶ 61,028.

Under Attachment Z, "transmission customers that [paid] for Network Upgrades receive[d] revenues from new transmission service that [made] use of the Network Upgrades." *Sw. Power Pool*, 122 FERC ¶ 61,060 P 14; *see also id.* at P 3 (the Regional Operator "replac[ed] the Order No. 2003 crediting provisions for Network Upgrades with provisions that provide financial compensation for subsequent use of certain limited Network Upgrades"); *Sw. Power Pool*, 124 FERC ¶ 61,014 P 14 (Commission accepted "SPP's proposal under which Interconnection Customers will pay the 'but for' costs of the interconnection and in return receive a valuable right to future revenues when the Network Upgrades funded by the customer are used by others"). Attachment Z did "not guarantee full reimbursement; rather it provide[d] financial compensation to the funding customer

when use is made of the Network Upgrades funded by the customer."

*Sw. Power Pool*, 124 FERC ¶ 61,014 P 14.

## B. SPP Replaces Attachment Z With Attachments Z1 and Z2

In 2008, the Commission accepted the Regional Operator's proposal to split Attachment Z into separate attachments:  Attachment Z1, "Aggregate Transmission Service Study Procedures and Cost Allocation and Recovery for Service Upgrades"; and Attachment Z2, "Revenue Crediting for Upgrades" ("Crediting Procedures").  *See Sw. Power Pool, Inc.*, 123 FERC ¶ 61,208 P 19 (2008).

Under Attachment Z1 (set out at Petitioner Br. Addendum A-9), the Regional Operator continues to study long-term transmission service requests to determine whether any new network upgrades are needed to accommodate those requests.  *See Xcel Energy Servs. Inc. v. Sw. Power Pool, Inc.*, 178 FERC ¶ 61,096 P 4 (2022) ("Xcel Rehearing Order"), JA 443.  And under that Attachment, any network upgrade costs continue to be directly assigned to the transmission customer whose service request gave rise to the network upgrade—the upgrade sponsor.  *Id.*

Under Attachment Z2 (set out at Petitioner Br. Addendum A-26), upgrade sponsors continue to receive revenue credits to reimburse them for the network upgrade costs SPP directly assigned them under Attachment Z1. *See Sw. Power Pool*, 123 FERC ¶ 61,208 PP 32, 35. But as both SPP's 2008 filing proposing Tariff Attachment Z2 and the Commission's 2008 Order accepting that Attachment explained, unlike Attachment Z, Attachment Z2 does not provide reimbursement only from customers that subsequently used a network upgrade in the same direction as the initial overload requiring the upgrade. *Id.* at P 32; SPP March 28, 2008, filing in FERC Docket No. ER08-746-000 ("SPP 2008 filing") at transmittal letter p. 7 (*quoted in* X-R. 32, Xcel Rehearing Request, at 22, JA 420). While a particular upgrade may have been built to enable transmission service in a particular direction, the upgrade may also provide benefits by increasing the ability to provide transmission service in the opposite direction. *Sw. Power Pool*, 123 FERC ¶ 61,208 P 32; SPP 2008 filing at transmittal letter p. 7, *quoted in* X-R. 32, Xcel Rehearing Request, at 22, JA 420.

Thus, to provide reimbursement from entities using network upgrades in either direction, the Regional Operator revised its tariff to

9

provide revenue credits from transmission service "that could not be provided 'but for'" the upgrade. *Sw. Power Pool*, 123 FERC ¶ 61,208 P 32; SPP 2008 filing at transmittal letter pp. 7-8 (*quoted in* X-R. 32, Xcel Rehearing Request, at 22, JA 420); *see also Okla. Gas*, 11 F.4th at 824 (SPP's 2008 "tariff required other utilities who benefitted from these upgrades to share the costs of the expanded network"); *id.* at 832 (Attachment Z2 "requir[es] stakeholders who benefit from upgrades to pay for a share of the upgrades").

Under Attachment Z2, an upgrade sponsor is paid revenue credits until its Attachment Z1 upgrade costs are reimbursed; then other transmission customers who have paid Attachment Z2 revenue credits receive revenue credits from other subsequent upgrade users. *See Sw. Power Pool*, 123 FERC ¶ 61,208 P 33.

## IV. The Regional Operator's Delayed Implementation Of Attachment Z2, SPP's 2011 White Paper, And The Billing Procedure Waiver Request Proceeding

Implementing the Attachment Z2 Crediting Procedure proved to be complex. *See Okla. Gas*, 11 F.4th at 825. In 2012, the Regional Operator's stakeholders unanimously endorsed a 2011 White Paper prepared by an SPP Task Force (appended to X-R. 1, Xcel Complaint,

JA 272-92), which sets forth the methodology SPP would use to implement the Attachment Z2 Crediting Provisions. *See Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*, 178 FERC ¶ 61,095 (2022) P 7 ("Kansas Electric Rehearing Order"), JA 170.

## A.    The White Paper

The White Paper noted that under SPP's Tariff an upgrade sponsor is due revenue credits if the network upgrade it sponsored is needed to grant a transmission customer's request for service—a "but for" test. White Paper at 2, JA 274. And it explained that, "[o]ne way to determine if a specific transmission service request meets the 'but for' test" is the "N-1 methodology". *Id.* Under that methodology, the requested service is added to the existing transmission system model including the upgrade and the upgrade is then removed from the model. *Id.* If any transmission overloads occur, the new service request satisfies the "but for" condition and revenue credits are due. *Id.*

The White Paper explained that it would be impractical to use this methodology for the revenue crediting purposes here for several reasons. First, an N-1 contingency analysis would require that all

upgrade sponsors' network upgrades are analyzed against hundreds of new transmission service requests each hour. *Id.* at 2-3, JA 274-75. Further, the results could be altered by the order in which network upgrades are assessed and the order in which each new service request is added. *Id.* at 3, JA 275. Moreover, an N-1 contingency analysis first adds the requested service to the existing transmission system model, which includes service granted since the upgrade was determined to be needed, and then removes the upgrade; but the more-recently granted service remaining in the analysis likely would no longer be feasible with the upgrade removed. *Id.* at 2-3, JA 274-75.

So, the White Paper recommended that the Regional Operator use a different methodology, the Reservation Stack Analysis, to determine if Attachment Z2's "but for" requirement is met regarding a network upgrade. White Paper at 3-4, JA 275-76. Under that methodology, SPP first constructs a "reservation stack" and then applies "subsequent use rules" to the stack. *Id.* at 4, JA 276; *see also id.* at 4-6, JA 276-78 (describing specifics of reservation stack construction); *id.* at 8, JA 280 (setting out the subsequent use rules). The reservation stack considers the cumulative magnitude and direction of the flow on each upgrade

just prior to the addition of the newly granted transmission service and the magnitude and direction of the incremental flow on the upgrade with the addition of the newly granted service. *Id.* at 8, JA 280.

The methodology includes an impact *de minimis* cut-off. *Id.* at 6, JA 278. SPP criteria specified that a transmission service request must have a "Transmission Distribution Factor" of at least three percent on a facility before the request is considered to impact the facility. *Id.* Consistent with that criterion, a new transmission service request with a Transmission Distribution Factor lower than three percent on an upgrade will not be considered to have an impact on and will not be assessed a revenue crediting obligation for that upgrade. *Id.*

Once the direction and magnitude of the impacts due to a new service request are added to the reservation stack, the subsequent use rules are applied. *Id.* at 8, JA 280. Rule 1 provides that all new reservations with impacts in the direction of the flow that necessitated the upgrade satisfy the "but for" test. *Id.* Under Rule 2, all new reservations with impacts in the opposite direction of the flow that necessitated the upgrade satisfy the "but for" test if it is shown during this analysis that the new reservation could not have been provided at

13

the time immediately prior to such upgrade but for the capacity provided by the upgrade. *Id.* Rule 3 explains that the Rule 2 analysis differs for long-term and short-term reservations. *Id.*

The White Paper further explains that the Reservation Stack Analysis differs depending on the type of upgrade at issue. For upgrades that are new facilities, any transaction that occurs after the transaction that caused the new facilities to be built and that has an impact on the upgrade regardless of direction is deemed to satisfy subsequent use rules 1 or 2. *Id.* at 3, JA 275.

For upgrades to existing facilities, a transaction that increases power flow on the upgrade in the same direction as the transaction that caused the upgrade to be built satisfies the "but for" requirement for that upgrade; all other transactions are evaluated under the Reservation Stack Analysis. *Id.*

There is also a third type of upgrade, called "sponsored upgrades". Unlike new facilities upgrades and upgraded facilities upgrades, sponsored upgrades are not built to satisfy SPP or Transmission Owner criteria. *Id.* at 2-3, JA 274-75. So, before the Reservation Stack Analysis can be applied regarding a sponsored upgrade, the sponsored

14

upgrade must first be evaluated using an N-1 contingency analysis—
i.e., all transmission and interconnection service requests are evaluated
with the sponsored upgrade removed from the model.  *Id.* at 3, JA 275.
If the N-1 analysis shows that the sponsored upgrade is needed to grant
the requested service, it will be included in the Reservation Stack
Analysis as an upgrade eligible for revenue crediting.  *Id.*

### B.    Billing Procedure Waiver Request Proceeding

SPP was not able to develop the special software needed to
calculate revenue credits until 2015, and it was not able to begin
calculating credit payment obligations until 2016.  *Okla. Gas*, 11 F.4th
at 825.  In 2016, the Regional Operator sought a waiver of its Tariff's
one-year billing deadline provision (section I.7.1) so it could
retroactively bill network upgrade users for Attachment Z2 revenue
credits back to 2008.  *See id.* at 826.  Initially, without considering filed
rate doctrine implications, the Commission granted the waiver (*Sw.
Power Pool, Inc.*, 156 FERC ¶ 61,020 (2016), *on reh'g*, 161 FERC
¶ 61,144 (2017)), and SPP began collecting upgrade charges for the
historical 2008-2016 period.  *See id.*

Xcel petitioned this Court for review of the Waiver Orders, and this Court granted the Commission's motion for voluntary remand so the Commission could consider the implications of the filed rate doctrine on the waiver request.  *See id.*  On remand, the Commission denied the retroactive waiver of Tariff section I.7.1's one-year billing limitation and directed SPP to refund historical period upgrade charges collected in contravention of that limitation.  *See id.* at 826, 832; *see also* Kansas Electric Rehearing Order P 17, JA 174, and Xcel Rehearing Order P 40, JA 461 (explaining that Kansas Electric and Xcel no longer have any credit payment obligations during the historical period).  This Court affirmed the Commission's remand determinations on appeal. *Okla. Gas*, 11 F.4th at 825, 833.

## V.    The Complaints Here

### A.    Kansas Electric's Complaint

On November 16, 2016, Kansas Electric filed a Federal Power Act section 206, 16 U.S.C. § 824e, complaint against the Regional Operator. KE-R. 1.[2]  As pertinent here, the complaint alleged that in assigning

---

[2] This brief will cite to items in the certified index to record regarding Kansas Electric's petition for review as "KE-R.".  The items regarding Xcel's petitions for review will be cited as "X-R.".

16

Kansas Electric Tariff Attachment Z2 network upgrade credit payment obligations, the Regional Operator: (1) violated Kansas Electric's transmission service agreements and the filed rate doctrine (KE-R. 1 at 17-20, JA 17-20); (2) violated the Tariff's Attachment Z1 study process (*id.* at 21-23, JA 21-23); and (3) improperly implemented the "but for" language in Attachment Z2 section II.B (*id.* at 23-28, JA 23-28). *See Kansas Elec. Power Coop., Inc. v. Southwest Power Pool, Inc.*, 161 FERC ¶ 61,145 PP 5-13 (2017) ("Kansas Electric Order"), JA 95-100.

The Regional Operator filed an answer disputing Kansas Electric's allegations (KE-R. 33), Kansas Electric filed an answer to SPP's answer (KE-R. 37), and SPP filed an answer to that answer (KE-R. 41). *See* Kansas Electric Order PP 18-50, JA 102-14.

## B.    Xcel's Complaint

On October 10, 2017, Xcel filed a Federal Power Act section 206, 16 U.S.C. § 824e, complaint against the Regional Operator. X-R. 1. As pertinent here, the complaint alleged that, in assigning Xcel SPP Tariff Attachment Z2 network upgrade credit payment obligations, the Regional Operator: (1) violated Tariff Attachment Z2 and the filed rate doctrine because it did not apply Attachment Z2's "but for" test (X-R. 1

17

at 17-33, JA 208-24); and (2) violated Tariff Attachment Z1 because it assessed Xcel credit payment obligations regarding network upgrades that were not studied as part of Xcel's request for transmission service or were not specified in Xcel's transmission service agreement (*id.* at 33-36, JA 224-27).  *See Xcel Energy Servs. Inc. v. Sw. Power Pool, Inc.*, 162 FERC ¶ 61,203 PP 7-24 (2018) ("Xcel Order"), JA 362-70.

The Regional Operator and NextEra Energy Resources, LLC ("NextEra") filed answers disputing Kansas Electric's complaint (X-R. 24, 25), Xcel filed an answer to SPP's and NextEra's answers (X-R. 27), and SPP filed an answer to that answer (X-R. 28).  *See* Xcel Order PP 31-68, JA 372-89.

## VI.  The Challenged Orders

After considering everything in the records in the Kansas Electric and Xcel proceedings as well as Court and Commission precedent regarding the matters at issue here, the Commission denied the complaints.  (The Commission granted Kansas Electric's complaint in part and set for trial-type hearing an allegation not at issue on appeal here.  Kansas Electric Order PP 71-74, Ordering P (B), JA 123-25, 126. Kansas Electric subsequently withdrew the complaint allegation set for

hearing.  Kansas Electric Dec. 29, 2017, filing in FERC Docket

No. EL17-21.)

## A.    The Kansas Electric Complaint Orders

The Commission found no merit in Kansas Electric's contention

that SPP violated the Kansas Electric-SPP service agreements and the

filed rate doctrine by assessing Kansas Electric Attachment Z2 credit

payment obligations for network upgrades not listed in the service

agreements.  Kansas Electric Rehearing Order PP 16, 18, JA 173, 175.

When the 2016 complaint was filed, SPP's Tariff did not require

Attachment Z2 upgrades to be listed in service agreements; that

requirement was later added to SPP's Tariff, beginning May 4, 2018.

*Id.* at P 16 & n.32, JA 173-74.  Furthermore, Attachment 1 Section 8.0

of each service agreement provides that the "appropriate charges for

individual transactions will be determined in accordance with the terms

and conditions of the Tariff."  *Id.* at P 16, JA 174.  And under Section

3.0 of the service agreements, transmission service is governed by the

Tariff, and the Tariff controls if there is a conflict between the service

agreement and the Tariff.  *Id.* at n.34, JA 174.  Tariff Attachment Z2,

which is also part of the filed rate, provided Kansas Electric the formal

notice required regarding potential credit payment obligations.  *Id.*

P 18, JA 175.

Furthermore, the Commission found that the Regional Operator

properly implemented revenue crediting under Tariff Attachment Z2

section II.B.  The Commission determined that the Tariff language at

issue was ambiguous and reasonably interpreted that language to

permit SPP to use the Reservation Stack Analysis.  Kansas Electric

Rehearing Order PP 34-43, JA 182-87.

The Commission also found that SPP did not violate the Tariff's

Attachment Z1 study process.  Consistent with the requirements of

Attachment Z1 section III.c, the 2010 transmission study report stated

that credits may be required from Kansas Electric for network upgrades

in accordance with Attachment Z2.  Kansas Electric Rehearing Order

P 24, JA 178 (citing KE-R. 1, Complaint, at 2010 study report Table 3

pp. 32-35, JA 69-72); Kansas Electric Order P 63, JA 119.

## B.    The Xcel Complaint Orders

Likewise, the Commission found that there was no merit in Xcel's

contention that SPP violated its affiliate Southwestern Public Service

Co.'s service agreements and the filed rate doctrine by assessing

Southwestern Attachment Z2 credit payment obligations for network upgrades not listed in those agreements. Xcel Rehearing Order PP 39-41, JA 460-61. When Xcel filed its 2017 complaint, SPP's Tariff did not require that Attachment Z2 upgrades be listed in service agreements. *Id.* at P 39 & n.85, JA 460. And no provision in the service agreement required that all upgrades and charges be specified. *Id.* at P 39, JA 460. Moreover, section 3.0 of the service agreements provides that transmission service is governed by the Tariff and that the Tariff controls if there is a conflict between the service agreement and the Tariff. *Id.* In executing the service agreements, Xcel obligated itself to the Tariff's terms, including Attachment Z2's revenue crediting provisions. *Id.*

Furthermore, the Commission found that the Regional Operator properly implemented revenue crediting under Attachment Z2 section II.B. The Commission determined that the Tariff language at issue was ambiguous and that a reasonable interpretation of that language permits SPP to use the Reservation Stack Analysis. Xcel Rehearing Order PP 19-33, JA 450-58.

## SUMMARY OF ARGUMENT

The Commission appropriately considered the complaints filed by by Kansas Electric and Xcel, and reasonably rejected their allegations that they were improperly charged for their use of upgrades on SPP's transmission system.

First, the Commission correctly concluded that the Tariff's Attachment Z2 Crediting Provisions were ambiguous regarding the specific "but for" analysis the Regional Operator should apply in determining whether to assess credit payment obligations.  Tariff Attachment Z2's text does not specify that Kansas Electric and Xcel's preferred N-1 contingency analysis should be applied; indeed, Attachment Z2's text indicates instead that a different (subsequent use) analysis should be applied.

And while there is Commission precedent in which "but for" means using an N-1 contingency analysis, the Commission explained that this precedent involves the assignment of *initial* cost responsibility for network upgrades, which occurs under Tariff Attachment Z1.  Tariff Attachment Z2 addresses a different matter—reimbursement to those that already paid the upgrade's costs.

Second, the Commission reasonably interpreted Attachment Z2 as permitting SPP to apply the subsequent use Reservation Stack Analysis in determining whether to assess credit payment obligations.  In interpreting this provision, the Commission appropriately considered extrinsic evidence, and reasonably found that the evidence established that SPP intended to apply a subsequent use analysis to determine whether to assess credit payment obligations.

Specifically, SPP's Tariff filings and the Commission's Orders regarding those filings showed this intent.  For example, SPP's 2008 filing, which added the "but for" language to Attachment Z2, did not indicate that SPP intended to implement an N-1 contingency analysis. Rather, SPP's statements in that filing show that it intended to continue to determine whether to assess credit payment obligations based on subsequent use.

Likewise, the Commission reasonably considered SPP's White Paper, which was prepared to provide SPP guidance in implementing Attachment Z2.  The Commission found that the White Paper further demonstrated that SPP's intent was to conduct a subsequent use analysis in determining whether to assess crediting payment

23

obligations.  The White Paper explained why it would be impractical to use an N-1 contingency in the context of credit payment obligations. And it set out a subsequent use methodology (the Reservation Stack Analysis) for SPP to apply in determining whether the "but for" causation required to assess credit payment obligations under Attachment Z2 is met.

The Commission explained that "but for" causation under the Reservation Stack Analysis is not satisfied simply by flows on an upgrade.  Rather, the Reservation Stack Analysis ensures that credit payment obligations are assessed only if SPP has found that the upgrade was needed to provide the new service request.

Third, the Commission reasonably determined that Kansas Electric and Xcel had sufficient notice—through Tariff Attachment Z2, SPP's filed statements in Commission rate proceedings, Commission Orders regarding those filings, and Kansas Electric's and Xcel's filed service agreements (which incorporated SPP's Tariff into the agreements)—that SPP would apply a subsequent use analysis in determining whether to assess credit payment obligations.  As this Court has found, notice provided through Commission proceedings may

24

satisfy the filed rate doctrine. And Tariff Attachment Z2, SPP's filed explanatory statements, the Commission's Orders on those filings, and the service agreements are all forms of notice provided through Commission proceedings.

Finally, the Commission reasonably determined that SPP appropriately complied with Tariff Attachment Z1's study process requirement to provide upgrade cost estimates in the circumstances here. SPP was not able to develop the special software needed to implement the Attachment Z2 revenue crediting analysis by the time the 2010 transmission study report issued. So, for each transmission service request, it included in Table 3 of the 2010 study report notations stating that Attachment Z2 credits may be assessed. Kansas Electric acknowledges that it would be sufficient under Attachment Z1 for SPP to indicate that the amount of upgrade charges was unknown. The study report notations did just that.

## ARGUMENT

## I.    Standard Of Review

The Court reviews Commission actions under the Administrative Procedure Act's narrow "arbitrary and capricious" standard. 5 U.S.C.

§ 706(2)(A); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016).  Under that standard, the question is not "whether a regulatory decision is the best one possible or even whether it is better than alternatives." *Elec. Power Supply Ass'n*, 577 U.S. at 292; *see also Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1017 (D.C. Cir. 2022) (same).  Rather, the Court must uphold the Commission's determination "if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Elec. Power Supply Ass'n*, 577 U.S. at 292; *see also Coal. of MISO Transmission Customers*, 45 F.4th at 1017 (same).

The Commission's factual findings are conclusive if supported by substantial evidence.  *See* 16 U.S.C. § 825*l*(b).  Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of evidence." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008) (citation omitted); *accord S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014).  The Court "do[es] not ask whether record evidence could support the petitioner's view of the issue, but whether it supports the Commission's ultimate

decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2014); *see also Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 174 (D.C. Cir. 2022) (question is not whether, on this record, reasonable minds could have reached a different conclusion, but only whether substantial evidence supported the Commission's conclusion and whether it reasonably explained its decision.)

"When reviewing the Commission's interpretation of a tariff, this court first considers *de novo* whether the relevant language unambiguously addresses the matter at issue, and if so, [it] appl[ies] that unambiguous meaning." *Okla. Gas*, 11 F.4th at 821 (internal quotation omitted). "If, however, there is ambiguity, [the Court] defer[s] to the Commission's construction so long as that construction is reasonable." *Id.* (internal quotation omitted); *see also Old Dominion*, 892 F.3d at 1230 (same); *ESI Energy, LLC v. FERC*, 892 F.3d 321, 323 (D.C. Cir. 2018) (same).

The Court also defers to the Commission's interpretation of its own precedent. *See*, *e.g.*, *ESI Energy*, 892 F.3d at 329; *Miss. Pub. Serv. Comm'n v. FERC*, 783 F.3d 310, 316 (D.C. Cir. 2015); *see also ANR*

*Pipeline Co. v. FERC*, 863 F.2d 959, 963 (D.C. Cir. 1988) (noting "the Commission's superior capacity to construe its own decisions").

## II. The Commission Reasonably Interpreted Tariff Attachment Z2 As Permitting SPP To Apply The Subsequent Use Reservation Stack Analysis In Determining Whether To Assess Credit Payment Obligations

In Kansas Electric and Xcel's view, Attachment Z2 unambiguously requires the Regional Operator to apply an N-1 contingency analysis in determining whether to assess a network upgrade credit payment obligation.  Br. at 31-35; *see also id.* at 12-13, 40 (discussing N-1 contingency analysis).  Kansas Electric and Xcel are mistaken.

First, as the Commission found, Attachment Z2's language is ambiguous.  Kansas Electric Rehearing Order PP 34-37, JA 182-85; Xcel Rehearing Order PP 19-22, JA 450-53; Kansas Electric Order P 65, JA 120.

And second, after considering extrinsic evidence regarding the Crediting Provisions, the Commission reasonably determined that the "subsequent use" methodology SPP used to determine whether to assess credit payment obligations complied with its Tariff.  Kansas Electric Rehearing Order PP 34, 38-43, JA 182, 185-87; Xcel Rehearing Order

28

PP 19, 23-33, JA 450, 453-58; Kansas Electric Order PP 65-70, JA 120-23; Xcel Order PP 73-76, 78, JA 390-92.

### A. Attachment Z2 Is Ambiguous Regarding The Specific "But For" Analysis To Be Used In Determining Whether SPP Should Assess A Network Upgrade Credit Payment Obligation

Contrary to Kansas Electric and Xcel's claim, Br. at 31-35, the Commission correctly concluded that Attachment Z2 is ambiguous regarding the specific "but for" analysis that applies in determining whether new transmission service should be assessed a network upgrade credit payment obligation to reimburse those that already paid for the upgrade's costs.

Attachment Z2 section II.B. provides that "[r]evenue for credits will be provided from [new transmission service] that could not be provided but for one or more Creditable Upgrades . . . ." *See* Pet. Br. at A-28.  (SPP's Tariff defines "Creditable Upgrade" as "Any Network Upgrade which was paid for, in whole or part, through revenues collected from a [customer] through Directly Assigned Upgrade Costs," *see* Pet. Br. at A-26.)  Attachment Z2 does not specify the use of an N-1 contingency analysis or any other particular methodology to resolve the

"but for" question.  Kansas Electric Rehearing Order PP 35-36, JA 182-83; Xcel Rehearing Order PP 20-21, JA 451.

Attachment Z2's text indicates that SPP should apply a "subsequent use" analysis in determining whether the "but for" standard is met.  As the Commission noted, the introductory paragraph of Attachment Z2 section II provides that "Directly Assigned Upgrade Costs are recoverable . . . from new transmission service using the facility . . . ."  Xcel Rehearing Order P 41 & n.90, JA 461; *see also* Pet. Br. at A-27 (setting out Tariff provision).  And Attachment Z2 section II.B provides that:  "Revenue credits shall be determined based upon the subsequent incremental use of each affected Creditable Upgrade for such new or increased [service];" a customer is to pay "for each such new or increased use of a Creditable Upgrade;" "such revenue credits [are] to be given to an Upgrade Sponsor for subsequent use of a Creditable Upgrade;" and revenue credits "shall be paid by the Network Customer making such new or increased use of the Creditable Upgrade".  *See* Pet. Br. at A-28; s*ee also* Kansas Electric Rehearing Order P 35, JA 182 (quoting Attachment Z2 section II.B); Xcel Rehearing Order P 20, JA 451 (same).

30

Kansas Electric and Xcel contend that "but for" means "if not for". Br. at 32 (discussing dictionary definition of "but for"). But that does not mean Attachment Z2 unambiguously requires the use of a specific causation analysis that cannot rely on subsequent use. *See* Kansas Electric Rehearing Order P 34, JA 182; Xcel Rehearing Order P 19, JA 450. Indeed, the "if not for" dictionary definition of "but for" can be satisfied by new or increased transmission service using a network upgrade. *See infra* pp. 43-47 (explaining that Attachment Z2 "but for" causation is satisfied under the subsequent use analysis SPP applies only if SPP has determined the upgrade is needed to provide the new transmission service request).

Kansas Electric and Xcel also point to Commission precedent in which "but for" means using the N-1 contingency analysis they prefer. Br. at 32-33. But as the Commission explained, under its precedent an N-1 contingency analysis is used to assign *initial* cost responsibility for network upgrades. Kansas Electric Rehearing Order P 37 & n.84, JA 183; Xcel Rehearing Order P 21 & n.46, JA 451-52. Consistent with this, Tariff Attachment Z1 uses an N-1 contingency analysis to *initially* assign cost responsibility to the entity or entities whose service

31

request(s) gave rise to the upgrade.  Xcel Order P 2, n. 142, JA 359, 390; Kansas Electric Rehearing Order P 4, JA 168.  But Attachment Z2 does not address initial upgrade cost assignment; instead, it addresses reimbursement to those that already paid the upgrade's costs.

Kansas Electric and Xcel contend that the presence of the words "could not be provided" before the words "but for" in Attachment Z2 section II.B prevents a finding of ambiguity.  Br. at 33-34.  But the point is that Attachment Z2 does not specify the use of an N-1 contingency analysis to resolve the "could not be provided but for" question; instead, Attachment Z2's text indicates that SPP should apply a subsequent use analysis in resolving that question.  Kansas Electric Rehearing Order PP 35-36, JA 182-83; Xcel Rehearing Order PP 20-21, P 41 & n.90, JA 451, 461.

Kansas Electric and Xcel also posit that, if "SPP could not implement Attachment Z2 as written," the Tariff's language should have been prospectively modified through Federal Power Act section 205, 16 U.S.C. § 824d, or section 206, 16 U.S.C. § 824e.  Br. at 44-45. But finding Attachment Z2's language ambiguous is not a finding that

the provision could not be implemented "as written" so that it must be modified.

**B.    The Commission Reasonably Found That Determining Whether To Assess Credit Payment Obligations Based On The Subsequent Use Reservation Stack Analysis Complied With SPP's Tariff**

**1.    The Commission Appropriately Considered Extrinsic Evidence In Interpreting Attachment Z2**

To discern Tariff Attachment Z2's intent, the Commission properly considered extrinsic evidence regarding that provision. Kansas Electric Rehearing Order PP 38-43, JA 185-87; Xcel Rehearing Order PP 23-33, JA 453-58; Kansas Electric Order PP 65-70, JA 120-23; Xcel Order PP 74-76, JA 390-91.  This included SPP's Tariff filings, Commission Orders, and the White Paper.

**a.    SPP's Tariff Filings And Commission Orders Regarding Those Filings**

The Commission reasonably found that SPP's Tariff filings and the Commission's Orders regarding those filings show that SPP intended to conduct a subsequent use analysis in determining whether to assess a credit payment obligation.  Xcel Rehearing Order PP 26-29,

33

JA 454-56; Kansas Electric Rehearing Order PP 41-42, JA 186-87;

Kansas Electric Order PP 66-69, JA 120-22; Xcel Order P 74, JA 390.

In 2005, when SPP originally proposed revenue crediting under

Attachment Z (*see supra* pp. 6-10 (discussing history of SPP's

Attachment Z and then Attachment Z2 Crediting Provisions)), it

proposed to reimburse upgrade sponsors from new point-to-point service

that increased load on an upgrade in the same direction as the overload

that caused the upgrade.  Kansas Electric Order P 66, JA 120.  The

Commission accepted the proposal but found it "'appropriate to grant

credits for subsequent network transmission service as well as point-to-

point requests that use the capacity created by [an upgrade].'"  Xcel

Rehearing Order P 26, JA 454 (quoting *Sw. Power Pool*, 111 FERC

¶ 61,118 P 72); Kansas Electric Rehearing Order P 41, JA 186 (same);

Kansas Electric Order P 67, JA 120 (same).

In a 2007 filing with the Commission, SPP reiterated that

upgrade sponsors would be reimbursed for the upgrade costs they

incurred through the payment of credits "for all subsequent incremental

utilization" of the upgrade.  Kansas Electric Order P 67, JA 120.

In a 2008 order accepting SPP's proposal to expand Attachment Z revenue credits to network upgrades, the Commission noted that upgrade sponsors are reimbursed for their upgrade costs when new transmission service uses the upgrade, consistent with the Commission's interconnection pricing policy. Xcel Rehearing Order P 26, JA 454 (citing *Sw. Power Pool*, 122 FERC ¶ 61,060 PP 30, 33); Kansas Electric Order P 68, JA 121 (same); Kansas Electric Rehearing Order P 41, JA 186 (same); *see also Sw. Power Pool*, 122 FERC ¶ 61,060 P 14 (noting that compensation to the funding customer occurs when use is made of the funded network upgrade).

And in SPP's 2008 filing seeking to split Attachment Z into Attachments Z1 and Z2, SPP proposed to remove from the Crediting Provisions certain language—"increases loading on" and "in the direction of the initial overload"—and to add in other language—"could not be provided but for". Xcel Rehearing Order P 27, JA 455; Kansas Electric Rehearing Order P 42, JA 187; Kansas Electric Order P 68, JA 121.

SPP's filing explained that it was making these changes to recognize that, although a particular upgrade may have been built to

enable transfer capability in a particular direction, it may also provide

benefits by increasing the ability to provide transmission service in the

opposite direction; so network customers taking new network service in

the opposite direction of the original overload would no longer be "free

riders." *See* Kansas Electric Order P 69, JA 122 (citing SPP 2008 filing

at Transmittal Letter pp. 7-8, *quoted in* X-R. 32, Xcel Rehearing

Request, at 22, JA 420).  SPP further explained that the proposal was

consistent with then-existing Tariff Attachment Z's requirement that

customers pay for new or increased uses of network upgrades.  *See id.*

(citing SPP 2008 filing at Transmittal Letter pp. 7-8, *quoted in* X-R. 32,

Xcel Rehearing Request, at 22, JA 420).[3]

---

[3] SPP's 2008 filing stated that:

> SPP has replaced the impact directional criterion used for revenue
> crediting purposes in Sections I.1 and I.2 of the new Attachment
> Z2 with language providing that revenue credits will be based on
> network and point-to-point service that could not be provided "but
> for" the existence of the upgrade.  SPP's currently effective Tariff
> only allows credits when new service increases loading in the
> direction of the initial overload.  SPP's proposed revision
> recognizes that, although a particular upgrade may have been
> built to enable transfer capability in a particular direction, it may
> also provide benefits by increasing the ability to provide
> transmission service in the opposite direction.  SPP's proposal is
> just and reasonable because (a) network customers taking new
> network service in the opposite direction of the original overload

In adding the "but for" language to the Crediting Provision, the Regional Operator did not indicate that it intended to implement an N-1 contingency analysis.  Xcel Rehearing Order P 28, JA 455; Kansas Electric Rehearing Order P 42, JA 187; Kansas Electric Order P 69, JA 122.  Rather, SPP indicated that it intended to continue to assess credit payment obligations for subsequent use of an upgrade.  *See* Xcel Rehearing Order P 28, JA 455; Kansas Electric Rehearing Order P 42, JA 187; Kansas Electric Order P 69, JA 122.

The Commission's 2008 Order accepting SPP's Attachment Z2 Crediting Provisions noted that SPP explained that it had removed the directional language and added the "but for" language to recognize that an upgrade may provide benefits not only in the direction of the overload that caused the upgrade to be built but also in the opposite

---

are no longer 'free riders' and (b) the proposal is consistent with currently effective Section VII.2 of Attachment Z (now Section [II.B] of Attachment Z2), which requires network customers to pay for new or increased uses of network upgrades.  Moreover, in approving the currently effective provision, the Commission found that "it is appropriate to grant credits for subsequent network transmission service as well as point-to-point requests that use the capacity created by a requested or economic upgrade." [quoting *Sw. Power Pool, Inc.*, 111 FERC ¶ 61,118 P 72].

SPP 2008 Filing at Transmittal Letter pp. 7-8, *quoted in* X-R. 32, Xcel Rehearing Request, at 22, JA 420.

direction. *Sw. Power Pool*, 111 FERC ¶ 61,118 P 32. And that Order pointed out that the revisions responded to the Commission's directive in *Sw. Power Pool*, 122 FERC ¶ 61,060 P 31, that SPP revise its revenue crediting provisions to provide credits in a manner consistent with the financial compensation process used for subsequent incremental use of economic upgrades. *See* Xcel Rehearing Order P 29, JA 456 (citing *Sw. Power Pool*, 123 FERC ¶ 61,208 n.24). As the Commission found here, its statement in *Sw. Power Pool*, 123 FERC ¶ 61,208 n.24, explicitly supports a subsequent use approach to implementing Attachment Z2. Xcel Rehearing Order P 29, JA 455.

Thus, as the Commission found, SPP's discussion of the Crediting Provisions in its Commission filings shows that SPP intended to apply a subsequent use approach in determining whether to assess credit payment obligations, and the Commission's Orders regarding those filings show that this was the Commission's understanding.

Kansas Electric and Xcel claim that the Commission "unreasonably infers that SPP did not intend to 'implement an N-1 contingency analysis' because SPP did not say so in its [2008 filing transmittal] letter." Br. at 36 (quoting Xcel Rehearing Order P 28,

JA 455). But the Commission's point was not only that SPP did not indicate that it intended to implement an N-1 contingency analysis, but also that its filing indicated that it intended to continue its prior Attachment Z practice of determining whether to assess credit payment obligations based on subsequent use. *See* Xcel Rehearing Order P 28, JA 455; Kansas Electric Rehearing Order P 42, JA 187; Kansas Electric Order P 69, JA 122.

Kansas Electric and Xcel note that Tariff language controls over conflicting transmittal letter language, but do not specify any purported conflicts. Br. at 37-38. The Commission did not see any conflicts between the Tariff language proposed in SPP's 2008 filing and the language in the transmittal letter SPP included as part of that filing. Rather, as the Commission explained, SPP's transmittal letter informed the meaning of the ambiguous Tariff language proposed in that filing. Xcel Rehearing Order PP 27-29, JA 455-56; Kansas Electric Rehearing Order P 42, JA 187; Kansas Electric Order PP 68-69, JA 121-22.

### b.    The White Paper

The Commission also reasonably found that SPP's White Paper demonstrated that SPP's intent was to conduct a subsequent use

analysis under Attachment Z2 to determine whether to assess crediting

payment obligations.  Kansas Electric Rehearing Order PP 39-40,

JA 185-86; Xcel Rehearing Order PP 7, 24-25, 28, 31-33, JA 445, 453-58;

Kansas Electric Order P 70, JA 122; Xcel Order PP 74-76, 390-91; *see*

*also* Xcel Rehearing Order P 30, JA 456 (finding that the significant

difficulty in implementing an N-1 contingency analysis is further

evidence that SPP did not intend to use that analysis).  (The White

Paper is discussed in more detail *supra* pp. 11-15.)

In 2012, SPP stakeholders (including Kansas Electric and Xcel)

universally endorsed the White Paper, which was prepared to provide

guidance to SPP in implementing Attachment Z2.  Xcel Rehearing

Order P 7, JA 445; Kansas Electric Rehearing Order P 6, JA 169.

The White Paper explained that it would be impractical to use an

N-1 contingency analysis to determine whether Attachment Z2's "but

for" standard is met.  Kansas Electric Order P 70, JA 122; White Paper

at 2-3, JA 274-75.  Using an N-1 contingency analysis would require all

Creditable Upgrades to be analyzed against hundreds of new

transmission service requests each hour.  Kansas Electric Order P 70,

JA 122; White Paper at 2-3, JA 274-75.  And the results of an N-1

contingency analysis could be altered by the order in which network upgrades are assessed and the order in which each new service request is added. Kansas Electric Order P 70, JA 122; White Paper at 3, JA 275. Moreover, since an N-1 contingency analysis first adds the requested service to the existing transmission system model, which includes service granted since the upgrade was determined to be needed, and then removes the upgrade, the more-recently granted service remaining in the analysis likely would no longer be feasible with the upgrade removed. Xcel Rehearing Order P 22, JA 451-53; White Paper at 2-3, JA 274-75.

The Commission agreed that using an N-1 contingency analysis here would be impractical and perhaps impossible. Xcel Rehearing Order P 22, JA 452; Kansas Electric Rehearing Order P 37, JA 184. As the Commission explained, using an N-1 contingency analysis under the Commission's traditional transmission pricing policy to assign *initial* cost responsibility for network upgrades is a straightforward, feasible exercise. Xcel Rehearing Order n.47, JA 452; Kansas Electric Rehearing Order n.85, JA 184; *see also* Xcel Rehearing Order P 21 & n.46, JA 451-52 (under Commission precedent an N-1 contingency

analysis is used to assign initial cost responsibility for network upgrades); Kansas Electric Rehearing Order P 37 & n.84, JA 183 (same). New service requests and incremental upgrades are marginal planning inputs vis-à-vis all previously granted service requests and the existing system, so modeling the system without each is an uncomplicated exercise. Xcel Rehearing Order n.47, JA 452; Kansas Electric Rehearing Order n.85, JA 184.

But under Attachment Z2 SPP does not determine whether to assign initial cost responsibility for network upgrades; that analysis occurs under Attachment Z1. Instead, Attachment Z2 addresses the assessment of credit payment obligations to reimburse those that paid for an upgrade. Using an N-1 contingency analysis in this scenario is much more complicated because, unlike in the initial cost assessment scenario, the base case model already accounts for the upgrade as well as other changes to the system and transmission service requests granted since the upgrade sponsor's request (all of which may depend on the upgrade's existence); so it is difficult to isolate a particular upgrade. Xcel Rehearing Order n.47, JA 452; Kansas Electric Rehearing Order n.85, JA 184; *see also* Xcel Rehearing Order P 22,

JA 451 (unlike in the initial cost responsibility context, it would be particularly problematic to apply an N-1 contingency analysis here, since it would have to be performed retroactively on upgrades that have already been determined to be needed, and the analysis would have to be conducted for each new service request hour by hour and upgrade by upgrade); Kansas Electric Rehearing Order P 37, JA 183 (same).

The White Paper recommended that SPP apply the subsequent use Reservation Stack Analysis to determine whether Attachment Z2's "but for" causation requirement is met. Xcel Rehearing Order P 24, JA 453; Kansas Electric Rehearing Order P 39, JA 185; White Paper at 3-4, JA 275-76.

Under the Reservation Stack Analysis, the Regional Operator first determines whether a newly granted transmission service reservation uses an upgrade at levels above a *de minimis* cut off. Xcel Rehearing Order P 24, JA 453; Kansas Electric Rehearing Order P 39, JA 185; White Paper at 4-6, JA 276-78. If so, the Regional Operator applies subsequent use rules depending on flow direction: Rule 1 applies to service reservations that flow on the upgrade in the same direction as the reservation that caused the upgrade to be needed; Rule 2 applies to

service reservations that flow on the upgrade in the opposite direction. Rehearing Order P 24, JA 453; Kansas Electric Rehearing Order P 39, JA 185; White Paper at 4-6, 8, JA 276-78, 280.

Under Rule 1, since SPP already determined (under Attachment Z1's N-1 contingency analysis) that the upgrade was needed to relieve a flow constraint caused by the upgrade sponsor's service request, all new reservations that flow on the upgrade in that direction satisfy the "but for" causation test. Xcel Order P 2, n.142, JA 359, 390; Xcel Rehearing Order P 24, JA 453; Kansas Electric Rehearing Order P 39, JA 185; White Paper at 8, JA 280.

Under Rule 2, because SPP had not already determined (under Attachment Z1) that the upgrade in question was needed to resolve constraints in the opposite direction, SPP determines whether the new service request would be facilitated by the capacity available before the upgrade. If so, Attachment Z2's "but for" test is not met. But if the capacity added by the upgrade was needed to facilitate the new service request, Attachment Z2's "but for" test is met. Xcel Rehearing Order P 24, JA 454; Kansas Electric Rehearing Order P 39, JA 185; White

Paper at 8, JA 280.   (The Reservation Stack Analysis is discussed in more detail *supra* pp. 12-15.)

Kansas Electric and Xcel challenge the Commission's reliance on the White Paper because it was developed after Attachment Z2 went into effect.  Br. at 36.  But the Commission relied on the White Paper only as the final piece in a long line of extrinsic evidence (the rest of which pre-dated or was contemporaneous with the filing removing the directional language from and adding the "but for" language to Attachment Z2) showing that SPP always intended to apply a subsequent use test in determining under Attachment Z2 whether to assess credit payment obligations.

Xcel acknowledges that using an N-1 contingency analysis might be difficult, but argues that it would not be infeasible because in 2018 the Commission accepted SPP's proposal to no longer consider short-term transmission requests in the Attachment Z2 crediting process.  Br. at 43-44 & n.7 (citing *Sw. Power Pool, Inc.*, 163 FERC ¶ 61,092 (2018), *cited in* Xcel Rehearing Order n.85, JA 460).  But that Tariff change only eliminated consideration of short-term service requests granted on or after February 1, 2018.  *Sw. Power Pool*, 163 FERC

45

¶ 61,092 PP 7, 12, 69, 78, 81. And SPP's decision to no longer consider short-term transmission requests does not show that, when it proposed the "but for" language, SPP did not intend to use a subsequent use analysis.

> ### 2. The Commission's Interpretation Of Attachment Z2 Appropriately Ensures That "But For" Causation Is Satisfied

Kansas Electric and Xcel argue that the Commission's interpretation of Attachment Z2 reads the "but for" causation test out of the Tariff. Br. at 36. They assert that, since electrical flows follow a path of least resistance on a transmission grid, the fact that a service reservation flows on an upgrade does not mean the upgrade is needed to provide that service. Br. at 38-43.

But Kansas Electric and Xcel miss the Commission's point. As already discussed, *supra* pp. 43-47, the Commission did not find that "but for" causation under Attachment Z2 is satisfied simply by flows on an upgrade. Rather, Attachment Z2 "but for" causation can be satisfied under the Reservation Stack Analysis only where: (1) a new service reservation flows on an upgrade that SPP already determined (in the Attachment Z1 process) was needed to provide the upgrade sponsor's

service request (Reservation Stack Analysis Rule 1); or (2) a new service reservation flows on an upgrade that SPP determines (in the Attachment Z2 process) added capacity needed to facilitate the new service request (Reservation Stack Analysis Rule 2). Xcel Rehearing Order P 24, JA 453; Kansas Electric Rehearing Order P 39, JA 185.

The Commission did not disregard the words "could not be provided" before "but for" in interpreting Attachment Z2 section II.B. *See* Pet. Br. at 34-35. Its interpretation honors those words by ensuring that credit payment obligations will be assessed only if SPP has found that the upgrade's capacity is needed to provide the new service. Xcel Rehearing Order P 24, JA 453; Kansas Electric Rehearing Order P 39, JA 185. And while Kansas Electric and Xcel complain that the Commission used the word "facilitated" in discussing its interpretation (Br. at 34, citing Xcel Rehearing Order PP 24-25, JA 453-54), the Commission's discussion in the cited paragraphs shows that the Commission used the words "facilitated" and "needed" interchangeably, with both intended to mean needed.

Kansas Electric and Xcel next claim that the Commission ignored its precedent providing that the Commission generally will define a

47

term consistently with industry usage if a tariff does not clearly define the term.  Br. at 37.  But again, the Commission explained that industry usage of "but for" means using an N-1 contingency analysis only in the context of assigning initial cost responsibility for network upgrades, not in the context of reimbursing those initially assigned costs.  Kansas Electric Rehearing Order PP 4, 37 & n.84, JA 168, 183; Xcel Rehearing Order P 22 & n.46, JA 451-52; Xcel Order P 2, n.142, JA 359, 390.  And the Commission explained why it would not make sense to use an N-1 contingency analysis in the context here.  Xcel Rehearing Order PP 21-22 & nn.46-47, JA 451-52; Kansas Electric Rehearing Order P 37 & nn.84-85, JA 183-85.

Xcel's claim that it was improperly assigned credit payment obligations for upgrades that did not increase transmission system capacity (i.e., "non-capacity upgrades"), Br. at 41-42, is not properly before the Court.  The Xcel Order considered Xcel's claim (*see* Xcel Order P 13 & n.29, JA 365) and SPP's responses refuting it (*see id.* at PP 35, 67, JA 374, 388), and determined that the claim lacked merit. Xcel Order P 76, JA 391.  Xcel did not challenge the Commission's determination in its request for rehearing of the Xcel Order.  X-R. 32,

JA 396-441.  So Xcel waived its opportunity to challenge that determination on appeal.  *See*, *e.g.*, *United Power, Inc. v. FERC*, 49 F.4th 554, 559 (D.C. Cir. 2022).

In any event, while SPP proposed in 2017 to prospectively eliminate revenue crediting for upgrades that do not increase power flow capacity on the transmission system, its proposal provided that non-capacity upgrades with upgrade sponsor funding commitments as of February 1, 2018, continue to be eligible for revenue crediting.  *See Sw. Power Pool*, 163 FERC ¶ 61,092 PP 6, 12.  And the Order accepting that proposal found that, even though non-capacity upgrades do not add capacity, they can provide benefits by enhancing reliability or operational flexibility.  *Sw. Power Pool*, 163 FERC 61,092 P 75.

## III. The Commission Reasonably Determined That Kansas Electric and Xcel Had Adequate Formal Notice That SPP Would Apply A Subsequent Use Analysis In Determining Whether To Assess Credit Payment Obligations

This Court explained in *Oklahoma Gas* that "notice may satisfy the filed rate doctrine when entities have formal notice of the rates . . . either through a FERC proceeding or through the courts."  11 F.4th at 831; *see also id.* ("these are not exceptions so much as further

49

elaborations of the boundaries of the statutory requirements that comprise the filed rate doctrine;" stakeholder process and study reports could not provide sufficient notice because they were not filed with the Commission); *Old Dominion*, 892 F.3d at 1231-32 ("no violation of the filed rate doctrine occurs when buyers are on adequate advance notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service"; statement on regional operator's website did not satisfy the filed rate doctrine because, among other reasons, it was not filed with the Commission) (internal quotation marks omitted); Kansas Electric Rehearing Order n.35, JA 174 (the type of notice that matters for the filed rate doctrine is formal notice, usually notice filed with the Commission) (citing *Oklahoma Gas*, 11 F.4th at 831).

Here, the Commission reasonably found that Kansas Electric and Xcel had sufficient formal notice that SPP would apply a subsequent use analysis in determining whether to assess credit payment obligations through Tariff Attachment Z2, SPP's filed statements in Commission rate proceedings, Commission Orders regarding those

filings, and Kansas Electric's and Xcel's service agreements with SPP.[4]
Xcel Rehearing Order PP 26-29, 39, 41, 42 & n.90, JA 454-56, 460-62;
Kansas Electric Rehearing Order P 18 & n.39, JA 175; Kansas Electric
Order PP 66-69, JA 120-22; Xcel Order P 76, JA 391.

First, Tariff Attachment Z2's text provided notice that revenue
credits would be assessed for subsequent use of an upgrade.  Xcel
Rehearing Order PP 39, 41, JA 460, 461; Kansas Electric Rehearing
Order P 18, JA 175.  For example, Attachment Z2 section II's
introductory paragraph states that revenue credits "are recoverable . . .
from new transmission service using the facility . . . ."  Xcel Rehearing
Order P 41 & n.90, JA 461; Kansas Electric Rehearing Order P 18 &
n.39, JA 175; *see also* Pet. Br. at A-27 (setting out Tariff provision);
*supra* p. 30 (noting other portions of Attachment Z2 providing notice
that revenue credits would be assessed for subsequent use of an
upgrade).  As this Court found in *Oklahoma Gas*, Attachment Z2 "set

---

[4] Kansas Electric and Xcel note that statements in unfiled study reports
cannot provide adequate notice for filed rate doctrine purposes.  Br. at
58-59.  On rehearing, the Commission recognized this and no longer
relied on study report statements (or on the White Paper) as providing
filed rate doctrine notice.  Xcel Rehearing Order PP 39-41, JA 460-61;
Kansas Electric Rehearing Order PP 16-18, 25, JA 173-75, 178.

forth the possibility of upgrade charges," requiring SPP customers who benefit from an upgrade to share the upgrade's costs.  11 F.4th at 824, 831, 832; *see also* Xcel Rehearing Order P 41, JA 461; Kansas Electric Rehearing Order P 18, JA 175 (citing *Okla. Gas*, 11 F.4th at 831).

Moreover, as already discussed, *supra* pp. 33-38, SPP's explanations of its Tariff's Crediting Provisions in Commission filings and the Commission's Orders regarding those filings provided notice that SPP would use a subsequent use approach in determining whether to assess Attachment Z2 credit payment obligations.  Kansas Electric Order PP 66-69, JA 120-22; Xcel Order P 76, JA 391; Xcel Rehearing Order PP 26-29, JA 454-56; Kansas Electric Rehearing Order PP 41-42, JA 186-87.

Furthermore, section 3.0 of Kansas Electric's and Xcel's filed transmission service agreements provides that the agreements' terms and conditions are governed by SPP's Tariff, which includes the Attachment Z2 revenue crediting provisions.  Xcel Rehearing Order P 39, JA 460; Kansas Electric Rehearing Order P 16 & n.34, JA 174. And Attachment 1 section 8.0 of Kansas Electric's service agreements provides that the appropriate charges for individual transactions will be

determined in accordance with the terms and conditions of SPP's Tariff. Kansas Electric Rehearing Order P 16, JA 174.

Kansas Electric and Xcel claim that Attachment Z2's language did not place them on notice of the possibility of upgrade charges because the Commission found that language ambiguous.  Br. at 48-49.  But the Commission found Attachment Z2 ambiguous only as to the specific analysis SPP should use to satisfy the provision's "but for" standard. And the Commission's sufficient notice finding was not based solely on Attachment Z2's language.  Rather, the Commission determined that Attachment Z2 section II's text, in conjunction with SPP's explanatory statements filed in Commission proceedings and the Commission's Orders on those filings, provided formal notice that SPP would apply a "subsequent use" analysis in determining whether Attachment Z2's "but for" standard is met.  Xcel Rehearing Order PP 26-29, 39, 41 & n.90, JA 454-56, 460-61; Kansas Electric Rehearing Order P 18 & n.39, JA 175; Kansas Electric Order PP 66-69, JA 120-22; Xcel Order P 76, JA 391.  Again, notice provided through Commission proceedings may satisfy the filed rate doctrine.  *Oklahoma Gas*, 11 F.4th at 831.  And Tariff Attachment Z2, SPP's filed explanatory statements, the

Commission's Orders on those filings, and the service agreements are all forms of notice provided through Commission proceedings.

Next, Kansas Electric asserts that it did not have notice because this Court already determined that Attachment Z2 did not provide notice of retroactive charges for the historical period (2008 through 2016) and Kansas Electric's service agreements were executed in 2012. Br. 49-50. But the prior determination Kansas Electric seems to refer to is *Oklahoma Gas*, 11 F.4th at 831. And there, affirming the Commission, the Court found that Attachment Z2 "set forth the possibility of upgrade charges" but "did not provide notice that upgrade users could be charged outside of [Tariff] Section I.7.1's [one-year] billing requirements." *Oklahoma Gas*, 11 F.4th at 831. So, in the orders underlying *Oklahoma Gas* the Commission directed SPP to refund historical period upgrade charges collected in contravention of the Tariff's billing limitation, and *Oklahoma Gas* affirmed that directive. *See Okla. Gas*, 11 F.4th at 826, 832-33; Kansas Electric Rehearing Order P 17, JA 174; Xcel Rehearing Order P 40, JA 461.[5]

---

[5] Throughout its brief, Kansas Electric repeatedly asserts that SPP assigned it $6.2 million in credit payment obligations. Br. at 1, 15, 17, 28, 59, 61, 66, 67. But in a footnote on page 15 of the brief, Kansas

In addition, Kansas Electric and Xcel argue that, even if Attachment Z2 provided notice of their credit payment obligations, the filed rate doctrine requires that they have notice of charges in their service agreements.  Br. at 50; *see also id.* at 50-59.  But as the Commission explained, section 3.0 of Kansas Electric's and Xcel's service agreements incorporates the Tariff into the service agreements. Xcel Rehearing Order P 39, JA 460; Kansas Electric Rehearing Order P 16 & n.34, JA 174; *see also* Xcel Rehearing Order P 39, JA 460 (when it executed the service agreements, Xcel subjected itself to the Tariff's terms, including Attachment Z2's revenue crediting provisions).  So Kansas Electric and Xcel's service agreements provided them notice that they could be assessed credit payment obligations for their subsequent use of network upgrades, and the filed rate doctrine was satisfied.  Xcel Rehearing Order P 41, JA 461; Kansas Electric Rehearing Order P 18, JA 175.

---

Electric acknowledges that "[a] portion of [Kansas Electric's] $6.2 million in directly assigned upgrade charges were billed for the historical period (before 2016)."  Kansas Electric does not indicate what portion of the assigned credit payment obligations relates to the historical period.

Kansas Electric and Xcel also contend that SPP was required to list the upgrades eligible for Attachment Z2 crediting in the service agreements. Br. at 51-55, 67. But Kansas Electric and Xcel undercut this contention by asserting that "[t]he service agreements could have said that it is unknown at this time whether particular upgrade costs will be assignable to the customer." Br. at 56, *see also id.* at 64 (same).

In any event, as the Commission noted, when Kansas Electric's and Xcel's service agreements were executed, SPP's Tariff did not require service agreements to include a list of upgrades eligible for Attachment Z2 crediting. *See* Kansas Electric Rehearing Order P 16 & n.32, JA 174 (explaining that SPP added this requirement to its Tariff in 2018) (citing *Sw. Power Pool*, 163 FERC ¶ 61092 P 6); Xcel Rehearing Order P 39 & n.85, JA 460 (same). And nothing in the service agreements required specification of all upgrades and charges. Xcel Rehearing Order P 39, JA 460.

It was sufficient under the filed rate doctrine that Kansas Electric and Xcel had notice through the Tariff that they could be assessed credit payment obligations for their subsequent use of network upgrades. Xcel Rehearing Order PP 39, 41, JA 460, 461; Kansas

Electric Rehearing Order PP 16, 18, JA 173, 175.  Federal Power Act

section 205(c), 16 U.S.C. § 824d(c), and Commission regulation

18 C.F.R. § 35.1(a) (*see* Pet. Br. at 52-53), which set out the filed rate

doctrine, require no more.

Nor does *Southern Company Services, Inc. v. FERC*, 353 F.3d 29,

33-34 (D.C. Cir. 2003).  *See* Pet. Br. at 53.  There, the Court found that

language in service agreements allowing recovery of "all costs and

expenses" related to planning and construction did not provide notice

that "all" would include outage costs when those costs were not

specified.  *S. Co. Servs.*, 353 F.3d at 34.  But here, Kansas Electric's and

Xcel's service agreements incorporate SPP's Tariff, which specifically

addresses revenue crediting and provides notice that they could be

assessed credit payment obligations for their subsequent use of network

upgrades.  Xcel Rehearing Order PP 39, 41, JA 460, 461; Kansas

Electric Rehearing Order PP 16, 18, JA 173, 175.  Kansas Electric and

Xcel knew (or should have known) that this was a consequence of

entering into the service agreements.  *See* Pet. Br. at 54.

Kansas Electric also argues that Attachment 1 section 8.0 of its

service agreements required SPP to list upgrades eligible for

Attachment Z2 crediting in its service agreements because that section
stated that "[s]ervice under this Service Agreement may be subject to
some combination of the charges detailed below."  Br. at 56.  But
Attachment 1 section 8.0 further provides that "'appropriate charges for
individual transactions will be *determined in accordance with the terms
and conditions of the Tariff*.'"  Kansas Electric Rehearing Order P 16,
JA 174 (quoting Tariff Attachment 1 section 8.0) (emphasis added by
Commission); *see also id.* at P 16 & n.34, JA 174 (section 3.0 of the
service agreements incorporates the Tariff into the service agreements);
Xcel Rehearing Order P 39, JA 460 (same).  And no provision in the
service agreements required specification of all upgrades and charges.
Xcel Rehearing Order P 39, JA 460.

Finally on this issue, Xcel claims that SPP was not sufficiently
transparent regarding its calculation of credit payment obligations.
Br. at 56.  But as the Commission explained, SPP market participants
had multiple means to examine credit payment obligation calculations,
including during multiple workshops and seminars regarding the
processes used to calculate credit payment obligations and one-on-one
sessions with SPP.  Xcel Rehearing Order PP 48-49, JA 464-65; Xcel

Order P 83, JA 394. On appeal, as before the Commission, Xcel has not explained why these means were insufficient to satisfy transparency requirements. *See* Xcel Rehearing Order P 49, JA 465.

## IV. The Commission Reasonably Determined That The Regional Operator Appropriately Complied With Attachment Z1's Study Process Rules

Kansas Electric's complaint asserted that SPP violated Attachment Z1 sections III (a) and (c) requirements to identify during the study process the upgrades necessary to provide the requested service and cost estimates for those upgrades. *See* Kansas Electric Rehearing Order P 19, JA 175.

The Commission found that the Regional Operator complied with these requirements. Table 3 of the 2010 transmission study report informed Kansas Electric, for each of its service requests, that "[c]redits may be required for the following Network Upgrades in accordance with Attachment Z2 of the SPP [Tariff]," and more generally that "*Credits may be required for applicable generation interconnection network upgrades." Kansas Electric Rehearing Order P 24, JA 178 (quoting Study Report Table 3 (KE-R. 1, Complaint Att. A-2) at pp. 32-35, JA 69-72); Kansas Electric Order P 63, JA 119. (These same notations were

also provided in Table 3 regarding the service requests by Xcel's affiliate Southwestern, which Table 3 listed as "SPSM". Study Report Table 3 (KE-R. 1, Complaint Att. A-2) at pp. 48-60, JA 73-85.)

These notations provided a reasonable placeholder estimate regarding Kansas Electric's possible network upgrade costs, consistent with Attachment Z1's study process rules. Kansas Electric Rehearing Order P 24, JA 178; Kansas Electric Order P 63, JA 119. As SPP explained in response to Kansas Electric's complaint, SPP could not provide accurate estimates of revenue crediting upgrade costs when it issued the study report because it was in the process of developing the Reservation Stack Analysis to definitively determine those costs; so SPP included the notations in study report Table 3 to inform Kansas Electric that Attachment Z2 credits may be assessed in the future. Kansas Electric Order P 63, JA 119 (citing KE-R. 33, SPP Answer to Complaint, at 11-12, JA 87-88); *see also* KE-R. 52, Kansas Electric Rehearing Request, at 15, JA 157 (acknowledging that "SPP could not provide accurate estimates.").

In light of the notice these study report notations provided, the Commission found that it was reasonable for the Regional Operator to

later "make corrections to the list of network upgrades," i.e., to assess credit payment obligations for upgrades not listed and/or whose costs were not specified in the study report. Kansas Electric Rehearing Order P 24, JA 178. As the Commission pointed out, Kansas Electric could have rejected the Regional Operator's offer of service if it did not want to accept potential future credit payment obligations. *Id.*; *see also* Br. at 60 (acknowledging that Kansas Electric could have withdrawn its service request after it received the study report).

Kansas Electric claims that the Commission erred in finding that SPP complied with Attachment Z1's requirements here. Br. at 59-67. First, Kansas Electric contends that, when SPP determined Kansas Electric's credit payment obligations in 2016, it assessed those obligations based on network upgrades that were not evaluated in the 2010 transmission study conducted under Tariff Attachment Z1. Br. at 61, 66. Kansas Electric is mistaken.

As the Commission determined, the record showed that all the upgrades for which Kansas Electric was assessed credit payment obligations were evaluated in the 2010 transmission study. Kansas Electric Order P 63, JA 119 (citing KE-R. 33, SPP Answer to Complaint,

at Purdy Affidavit P 8, JA 91); Kansas Electric Rehearing Order P 26,

JA 179; *see also* Kansas Electric Order P 20, JA 103 (noting SPP's

explanation that, when it conducted the Reservation Stack Analysis in

2016 to assess Attachment Z2 credit payment obligations, it based that

assessment on SPP's 2010 transmission system topology, applying the

Reservation Stack Analysis to the upgrades evaluated in the 2010

study) (citing KE-R. 33, SPP Answer to Complaint, at 18, JA 89).

Next, Kansas Electric claims that the notations in the 2010 study

report did not satisfy SPP's obligation to provide an estimate of upgrade

costs.  Br. at 62-64.  But again, the Commission found that the

notations that credits may be required provided a reasonable

placeholder estimate regarding possible network upgrade costs,

consistent with Attachment Z1's study process rules.  Kansas Electric

Rehearing Order P 24, JA 178; Kansas Electric Order P 63, JA 119.

Kansas Electric acknowledges that it would be sufficient under

Attachment Z1 to indicate that the amount of upgrade charges was

unknown.  Br. at 64.  The study report notations did just that.  There

was no need for SPP to seek a waiver of Attachment Z1's estimate

requirement here.  *See* Br. at 64.

Kansas Electric also contends that the Commission ignored that "there was some dispute over whether SPP had information it could have provided[.]"  Br. at 63 (citing Kansas Electric's Rehearing Request at 15, JA 157).  But as the Commission found, the record demonstrated that, while the upgrades in question were considered in the 2010 transmission study for Attachment Z1 purposes, SPP was not able to develop the special software needed to implement the Attachment Z2 revenue crediting analysis by the time the 2010 study report issued in 2012.  Kansas Electric Rehearing Order P 26, JA 179; *see also Okla. Gas*, 11 F.4th at 825 (SPP was not able to develop the special software needed to calculate revenue credits until 2015); 2010 Study Report (KE-R. 1, Complaint Att. A-2, at cover page, JA 64) (showing the study report issued in 2012).  So, when it issued the 2010 study report, SPP did not know which upgrades would be directly assigned to which customers via Attachment Z2 credit payment obligations.  Kansas Electric Rehearing Order P 26, JA 179.

The Commission did not find that SPP was excused from complying with Attachment Z1's estimate requirement because it was unable to do so.  *See* Pet. Br. at 64.  Rather, the Commission found that

SPP complied with the estimate requirement in the circumstances here by stating in Table 3 of the study report that Attachment Z2 credits may be required.  Kansas Electric Rehearing Order P 24, JA 178; Kansas Electric Order P 63, JA 119.

Kansas Electric further asserts that, since study reports are not filed with the Commission and therefore notations in them would not constitute formal notice of costs for filed rate doctrine purposes, the Commission cannot find that the study report notations satisfied SPP's Attachment Z1 requirement to provide estimated costs in the study report.  Br. at 65-66.  But Kansas Electric's Attachment Z1 contention below and here is that SPP violated Attachment Z1 by failing to provide Kansas Electric upgrade cost estimates in the study report.  *See* Kansas Electric Rehearing Order PP 19-26, JA 175-79.  So, it was wholly appropriate, and indeed necessary, for the Commission to determine whether SPP provided the required estimates in the study report based on the contents of that report.

Xcel raises one contention in the Attachment Z1 portion of the brief—that the Commission purportedly sidestepped its rehearing claim that SPP was required to perform specific tasks under Attachment Z1.

Br. at 67.  But as Xcel's brief indicates, its rehearing request and brief

quote the version of Attachment Z1 that apparently was effective in

2013, Br. at 67, not the version in effect when the 2010 study was

performed, *id.* at 8 n.2 (noting that the then-effective Attachment Z1 is

included in the Addendum at A-9).

And Xcel's rehearing request raised this contention to support its

argument that credit payment obligations could be assessed only for

upgrades listed in service agreements.  X-R. 32 at 31-33, JA 429-31.

The Commission appropriately responded to that rehearing claim by

explaining that:  (1) SPP's Tariff did not require service agreements to

list upgrades eligible for Attachment Z2 crediting until 2018, after

Xcel's service agreement was executed (Xcel Rehearing Order P 39 &

n.85, JA 460 (citing *Sw. Power Pool*, 163 FERC ¶ 61092 P 6));

(2) nothing in the service agreement required specification of all

upgrades and charges (*id.* at P 39, JA 460); and (3) Attachment Z2,

which was incorporated into Xcel's service agreement, provided notice

that Xcel could be assessed credit payment obligations for its

subsequent use of network upgrades (*id.* at PP 39, 41, JA 460, 461).

## CONCLUSION

For the foregoing reasons, the petitions for review should be denied, and the Commission's orders should be affirmed.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Beth G. Pacella*
Beth G. Pacella
Deputy Solicitor

Federal Energy Regulatory
   Commission
888 First Street, N.E.
Washington, D.C. 20426
Phone:  (202) 502-6048
Email:  beth.pacella@ferc.gov

March 17, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's July 25, 2022, Order because this brief contains 12,580 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word 365.

*/s/ Beth G. Pacella*
Beth G. Pacella
Deputy Solicitor

Federal Energy Regulatory
  Commission
888 First Street, N.E.
Washington, D.C. 20426
Phone:  202-502-6048
E-mail:  beth.pacella@ferc.gov

March 17, 2023

# ADDENDUM

## STATUTES

## AND

## REGULATIONS

# Table Of Contents

**Statutes**:                                                                        **Page**

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ........................................................................... A-1

Federal Power Act

    Section 205, 16 U.S.C. § 824d ...................................................... A-2

    Section 206, 16 U.S.C. § 824e ...................................................... A-3

    Section 313, 16 U.S.C. § 825*l* ...................................................... A-6

**Regulation:**

    18 C.F.R. § 35.1 ............................................................................. A-7

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface to the report.

**Editorial Notes**

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.  Congressional review.
802.  Congressional disapproval procedure.
803.  Special rule on statutory, regulatory, and judicial deadlines.
804.  Definitions.
805.  Judicial review.
806.  Applicability; severability.
807.  Exemption for monetary policy.
808.  Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit

State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

## § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years there-

after, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

**§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission**

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteenth-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for

---

[1] See References in Text note below.

A-4

a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

### REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), substituted ''hearing held'' for ''hearing had'' in first sentence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out ''the public utility to make'' before ''refunds of any amounts paid'' in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted ''the date of the filing of such complaint nor later than 5 months after the filing of such complaint'' for ''the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period'', in third sentence, substituted ''the date of the publication'' for ''the date 60 days after the publication'' and ''5 months after the publication date'' for ''5 months after the expiration of such 60-day period'', and in fifth sentence, substituted ''If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision'' for ''If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

### EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–473, § 4, Oct. 6, 1988, 102 Stat. 2300, provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: Provided, however, That such complaints may be withdrawn and refiled without prejudice.''

### LIMITATION ON AUTHORITY PROVIDED

Pub. L. 100–473, § 3, Oct. 6, 1988, 102 Stat. 2300, provided that: ''Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.].''

### STUDY

Pub. L. 100–473, § 5, Oct. 6, 1988, 102 Stat. 2301, directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

### § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, § 207, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

### § 824g. Ascertainment of cost of property and depreciation

#### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

#### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, § 208, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

A-5

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

### (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

#### CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

#### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon," substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United

35.3  Notice requirements.
35.4  Permission to become effective is not approval.
35.5  Rejection of material submitted for filing.
35.6  Submission for staff suggestions.
35.7  Electronic filing of tariffs and related materials.
35.8  Protests and interventions by interested parties.
35.9  Requirements for filing rate schedules, tariffs or service agreements.
35.10  Form and style of rate schedules, tariffs and service agreements.
35.10a  Forms of service agreements.
35.10b  Electric Quarterly Reports.
35.11  Waiver of notice requirement.

**Subpart B—Documents To Be Submitted With a Filing**

35.12  Filing of initial rate schedules and tariffs.
35.13  Filing of changes in rate schedules, tariffs or service agreements.

**Subpart C—Other Filing Requirements**

35.14  Fuel cost and purchased economic power adjustment clauses.
35.15  Notices of cancellation or termination.
35.16  Notice of succession.
35.17  Withdrawals and amendments of rate schedule, tariff or service agreement filings.
35.18  Asset retirement obligations.
35.19  Submission of information by reference.
35.19a  Refund requirements under suspension orders.
35.21  Applicability to licensees and others subject to section 19 or 20 of the Federal Power Act.
35.22  Limits for percentage adders in rates for transmission services; revision of rate schedules, tariffs or service agreements.
35.23  General provisions.
35.24  Tax normalization for public utilities.
35.25  Construction work in progress.
35.26  Recovery of stranded costs by public utilities and transmitting utilities.
35.27  Authority of State commissions.
35.28  Non-discriminatory open access transmission tariff.
35.29  Treatment of special assessments levied under the Atomic Energy Act of 1954, as amended by Title XI of the Energy Policy Act of 1992.

**Subpart D—Procedures and Requirements for Public Utility Sales of Power to Bonneville Power Administration Under Northwest Power Act**

35.30  General provisions.
35.31  Commission review.

**Subpart E—Regulations Governing Nuclear Plant Decommissioning Trust Funds**

35.32  General provisions.
35.33  Specific provisions.

**Subpart F—Procedures and Requirements Regarding Regional Transmission Organizations**

35.34  Regional Transmission Organizations.

**Subpart G—Transmission Infrastructure Investment Procedures**

35.35  Transmission infrastructure investment.

**Subpart H—Wholesale Sales of Electric Energy, Capacity and Ancillary Services at Market-Based Rates**

35.36  Generally.
35.37  Market power analysis required.
35.38  Mitigation.
35.39  Affiliate restrictions.
35.40  Ancillary services.
35.41  Market behavior rules.
35.42  Change in status reporting requirement.
APPENDIX A TO SUBPART H OF PART 35—STANDARD SCREEN FORMAT
APPENDIX B TO SUBPART H OF PART 35—CORPORATE ENTITIES AND ASSETS SAMPLE APPENDIX

**Subpart I—Cross-Subsidization Restrictions on Affiliate Transactions**

35.43  Generally.
35.44  Protections against affiliate cross-subsidization.

**Subpart J—Credit Practices In Organized Wholesale Electric Markets**

35.45  Applicability.
35.46  Definitions.
35.47  Tariff provisions governing credit practices in organized wholesale electric markets.

AUTHORITY: 16 U.S.C. 791a–825r, 2601–2645; 31 U.S.C. 9701; 42 U.S.C. 7101–7352.

SOURCE: Order 271, 28 FR 10573, Oct. 2, 1963, unless otherwise noted.

## Subpart A—Application

**§ 35.1  Application; obligation to file rate schedules, tariffs and certain service agreements.**

(a) Every public utility shall file with the Commission and post, in conformity with the requirements of this part, full and complete rate schedules

**Federal Energy Regulatory Commission**  §35.1

and tariffs and those service agreements not meeting the requirements of §35.1(g), clearly and specifically setting forth all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, the classifications, practices, rules and regulations affecting such rates, charges, classifications, services, rules, regulations or practices, as required by section 205(c) of the Federal Power Act (49 Stat. 851; 16 U.S.C. 824d(c)). Where two or more public utilities are parties to the same rate schedule or tariff, each public utility transmitting or selling electric energy subject to the jurisdiction of this Commission shall post and file such rate schedule, or the rate schedule may be filed by one such public utility and all other parties having an obligation to file may post and file a certificate of concurrence on the form indicated in §131.52 of this chapter: *Provided, however,* In cases where two or more public utilities are required to file rate schedules or certificates of concurrence such public utilities may authorize a designated representative to file upon behalf of all parties if upon written request such parties have been granted Commission authorization therefor.

(b) A rate schedule, tariff, or service agreement applicable to a transmission or sale of electric energy, other than that which proposes to supersede, cancel or otherwise change the provisions of a rate schedule, tariff, or service agreement required to be on file with this Commission, shall be filed as an initial rate in accordance with §35.12.

(c) A rate schedule, tariff, or service agreement applicable to a transmission or sale of electric energy which proposes to supersede, cancel or otherwise change any of the provisions of a rate schedule, tariff, or service agreement required to be on file with this Commission (such as providing for other or additional rates, charges, classifications or services, or rules, regulations, practices or contracts for a particular customer or customers) shall be filed as a change in rate in accordance with §35.13, except cancellation or termination which shall be filed as a change in accordance with §35.15.

(d)(1) The provisions of this paragraph (d) shall apply to rate schedules, tariffs or service agreements tendered for filing on or after August 1, 1976, which are applicable to the transmission or sale of firm power for resale to an all-requirements customer, whether tendered pursuant to §35.12 as an initial rate schedule or tendered pursuant to §35.13 as a change in an existing rate schedule whose term has expired or whose term is to be extended.

(2) Rate schedules, tariffs or service agreements covered by the terms of paragraph (d) of this section shall contain the following provision when it is the intent of the contracting parties to give the party furnishing service the unrestricted right to file unilateral rate changes under section 205 of the Federal Power Act:

Nothing contained herein shall be construed as affecting in any way the right of the party furnishing service under this rate schedule to unilaterally make application to the Federal Energy Regulatory Commission for a change in rates under section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations promulgated thereunder.

(3) Rate schedules, tariffs or service agreements covered by the terms of paragraph (d)(1) of this section shall contain the following provision when it is the intent of the contracting parties to withhold from the party furnishing service the right to file any unilateral rate changes under section 205 of the Federal Power Act:

The rates for service specified herein shall remain in effect for the term of _____ or until _____, and shall not be subject to change through application to the Federal Energy Regulatory Commission pursuant to the provisions of Section 205 of the Federal Power Act absent the agreement of all parties thereto.

(4) Rate schedules covered by the terms of paragraph (d)(1) of this section, but which are not covered by paragraphs (d)(2) or (d)(3) of this section, are not required to contain either of the boilerplate provisions set forth in paragraph (d)(2) or (d)(3) of this section.

(e) No public utility shall, directly or indirectly, demand, charge, collect or receive any rate, charge or compensation for or in connection with electric service subject to the jurisdiction of

277

the Commission, or impose any classification, practice, rule, regulation or contract with respect thereto, which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for good cause shown.

(f) A rate schedule applicable to the sale of electric power by a public utility to the Bonneville Power Administration under section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act (Pub. L. No. 96–501 (1980)) shall be filed in accordance with subpart D of this part.

(g) For the purposes of paragraph (a) of this section, any service agreement that conforms to the form of service agreement that is part of the public utility's approved tariff pursuant to §35.10a of this chapter and any market-based rate service agreement pursuant to a tariff shall not be filed with the Commission. All agreements must, however, be retained and be made available for public inspection and copying at the public utility's business office during regular business hours and provided to the Commission or members of the public upon request. Any individually executed service agreement for transmission, cost-based power sales, or other generally applicable services that deviates in any material respect from the applicable form of service agreement contained in the public utility's tariff and all unexecuted agreements under which service will commence at the request of the customer, are subject to the filing requirements of this part.

[Order 271, 28 FR 10573, Oct. 2, 1963, as amended by Order 541, 40 FR 56425, Dec. 3, 1975; Order 541–A, 41 FR 27831, July 7, 1976; 46 FR 50520, Oct. 14, 1981; Order 337, 48 FR 46976, Oct. 17, 1983; Order 541, 57 FR 21734, May 22, 1992; Order 2001, 67 FR 31069, May 8, 2002; Order 714, 73 FR 57530, 57533, Oct. 3, 2008; 74 FR 55770, Oct. 29, 2009]

§ 35.2  Definitions.

(a) *Electric service.* The term *electric service* as used herein shall mean the transmission of electric energy in interstate commerce or the sale of electric energy at wholesale for resale in interstate commerce, and may be comprised of various classes of capacity and energy sales and/or transmission services. *Electric service* shall include the utilization of facilities owned or operated by any public utility to effect any of the foregoing sales or services whether by leasing or other arrangements. As defined herein, *electric service* is without regard to the form of payment or compensation for the sales or services rendered whether by purchase and sale, interchange, exchange, wheeling charge, facilities charge, rental or otherwise.

(b) *Rate schedule.* The term *rate schedule* as used herein shall mean a statement of (1) electric service as defined in paragraph (a) of this section, (2) rates and charges for or in connection with that service, and (3) all classifications, practices, rules, or regulations which in any manner affect or relate to the aforementioned service, rates, and charges. This statement shall be in writing and may take the physical form of a contract, purchase or sale or other agreement, lease of facilities, or other writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof. A rate schedule is designated with a Rate Schedule number.

(c)(1) *Tariff.* The term *tariff* as used herein shall mean a statement of (1) electric service as defined in paragraph (a) of this section offered on a generally applicable basis, (2) rates and charges for or in connection with that service, and (3) all classifications, practices, rules, or regulations which in any manner affect or relate to the aforementioned service, rates, and charges. This statement shall be in writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof. A tariff is designated with a Tariff Volume number.

(2) *Service agreement* as used herein shall mean an agreement that authorizes a customer to take electric service under the terms of a tariff. A service agreement shall be in writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof. A service agreement is designated with a Service Agreement number.

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d) and the Court's Administrative

Order Regarding Electronic Case Filing, I hereby certify that I have, this 17th day

of March 2023, served the foregoing upon the counsel listed in the Service

Preference Report via email through the Court's CM/ECF system.


/s/ Beth G. Pacella
Beth G. Pacella
Deputy Solicitor


Federal Energy Regulatory
 Commission
888 First Street, NE
Washington, DC  20426
Tel.:  (202) 502-6048
Email:  Beth.Pacella@ferc.gov